ORIGINAL

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

FILED
AUG 3 0 2007
U.S. COURT OF FEDERAL CLAIMS

SEALIFT, INC.
68 West Main Street
Oyster Bay, NY 11771,

Plaintiff,

v.

THE UNITED STATES OF AMERICA
950 Constitution Ave., NW
Washington, DC 20530,

Defendant.

No. 07 – 627C
(Judge Braden)

**Amended Complaint**

This case involves a competitive procurement conducted by the Military Sealift Command ("MSC"), an operating activity of the Department of the Navy, for the long-term lease (referred to as a "time charter") of a U.S.-flag tank vessel. Had the winning offer been properly disqualified because it contained a material misrepresentation of the vessel's fuel consumption rate and the vessel offered had ship repair work done outside the United States contrary to applicable law, Plaintiff-Sealift would have been awarded the contract as the next lowest responsible offeror. In addition, had MSC not waived other material solicitation requirements – such as those relating to the provision of vetting certificates, obtaining security clearances and a limitation against subcontracting for personnel – Plaintiff-Sealift would have been awarded the contract.

Plaintiff-Sealift alleges the following in support of its Complaint for declaratory and injunctive relief against the United States of America:

**Jurisdiction and Venue**

1. This Court has jurisdiction and venue over this action pursuant to The Tucker Act, codified at 28 U.S.C. § 1491(b) (2000).

**Parties**

2. Plaintiff Sealift, Inc., a company organized under the laws of New York with offices in Oyster Bay, New York, is the operator of twelve U.S.-flag vessels operating in the international trade.

3. Defendant is the United States of America.

The cognizant Contracting Officer for the contract at issue is:

Kenneth Allen
Contracting Officer
Military Sealift Command
Department of the Navy
Washington Navy Yard
914 Charles Morris Court, S.E.
Washington, D.C. 20398
Telephone: 202 685-5825
Facsimile: 202 685-5852
Electronic Mail: kenneth.allen@navy.mil

**Actions Complained of**

4. In Solicitation N 00033 – 06 – R – 5409 dated 31 March 2006 ("Solicitation"), the Military Sealift Command ("MSC") sought offers under a negotiated procurement for the time charter of a tank vessel for operations in the Pacific beginning in October 2006 for a base period of one year with three one year options and one 11 month option period. A time charter is a service contract in which the contractor is responsible for operating the vessel including engaging the crew and

maintaining and navigating the vessel in accordance with the direction of MSC. Fuel under a time charter is an expense of the vessel operator that is reimbursed by the time charterer (*i.e.*, by MSC in the case of the Solicitation).

5. The Solicitation sought detailed information on the size, draft, pumping capacity, configuration, fuel consumption, and other particulars of the vessels offered. Reflagging or repair work to enable the vessel to meet the U.S.-flag registration requirements and to meet military standards was required to be performed in the United States pursuant to the Solicitation, applicable regulation and the Cargo Preference Act of 1904, as amended, 10 U.S.C. § 2631. Award was to be based on price only. Price was to be evaluated based on offered charter hire rates on the "entire charter period (including options), cost of fuel, and any other costs set forth in the offer." Solicitation, pg. XI-1. Fuel price conversion factors were specified for various types of marine fuel. *Id.*

6. MSC has had a continuing requirement for this service for the last decade or more. Plaintiff-Sealift has been the continuous incumbent contractor during that time most recently with its vessel the *Montauk*.

7. In March 2006 Plaintiff-Sealift submitted a timely, responsive offer of its vessel the *Montauk* in response to the Solicitation.

8. TransAtlantic Lines LLC ("TAL"), which had never operated a tank vessel, submitted an offer while in possession of significant confidential information about Sealift's vessel characteristics and costs owing to disclosures by MSC in connection with a 2005 solicitation. In February 2005, MSC issued a solicitation for a long-term tanker charter contract. After award was made to Sealift in June of

2005, TAL protested the award to the Government Accountability Office ("GAO") in June 2005. In connection with the GAO protest, MSC provided TAL with a spread sheet, including evaluation of the financing and fuel calculations relating to *TAL's offer*. MSC inadvertently also attached a spread sheet containing financing and fuel calculations relating to *Sealift's offer*. TAL could have noted the mistake in the tabs provided with the spread sheets and declined to review the information regarding Sealift that it knew it should not have been provided. Instead, TAL chose to take commercial advantage of MSC's mistake and used the ill-begotten information as the basis for its GAO protest. MSC, after inviting submissions from parties as to how to remedy the error, decided to disclose to Sealift information relating to TAL's offer in an attempt to equalize the advantages of the offerors. TAL lost control of the vessel it had offered originally, although it had represented it was the vessel "owner" to MSC, and proved unable to secure another vessel in the intervening time. Accordingly, Sealift was awarded a contract for nine months in late 2005.

9. On or about June 23, 2006, MSC made award of the time charter to TAL under the Solicitation.

10. Sealift protested the status of TAL as a small business to the Small Business Administration and the size protest was dismissed. Sealift protested the award under the Solicitation to GAO on August 7, 2006. On October 17, 2006, GAO granted the agency motion to dismiss Sealift's protest without production of an agency record.

**11.** On or about November 10, 2006, TAL tendered its vessel *Bonito,* which had been renamed the *Transatlantic* when it was reflagged to U.S. registry in late October 2006, in Japan. On or about November 19, 2006, MSC took delivery of the TAL vessel *Transpacific* under the time charter.

**12.** TAL failed to deliver the *Transpacific* by the November 1, 2006 canceling date specified under the Solicitation. MSC accordingly, extended the charter of the Sealift's vessel, the *Montauk*, to cover the gap in service.

**13.** On or about November 22, 2006 Sealift's vessel, the *Montauk*, which had been providing the service under the 2005 contract award, including extensions, was taken off hire by MSC.

**14.** The primary elements of the total cost of the Government on the Solicitation for the time charter were the daily charter hire rate, which could vary by year, and the fuel consumption. The daily hire rate incorporated the costs of crewing, operation, insuring, and financing the vessel. In this case the Solicitation contemplated that the Government would ordinarily supply the fuel itself to the chartered vessel or, on occasion, reimburse the owner for the fuel.

**15.** TAL offered a time charter hire rate that was very close to Sealift's owing to the benefit of the confidential information on the Sealift vessel *Montauk* provided to TAL by MSC in 2005.

**16.** The cost evaluation of the fuel consumption was the critical determinant of the cost evaluation in the award.

**Misrepresentation of Fuel Consumption Rate by TAL**

17. TAL's warranted fuel consumption rate for the *Transpacific* was materially inaccurate. If accurate fuel consumption for TAL's vessel had been used, Sealift's offer would have been lower than that of TAL, and Sealift would have been awarded the contract.

18. Under the Solicitation, each offeror was required to warrant the fuel consumption of its vessel at 12 knots and the fuel consumption would be evaluated at costs specified in the Solicitation for each grade. The Solicitation provides at page II-7 that "[a]ll the fuel and speed characteristics provided in Part I shall be deemed warranties." Speed is defined in IV-4 as the rate derived from hours divided by distance "as shown in the Vessel's logs." The "cost of fuel" was to be evaluated in accordance with the prescribed scenario, 60% of the time underway laden at 12 knots using the information from Boxes 88 and 90 of the Solicitation, 28% in-port idle per Box 91a, and 12% in-port discharge per Box 91b. See Solicitation at pg. XI-1. Since the price of fuel and the speed were all fixed in the Solicitation, the only variable was the vessel fuel consumption rate underway.

19. The *Transpacific* has a nearly identical hull configuration, displacement and propeller arrangement as Plaintiff-Sealift's vessel *Montauk*. Both vessels have B&W Alpha engines with the *Transpacific*'s 2720 KW being somewhat larger that the *Montauk*'s 1966 KW. The larger engine on the *Transpacific* should have fuel consumption no less than that of the *Montauk*. Yet, according to the post-award debriefing information, TAL warranted its consumption at substantially less that of the *Montauk*.

20. Before its purchase by TAL, the *Transpacific* (then the *Bonito*) was managed commercially by Nordtank Shipping A/S, who was identified as the commercial managers by the vessel owners' website. Nordtank Shipping published vessel particulars on their website showing "Speed / Consumption: 12,0 knots / 12 mts" for the *Bonito*. This datum is inherently reliable because it was intended for commercial charterers to use to evaluate the cost of the vessel.

21. Using the equivalencies in the Solicitation, TAL warranted a consumption rate of approximately 31% less than the current commercial managers were advising the trade as the *Transpacific's* consumption at 12 knots.

22. Had the *Transpacific's* correct consumption rate been utilized, it would have increased TAL's offer by an amount sufficient to make its offer more costly than Plaintiff-Sealift's offer.

23. The material misrepresentation of the TAL offer was patent and should have been clear to MSC. The material misrepresentation should have caused MSC to disqualify TAL's offer or, at a minimum, MSC should have used an accurate figure.

**Reflagging and Repairs of the *Transpacific* Outside of the United States**

24. The Solicitation provided at page I-8 that " [a]ny reflagging or repair work to (1) enable the vessel to meet applicable standards to become a vessel of the United States; or (2) to convert the vessel to a more militarily useful configuration must be performed in the United States." This requirement tracks the terms of 10 U.S.C. § 2631(b) and implementing regulations. Further, section 2631(b)(3) provides that the Secretary of Defense may waive the reflagging or repair

requirements only if "the Secretary determines that such waiver is critical to the national security of the United States." *Id.*

**25.** The *Bonito* was under Swedish registry when TAL purchased it after the award of the Solicitation. TAL took the *Bonito* to a shipyard in Singapore on or about October 2, 2006. The vessel was at the shipyard for more than one week during which time refitting of the fire protection system, deck welding and upgrading of certain piping work were done. The vessel had its CO2 fire protection systems removed and upgraded with the assistance of Fire Protection Services, Inc. a Houston-based company specializing in the conversion of vessels to U.S.-flag standards.

**26.** The work conducted at the shipyard in Singapore constituted reflagging or repair work within the meaning of the Solicitation and 10 U.S.C. § 2631.

**27.** The *Bonito* departed Singapore and arrived at Guam, its first United States port since purchase, on Friday, October 20, 2006. On Monday, October 23, 2006, the *Bonito* was attached by judicial order at the request of a commercial creditor, a Guam shipyard, in connection with an overdue account from another TAL vessel. During the time the vessel was arrested, it was in the custody of a marshal or his designated agent. The attachment order was lifted on Friday, October 27, 2006. The vessel sailed from Guam bound for Japan on or about Monday, October 30, 2006. The vessel had approximately nine days available for reflagging or repair work to be done in Guam, counting the time the vessel was in the custody of the marshal, before it sailed for Japan.

**28.** Plaintiff-Sealift advised MSC of some of the work done on the vessel in the shipyard in Singapore. MSC was also aware of the itinerary of the vessel as it was positioning for delivery under the time charter. MSC sent a representative to the vessel when it was in Singapore. The fact that the *Bonito* never entered a U.S. shipyard and was available for work in Guam for nine days, at most, including the time that the vessel was in custody of a marshal, was so patent it should have caused MSC to demand specific confirmation of compliance with the U.S. reflagging requirements of 10 U.S.C. § 2631 and the Solicitation noted above.

**29.** TAL's use of the shipyard in Singapore for reflagging and repair work was a material violation of the Solicitation and 10 U.S.C. § 2631 which could not be waived under the circumstances presented and should have caused MSC to disqualify TAL and its vessel.

**Limitations of Subcontracting for Personnel**

**30.** TAL did not own or operate a tanker prior to the Solicitation so it had no current officers or crew experienced in the operation of tank vessels. Thus, as it had in the past, TAL proposed to use a vessel manager or crewing agent to hire the crew and provide technical management services. Interposition of such a manager or agent as a subcontractor to engage the crew meant that TAL would not itself have "appointed or hired" the officers and crew and that TAL would not expend at least 50 per cent of the costs of personnel for direct employees, not contract employees.

**31.** TAL wrongly warranted its ability to fulfill the crewing requirement of the Solicitation that "[t]he Master, Officers and crew of this Vessel shall be appointed or hired by the Owner," pg. III – 3, and that "[a]t least 50 percent of the cost of

contract performance incurred for personnel shall be expended for employees of the concern." See Solicitation VI-2.

**32.** The material misrepresentation of the TAL offer as to crewing was patent and should have been clear to MSC. The material misrepresentation should have caused MSC to disqualify TAL's offer.

**MSC Collective Waivers Granted to TAL**

**33.** MSC waived a number of other terms of the Solicitation such that the essential terms of the contract were modified for TAL.

**34.** Specifically, the Solicitation required that the vessel have vetting certificates from commercial petroleum refiners no less that 10 days prior to the canceling date. The TAL's vessel did not have any vetting certificated by October 21, 2006 or, indeed, by November 1, 2006, the canceling date. When in November 2006 the *Transpacific* first called a refinery in Korea, MSC permitted the vessel to call the commercial refinery there even though the vessel lacked the requisite vetting certificates as contemplated by the Solicitation.

**35.** MSC declared repeatedly to each offeror that time was of the essence in the delivery schedule and that failure to deliver the vessel by the canceling date would result in cancellation of any award as permitted by the Solicitation. TAL failed to deliver the vessel by November 1. MSC waived the failure of TAL to meet the November 1, 2006 when it accepted the vessel later in the month.

**36.** The Solicitation required each offeror to obtain a security clearance. At the time of its offer, TAL had a demonstrated inability to obtain a security clearance

having failed to obtain one for more than 18 months under another defense contract.

**37.** When the *Transpacific* was tendered to MSC in November 2006, it had a non-citizen crew member on board in violation of law and of the terms of the Solicitation.

**Count I**

**The Source Selection Decision Based on False Information In TAL's Offer Violated the Competition in Contracting Act and FAR**

**38.** Each and every allegation of paragraphs nos. 1 to 37 is incorporated herein by reference.

**39.** The contracting officer's cost evaluation of TAL's offer was based on TAL's material and patent misrepresentation of the fuel consumption of its vessel. TAL's offer should have been disqualified owing to the misrepresentation under the Competition in Contracting Act, 10 U.S.C. § 2304(a)(1)(A) and the Federal Acquisition Regulation at 48 C.F.R. § 6.101.

**40.** If an accurate fuel consumption rate of the vessel *Transpacific* had been used in the evaluation, award would have been made to Plaintiff-Sealift.

**41.** The actions of the contracting officer were arbitrary, capricious, an abuse of discretion and not in accordance with law under 5 U.S.C. § 706.

**Count II**

**TAL's Vessel was Ineligible for Award under the Solicitation Owing to the Reflagging and Repairs Performed Outside the United States**

**42.** Each and every allegation of paragraphs nos. 1 to 37 is incorporated herein by reference.

**43.** TAL 's vessel *Transpacific* was and remains ineligible for award under the Solicitation and under the Cargo Preference Act, 10 U.S.C. § 2631 by reason of the reflagging and repair work done outside the United States to enable the vessel to meet the U.S.-flag registration requirements and military standards.

**44.** The acceptance of the vessel by the contracting officer was arbitrary, capricious, an abuse of discretion and not in accordance with law under 5 U.S.C. § 706.

**Count III**

**The Contracting Officer Materially Altered the Material Terms of the Solicitation in Favor of TAL**

**45.** Each and every allegation of paragraphs nos. 1 to 37 is incorporated herein by reference.

**46.** TAL's offer failed to comply with the Solicitation and FAR section 52.219-14(b)(1) in so far as TAL would not incur at least fifty percent of its labor costs on the contract from its own employees. TAL's declared intention in its offer to contract for the officers and crew on the vessel in violation of the Solicitation

requirement was patently in contravention of this term. The TAL offer should have been excluded from consideration on this basis.

**47.** The contracting officer likewise waived the requirements for vetting certificates from commercial petroleum refiners, for timely delivery of the vessel, for security clearance, and for a U.S.-citizen crew.

**48.** The actions of the contracting officer to alter material terms of the Solicitation to favor TAL individually and collectively constituted material alterations of the Solicitation in violation of the terms of the Solicitation and the Federal Acquisition Regulation, at § 52.219-14(b)(1), and 10 U.S.C. § 2305(b).

**49.** The actions of the contracting officer were arbitrary, capricious and not in accordance with law or rule under 5 U.S.C. Section § 706.

## Prayer for Relief

Wherefore, Plaintiff-Sealift hereby requests an order:

(A) Declaring the actions of MSC to have been arbitrary, capricious and not in accordance with law or rule;

(B) Directing that MSC set aside the award to TAL;

(C) Enjoining further performance by TAL under the time charter;

(D) Disqualifying the vessel *Transpacific* from performance under this or any time charter to MSC;

(E) Declaring that TAL was not qualified as an offeror on the Solicitation;

(F) Resoliciting for the time charter services;

(G) Awarding bid preparation costs to Plaintiff; and

(H) Awarding reasonable attorneys fees and costs of this action and the protest to Plaintiff, as appropriate; and

(I) Such other relief as may be required in the interest of justice.

Dated: August 30, 2007

Respectfully submitted,

Timothy B. Shea
Nemirow Hu & Shea
1629 K Street, NW Suite 500
Washington, DC 20006
Tel. 202 835-0300
Fax No. 202 835-0306

Of Counsel

Constantine Papavizas
Winston & Strawn, LLP
1700 K Street, NW
Washington, DC 20006
Tel. No. 202 282-5732
Fax No. 202 282-5100

Attorneys for Sealift, Inc.

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | |
|---|---|
| SEALIFT, INC.<br>68 West Main Street<br>Oyster Bay, NY 11771,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA<br>950 Constitution Ave., NW<br>Washington, DC 20530,<br><br>Defendant. | No. 07 – 627C<br>(Judge Braden) |

**Certificate of Service**

I hereby certify that I have served the foregoing Amended Complaint on counsel for the United States

Brian S. Smith, Trial Attorney
Room 4054, 1000 L Street, NW
Washington, DC 20005

by email at brian.smith@usdoj.gov this 30th day of August, 2007.

Timothy B. Shea