UNITED STATES
COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SEALIFT, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Docket No. 07-627C |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

Pages: 1 through 124

Place: Washington, D.C.

Date: June 9, 2008

**HERITAGE REPORTING CORPORATION**
*Official Reporters*
1220 L Street, N.W., Suite 600
Washington, D.C. 20005-4018
(202) 628-4888
hrc@concentric.net

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| SEALIFT, INC., Plaintiff, | ) |
| v. | ) Docket No. 07-627C |
| UNITED STATES, Defendant. | ) |

Courtroom 6, Room 507
National Courts Building
717 Madison Place NW
Washington, D.C.

Monday,
June 9, 2008

The parties met, pursuant to notice of the Court, at 9:58 a.m.

BEFORE: HONORABLE SUSAN G. BRADEN
Judge

APPEARANCES:

For the Plaintiff:

TIMOTHY B. SHEA, Esquire
Nemirow Hu & Shea
1629 K Street, N.W., Suite 500
Washington, D.C. 20006
(202) 835-0300

For the Defendant:

CHRISTOPHER L. KRAFCHECK, Esquire
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-0041

APPEARANCES: (Cont'd)

Also for the Defendant:

CARA R. CONLIN, Esquire
JOEL A. WEGER, Esquire
Military Sealift Command
914 Charles Morris Court, S.E.
Washington Navy Yard, Building 210
Washington, D.C. 20398
(202) 685-5178 / 685-5174

P R O C E E D I N G S

(9:58 a.m.)

THE CLERK: All rise. The United States Court of Federal Claims session, the Honorable Susan G. Braden presiding.

THE COURT: Good morning.

MR. SHEA: Good morning, Your Honor.

MR. KRAFCHECK: Good morning, Your Honor.

THE COURT: Sit down. Is everybody comfortable enough to take their jackets off? I don't want to lose anybody here. It's actually cool this morning. Sometimes this courtroom is unbearably hot.

I'm very serious, you can take your jackets off. There is no point, unless you're -- well, keep them on, then.

(Laughter.)

THE COURT: See if I care. Do you all have water? Okay.

Okay. Plaintiff, I'm ready whenever you are.

MR. SHEA: Good morning, Your Honor. I'm Timothy Shea. I'm here on behalf of Sealift. And I would propose to speak in support of our motion for judgment on the administrative record.

I don't know whether Your Honor has a time

limit, but what I propose to do is speak to the four particular issues, the sort of major errors that we assign in this activity. And then I would like to speak to the standard of review with respect to those. And if that's all right, I'd like to proceed.

THE COURT: That's fine. And my law clerk said you wanted to sit down; that's fine with me. I'm real easy-going.

MR. SHEA: Your Honor, I would be pleased to stand up, but if I find myself wanting to refer to things, then --

THE COURT: I am very informal. Make yourself as comfortable as you wish.

MR. SHEA: Thank you, Your Honor.

THE COURT: And I don't really care about the time. You take what time you feel you need. Okay?

MR. SHEA: Very well, Your Honor. Thank you kindly.

As you know, Sealift is a vessel owner and operator based in New York. They have had this contract for the carriage of, a time charter contract for which they carry fuel for the military, for perhaps a couple decades.

Up until the time of the award that's in

controversy here, they had been providing the service with a vessel called the Montauk. There was a first iteration for this award in mid-2005. MSC solicited for a time charter for, in early 2005. In May of 2005, MSC made an award to Sealift for the Montauk. And intervenor, TransAtlantic Lines -- and I'll refer to them as TAL -- protested that award. And in connection with that award, first of all MSC --

THE COURT: It was protested at the GAO?

MR. SHEA: Yes, it was, Your Honor.

THE COURT: Okay.

MR. SHEA: In connection with that protest, MSC inadvertently, in response to some questions that came up at a debriefing, MSC provided to TAL some financial, an analysis of their offer. At the same time they provided the very same analysis of the Sealift offer.

And so at that time they had disclosed Sealift numbers, Sealift numbers to TAL. And MSC then decided, first of all, that they were going to reopen the negotiations on that particular contract activity. And they also made a decision, and that was dated July 7, 2005, to disclose to Sealift TAL's numbers, as well, on the vessel they had offered, which at that time was the Mercury, in order to equalize, as a

recognition, first of all, that they had disadvantaged Sealift, and in an attempt to equalize the posture of the two competing parties.

THE COURT: And you were satisfied with that.

MR. SHEA: Well, not necessarily, no.

THE COURT: What did you do about it?

MR. SHEA: Well, we haven't done anything about that at this time, Your Honor. And I suppose we might.

But at the time, at the time we were extremely dissatisfied about it for a couple reasons.

THE COURT: You see, that matter is really not before me. It may be that what they did was wrong, but there's nothing -- that's your problem at this point, not mine.

MR. SHEA: I understand that. I understand that. And the reason why we raise that really is two.

First of all, it shows, frankly, a history of something that I might describe as every-so-slightly cavalier, number one.

And number two, it also reflects the fact that, you know, in the particular solicitation we have here, we are reoffering the same vessel. And TAL knew all of our numbers for that.

THE COURT: But what's the cure?

MR. SHEA: Well, I'm saying that, first of all, that leads to an inquiry about our challenge to the way MSC viewed the fuel consumption numbers.

On the particular, on the matter before Your Honor, the difference between their time -- the biggest number in this whole, it was like a $25 million procurement, the biggest number in there was the time charter rate, which is the rate that covers all of the, you know, the crewing, the insurance, the vessel, the amortization, the overhead and all that.

The difference between that, Sealift's number and TAL's number was less than one percent. Our view is that didn't come from nowhere. That came because of the education that TAL got compliments of the MSC staff.

And that backs into the issue of well, okay, we're talking about, and the first substantive issue I will take up is the fuel consumption rate.

Now, as we explained, the government, like any time charter, when they charter a vessel, they agree, you know, they pay out these certain amounts. One thing, they purchase the fuel. And the government, of course, has the option of either purchasing it or supplying it on their own, and for

the most part they supply it. They purchase it from third parties, and then they provide it to the vessel.

So it's in that context, and Your Honor is correct, we haven't sought any remedy from this Court for that particular error -- particular, and frankly egregious, error; that is, the giving away of Sealift's information on the vessel. But we do think it's relevant in that respect.

Anyway, eventually, if I may, the government terminated for convenience the existing contract award that it had made to Sealift. It issued a new solicitation for short term, for a nine-month period. And it was during that nine-month period then that they began the procurement process for the matter that's before this Court.

THE COURT: When does that contract expire?

MR. SHEA: The nine-month contract?

THE COURT: Well, that one is done, I assume.

MR. SHEA: Yes, it is done.

THE COURT: The one that we have, that I'm looking at right now.

MR. SHEA: That was for one year, with a series of one-year options. The options, I think, end around November 1, Your Honor. So one year of service

was provided by TAL. The government exercised the option for the second year.

THE COURT: The contract was awarded in July 2006.

MR. SHEA: Correct.

THE COURT: And you didn't get over to our Court until a year later.

MR. SHEA: Well, Your Honor, we spent some time in the U.S. District Court, and that was regrettable. But we, that's the reason for the --

THE COURT: I understand that. But I'm trying to say so where are we now in the contract? They are in option year 1?

MR. SHEA: They have exercised the first option. They're still in that option year, Your Honor. And that, the exact timing I believe is around the 1st of November.

THE COURT: That's when option year 2 happens?

MR. SHEA: That's when option year 2 would begin. Now, they would exercise that option, I believe -- and perhaps the government can give this with more particularity -- I think they would ordinarily exercise that option something like 60 days prior to that, 60 to 90 days.

THE COURT: Okay.

MR. SHEA: And the government, in its last reply, notes that it likes the rates. It had, the rates that were submitted by TAL are fairly tiered. They differ by year.

So the government has a lower rate this year than it did last year. So it likes the contract better this year even than it might have liked it last year.

THE COURT: Well, I'm concerned. Let me just fast-forward here. Let's assume for the moment that, just for the sake of argument, that I decide to set aside the protest.

How can it be, if the fuel consumption rate information or whatever else TransAtlantic learned in the 2005 solicitation is there, how will it ever be that you could possibly win a contract?

MR. SHEA: I'm sorry, Your Honor, I don't --

THE COURT: You said that, you told the Court that the 2005 solicitation, okay, the government essentially provided your business information, perhaps proprietary information, basically to the other bidder.

MR. SHEA: Yes.

THE COURT: Okay. So how can it be that you

can ever achieve a contract, since they have that information embedded in their knowledge? I mean, how can it be that you can ever --

MR. SHEA: If Your Honor, first of all, if Your Honor were to set aside the -- then there would be a resolicitation, and Sealift would be in the market looking for a different vessel.

THE COURT: Oh, I see. So what you would do is you wouldn't use the same vessel again.

MR. SHEA: No, no.

THE COURT: Yes, you would not use the same vessel again.

MR. SHEA: Yes, Your Honor.

THE COURT: Okay, all right. That's how you'd do it, because you've got more than one vessel that can do this work.

MR. SHEA: No. I mean, the answer is no. Like in most cases, I expected, and Sealift certainly would basically go into the market and have to find another vessel. So they wouldn't be offering the Montauk, they would be offering some other vessel.

THE COURT: What's the status? What's going on with the Montauk now? Where is it?

MR. SHEA: Sealift doesn't own the Montauk any more.

THE COURT: Oh, I see.

MR. SHEA: We couldn't. There is no market for this kind of ship. It's a fairly small ship with high U.S. flag rates. The market for that kind of vessel, even though the Department of Defense has, from time to time, you know, indicates it has needs for smaller tankers, there is no consistent market for a vessel of this size.

So after a certain period of time, if you remember, of course, there was a delay between when these awards were and when TAL was able to appear. So, but after this, after Sealift was terminated, they had to make a decision about what to do with the vessel. And so they had to sell the vessel.

THE COURT: But you owned it at the time.

MR. SHEA: Yes. And they operated with their own crew.

THE COURT: All right. And you operate other boats now?

MR. SHEA: Yes. Sealift --

THE COURT: Just not one that carries fuel around.

MR. SHEA: That's correct. Sealift actually does a lot of contracting for the Department of Defense. They have vessels at Diego Garcia. They

have, they do individual time charters for them. Sealift has at least 12 vessels, and there are probably four of them that are on charter to the government at any one time.

THE COURT: Is it a publicly held company, or is it private?

MR. SHEA: It's privately held, Your Honor.

THE COURT: Okay. I'm sorry I interrupted you.

MR. SHEA: I'd like to jump, if I may then, to the issue of -- and I will only deal with really the four major challenges we have here. I can deal with the issue of misrepresentation of fuel consumption.

As I indicated in my background discussion, Your Honor, the difference between the Sealift award and the TAL, the Sealift offer and the TAL offer was, and this was a number that was something, I don't know what, tens of millions of dollars. The difference between the two offers for their time charter rate was less than $2,000, which is less than a one-percent different on their offers. The Sealift offer was ever so slightly lower.

The figure that drove the cost evaluation toward TAL was the government's evaluation of the fuel

consumption. Now, the government evaluation of the fuel consumption was based on a rate that the TAL vessel consumed 20 barrels a day less than the Sealift vessel.

Sealift has submitted information showing that the, that that can't possibly be true; and that that delta, the difference between approximately 76 tons, which is the accurate figure, and the 56 tons, which is the figure that TAL gave to MSC, was inaccurate, was materially inaccurate. And it certainly drove the award to TAL.

Now, the basis for that --

THE COURT: I've got 57.4 barrels.

MR. SHEA: That's correct, Your Honor.

THE COURT: If the boat is going 12 knots.

MR. SHEA: That is correct.

THE COURT: Okay. And that's 77.52 barrels a day. I'm assuming, is that right?

MR. SHEA: The 77 is the accurate figure. The submitted figure was the 56 or 57.

THE COURT: Okay. I've got 57.4.

MR. SHEA: Right.

THE COURT: Okay.

MR. SHEA: The difference, the 20 barrels, those 20 barrels per day in consumption amount to

about a million, $1,200,000, which far exceeded the difference in the -- so that was a savings that was assigned to TAL, which is entirely illusionary. It is based on their misrepresentation of the fuel consumption.

Now, we have a very straightforward line between what our believe, the basis for our assertion is this.

THE COURT: Who bears the brunt of the fuel consumption? They're buying the fuel from the government?

MR. SHEA: No. The government procures it on its own, so the government buys it. And it's a specified rate that says how much it's buying it at. And then it supplies it to the vessel.

So the vessel is just around navigating, and whenever it needs it, it gets fuel.

THE COURT: Well, I don't understand that. Does the government buy for them 57.4 barrels, and that's all they give them?

MR. SHEA: No. Actually, they give them fuel as and when needed, okay? In other words, it would be just as if anybody sort of, you know, you're renting a car, and you say okay, what's the fuel consumption. And so somebody tells you whatever the

number is, you know, they say the number is 30 miles per gallon.

If, at the end of the day, the real consumption -- and you're driving the car, and you're just buying the gas. At the end of the day, if the real consumption was 50 miles per gallon, then you would have paid more than you anticipated.

THE COURT: Well, given the increased rate in fuel, one would think that the government would be really upset about this.

MR. SHEA: Well, perhaps, maybe they should be. But Your Honor, I'm not here to explain why the government -- the government I think will have to speak for itself.

But the government should be. And the government does have an answer, which is that their, I think their explanation is that they might have some rights against TAL for basically giving them a vessel with a misrepresented fuel consumption rate.

And we have cited to you, there's a perfectly substantial body of commercial law that deals with fuel, speed and consumption cases on vessels, whereby if a vessel owner offers -- and we cite in our case a 1931 case from the Second Circuit called the Denholm case, in which the government makes

a certain amount of play, with the notion that -- let me just back up for a moment.

The government's answer, when we raised this issue the government says wait a minute, the basis for your assertion, Sealift, is some information that somebody got from a third-party website -- which is on page 5 of their last submission -- from a third-party website, estimating that the Bonito consumes 77.52 barrels of fuel per day.

Well, that website actually was the website of the then-current owner and operator.

THE COURT: Well, I understand that. But their point is it doesn't make it any more, you know, trustworthy, necessarily. It's just somebody's statement on a website.

MR. SHEA: Well, actually, Your Honor, first of all, TAL didn't own or -- they knew nothing about the ship. When TAL submitted that offer, TAL had never operated that ship. TAL knew as much information as anybody in this room. All they had ever done was simply look -- they had done the same thing that we described.

So they had no, TAL, who is, you know, the notion is there's something more reliable about that. I would think in the scheme of things the number

assigned by the then-current owner and operator of the vessel to the maritime trade about the fuel consumption of the vessel, made so that people who are, the commercial people like Exxon and Mobil and anybody else, any other charter, when they're offering their vessel to the trade, the data provided by them to the maritime trade is more reliable than someone who has never owned the vessel, never operated it, and for that matter had never owned or operated a tanker. It's that simple.

So hence, they're not third party. They were first party. They were the, they had more information than anybody else, certainly anybody else at that time.

THE COURT: All right.

MR. SHEA: But perhaps I lost my thread. The government's response then in that regard is that well, there is some notion that this is just information on a website. And we said well, look, as I started out, there is a well-established body of law in maritime cases whereby charters, who feel that the fuel consumption that they have relied on in chartering a vessel was inaccurate, they can seek recourse against the vessel owner. And we cite cases along the lines.

Perhaps the most basic one that we cite is the 1931 Second Circuit Denholm case in which the Second Circuit, the argument was essentially along the same lines. It said the vessel is capable of doing a certain speed and consuming a certain amount of coal, of course at that time.

Second, and the argument the ship owner resisted the claim on the very same sort of notion that the government is urging here, and that is well, it really wasn't stated as a warranty. It just said it's capable of doing this.

And the Second Circuit says look, that's what you, they relied -- there's no dispute that the charters relied on that when they chartered the vessel. That's good enough. They're bound, that is, the owner is bound by that advertised consumption rate.

And so, and hence the Second Circuit decided that the charterer can prevail because the vessel consumed more coal, in that case, than the advertised rate. It's that simple.

And in a commercial context, and we cite some other arbitrations and judicial decisions, in which people make claims along those lines all the time.

Now, then the government, of course, responds, the government responds to this. And I think perhaps with this, I don't need to add any more. But the government's opposition says there is no evidence to support the accuracy or explain the motives of the owner, the current owner and operator in May and June of 2006, about why they might possibly be overstating their fuel consumption.

Well, you know, it seems to me, first of all, that is, on its own, facially speculative. And the idea that the current owner and operator advice to the trade is trying to drive away business so that it won't expose itself to risks of fuel consumption claims is taking things pretty far field; and frankly, is nonsensical.

Anyway, that is all I have on the fuel consumption matter, if I may, Your Honor, unless the Court has any further questions.

THE COURT: What we have in the record -- and I need to go back on this, and the government can correct me if I'm wrong. We have Mr. Raggio's --

MR. SHEA: Mr. Raggio's, yes.

THE COURT: Mr. Raggio's, okay, declaration, which is based on the website.

MR. SHEA: Correct.

THE COURT: Okay. And the government doesn't contest that, other than to say that the website is not necessarily reliable. And in any event, we have a remedy on our own.

MR. SHEA: That's correct. And, well, actually they said it wasn't really a warrant --

THE COURT: They're just saying to you go away. You know, if we think this is a problem, we'll deal with it on our own.

MR. SHEA: That is correct. And our answer, the ultimate answer to that, Your Honor, is they're saying look, we have a right of action against them if we decide that this vessel consumes more fuel than they've represented.

THE COURT: Right.

MR. SHEA: And the answer, we say look, that is not just, it may well be an argument between TAL and the government at some point. But as well, it is an offense to the bidding system, insofar as they've submitted a number that was entirely, that simply had nothing to do with the operation of the vessel now.

THE COURT: Right. But the planning research case in our Circuit basically don't talk about the government's other remedies.

MR. SHEA: Right.

THE COURT: They talk about the fact that if there's a material misrepresentation, on which it was false and on which the government relied, then the procurement should be set aside. That's what the law is, okay.

Now, what is your second argument?

MR. SHEA: My second argument, Your Honor, is subcontracting limitation. This was a small business award that was a requirement in the solicitation, that at least 50 percent of the cost of contract performance would be incurred by personnel who are personnel of the concern. Which is basically the awardee, TAL.

We submitted information to the effect that TAL would be relying on an organization called Vessel Management Services, which would basically be a subcontractor who would provide the crew for the vessel. And --

THE COURT: But they don't, these people are not employed by that entity. They're ultimately employed by TAL.

MR. SHEA: Well, TAL hires, there's no question that TAL hires Vessel Management Services. There's no dispute about that.

THE COURT: Right, right. They're like a

finder. They go out and say I'm looking for sailors.

MR. SHEA: Well, that's what the government has said. But in fact, we, and we cite -- the government appreciated early on that in the initial staff review of the -- which was in May of 2006 -- when they looked at the TAL proposal, the MSC staff put together a list of issues that they had concerns about with respect to other TAL offer.

Now, keep in mind TAL is a very small company. They had never offered, and the concern is expressed everywhere throughout the, throughout the pre-contracting reviews. They had no people who had worked on, they had one or two engineers who had worked on tankers. Nobody else --

THE COURT: Right, as well as a Filipino cook.

MR. SHEA: Well, that's once they started operating they started using foreigners, Your Honor. But they had nobody who, at the time of submission of offer -- first of all, they didn't offer any tankers.

THE COURT: Well, the legal issue, it seems to me, is who did these individuals work for, ultimately? And I take it that that's TAL.

MR. SHEA: No, Your Honor. I don't --

THE COURT: How do you know that's not true?

MR. SHEA: Well, first of all, if Your Honor is saying it is sufficient that if those crewmen, if their immediate employer is Vessel Management Services, then they are a subcontractor. And keep in mind --

THE COURT: Their immediate employer.

MR. SHEA: Right. And then he provides -- what happens was this. They work for Vessel Management Services.

Now, Vessel Management Services says to TAL I'm going to provide the crew for your ship, and I'm going to crew them. And the reason why we raise that is, Your Honor, when these guys, these guys from time to time fall off, they get hurt. They don't sue TAL; they sue their employer and TAL. Their employer is Vessel Management Services.

THE COURT: Do we have anything, a document that shows that employee relationship?

MR. SHEA: Well, Your Honor, it is not in the administrative record. In fact, there are -- and I could tell you in other cases -- the reason why this came up is because TAL Vessel Management Services employees sue Vessel Management when they're on TAL's ships, and identify Vessel Management as their employer. That's the reason why this really came up.

But if we look, I think the question is, you're really asking me what is in the record to reflect that. Here, and I note on page 8 of our last submission, which is our reply, the initial analysis, dated May -- of the TAL offer. TAL submitted two ships at the time. They had two competing offers of their own.

And they said TAL should describe the crew qualifications necessary, and how the manning agent will hire and train the crew.

Well, the manning agent, this doesn't say they're finding crewmen and having TAL hire them. The manning agent is finding them, and the manning agent is hiring them. And they work for the manning agent when they're on the ship. It's that simple.

Now, I might add, and we note --

THE COURT: All right, but what you're giving me is an argument. I'm saying is there anything in the -- I mean, the government has the same problem. If there's nothing in the administrative record that basically shows the employment relationship.

MR. SHEA: Well, no. Well, we have cited, Your Honor, there is no question -- let me just, if you'll bear with me a moment.

THE COURT: It seems to me there's an answer to this, it's not all that difficult, which is someplace. There's a document that says who these people worked for. And it may or may not be in the administrative record. I'm going to come back to talk to the government about that.

MR. SHEA: Well, Your Honor, all I know is that, I know that Vessel Management Services provides crewing not to just these people, to other people.

THE COURT: That may all be true. But unless it's here in the record, that's not something I'm confident to take judicial notice of.

MR. SHEA: Well, I understand, Your Honor. If I may say, we set out, and we provided some proposition of fact based on the record where they identify Vessel Management Services, TAL, to the government. They say Vessel Management Services is our crewing company.

THE COURT: And that may be.

MR. SHEA: I think they are. I think that is. And I think, are you're right. You're asking the question what is, where is the characterization of the employment relationship. I read that into some of the materials we have here, but there's no doubt something more direct somewhere.

THE COURT: Did you ask the government for that documentation?

MR. SHEA: Well, I guess, I guess I have not, Your Honor. I would suggest to you that what we have cited here, where they describe the manning agent as, you know, it notes that they have been crewing our vessels for 12 years.

THE COURT: And so what? The crewing is not the issue. The issue is who is -- the solicitation says that the crew shall be appointed or hired by the owner, and shall be deemed the servants and agents of the owner at all times.

MR. SHEA: Well, that's true. And --

THE COURT: If you have an argument, it has to be a violation of solicitation.

MR. SHEA: Well, that's correct.

THE COURT: Okay.

MR. SHEA: And I think that was the response that originally was offered, and I think that's why the government -- if they're employees, and I think this really is a legal question, which is --

THE COURT: Well, yes, it is, isn't it?

MR. SHEA: If they're employees of Vessel Management Services, is that a breach of the subcontracting limitation? And we have cited, among

other things, a case involving TAL, in which TAL challenged another, another solicitation award. And one of the things they challenged it on was the issue about subcontracting.

And the Court there said first, and foremost, at that time also there was some confusion there -- and in this case, before GAO, MSC denied, said the subcontracting limitations don't apply. Now, counsel said that. They never corrected that.

In this Court, counsel looked with perhaps a little more care and said yes, subcontracting limitations do indeed apply.

And so we have said, first of all, and there's nothing in the record whereby MSC verified compliance with that. And we think there is ample information there at a minimum to show that Vessel Management Services was the employer of these people.

And yes, they were a contractor to TAL, but those people were employed by Vessel Management. The direct employer of the crew was Vessel Management Services. And we suggest the initial assessment, which is at page 1893 of the administrative record, really to say the manning agent will hire and train the crew.

If that person is a headhunter, headhunters

don't hire people. Headhunters find people, but they don't hire people, and they don't train people.

THE COURT: Well, another way of looking at this is the solicitation itself may establish the relationship, because the solicitation says that the crew of the vessel shall be appointed and hired by the owner, and shall be deemed to be the servants and agents of the owner.

So the government basically may be establishing the legal relationship, saying if you are awarded this contract, then I, the government, I'm setting up this relationship by virtue of your acceptance of this award.

MR. SHEA: Your Honor, I think, first of all, that deals -- I understand that. And I think that may have been the reason why the government made the position. The attorney that made that representation --

THE COURT: The government didn't want to be responsible for these people.

MR. SHEA: What's that?

THE COURT: The government didn't want to be responsible for these people falling off the ship.

MR. SHEA: I'm not arguing that. The subcontracting limitation has nothing to do with the

issue of legal responsibility in the case of, you know, that the ship runs aground, or it dumps, you know, it dumps something over the side. This has absolutely nothing to do with that.

THE COURT: So you're saying that this company had to have all those people in their employment.

MR. SHEA: In their direct employment, correct.

THE COURT: And do you?

MR. SHEA: With not an intermediate contractor between them.

THE COURT: And do you?

MR. SHEA: Yes.

THE COURT: But there's not an intermediate contractor. They basically go out and find the people.

MR. SHEA: Well, first of all --

THE COURT: They say, you know, put it in the newspaper, wanted, sailors who do not fall off ships.

MR. SHEA: Right, okay.

THE COURT: Okay.

MR. SHEA: But in this case, in this case there is no direct relationship. There may be a

direct, in certain terms of responsibility, to third parties.

The third-party argument is not one we're making. In other words, if something happens to the ship, that's not an issue for us. Because this is a small business requirement, and a small business requirement is that you can't contract out for services. You can't basically have a small businessperson show up and say okay, here, I'm going to provide the service. Except then they will subcontract out all the people to some non-small-business activity. That's what's going on. That's what the purpose of this, of the small business rule and application here. It has nothing to do with the maritime statutes.

So I'm not making a maritime point here. I'm making a point of the contractual relationship.

THE COURT: Okay.

MR. SHEA: And that's what TAL prevailed on in this Court, on the matter that they brought.

THE COURT: I don't know what the facts were there. I know it was in the record here. And it's not precedential, in any event.

MR. SHEA: If I may, then, I'd like to return then to what is my sort of fourth issue, which

is reflagging and repair work in the United States. And this --

THE COURT: This is the Singapore issue.

MR. SHEA: This is the trip to Singapore.

THE COURT: Okay.

MR. SHEA: Now, as Your Honor knows, there is, of course, a statute that the military, a preference statute, which requires that all reflagging and repair work be done in the United States. This solicitation had a cost implementing that. And there's a DFARs provision that says that a vessel cannot be accepted that has, you know, any vessel accepted for a time charter has to comply with that.

Further, I might add that the statute provides that the Secretary of -- waivers of this provision may only be given by the Secretary of Defense after determination of such waiver is critical to the national security of the United States.

And I might add, Your Honor, this really didn't happen in a vacuum. I think there's a very strict requirement. And as I sit here now, I can't think of any other procurement statute in which the, let's say the issue of waivers is, can only be given by the Secretary of Defense, and then certain notice of Congress has to be given after the Secretary makes

such a defense, makes such a waiver. So the statute is deliberately, and really very, very specifically strict.

I'd like to, if I may, then speak to what happened here briefly.

THE COURT: You took pictures that you sent to the contracting officer, the MSC, of the boat being -- we went through all those at the hearing, and adding those to the administrative record. And they investigated it. And they seemed to be satisfied that the statute had been complied with.

Now, why is it that you take issue with that?

MR. SHEA: Well, first of all, Your Honor, our view is that, on two levels. First, even if the Court would accredit the government's view of the facts, which I would say is, I think the government's view is, they go along with an elaborate ruse. And even if you accepted that, their interpretation, what they are -- their interpretation of the statute is that it only applies to installation.

Keep in mind, if we can go back -- and I'd like to, somewhere here I have a note that I already -- let me offer, if I may, the government's view on this. And I'd like to explain sort of, sort

of unpack why this is. First of all, it doesn't make real sense. And secondly, even if it is credited, it is contrary to the statute.

Because ultimately what they say is the statute only applies to installation. As long as we install the stuff in the United States, we can have anything prepared, manufactured, templates made somewhere else. But as long as we install in the United States, that's okay.

The government, in their reply, describes the scenario as this. Invoices from the shipyards in Guam, from the shipyards in Guam and Singapore demonstrate that TAL stopped in Singapore to purchase equipment to be installed in Guam for reflagging. In order to determine the equipment to purchase piping from the old CO2 system was removed, so that templates for the new system could be measured. After the templates were measured, the old CO2 system was reinstalled as it was originally found. And all that, you know, all that is perfectly fine.

First of all, the facts are that the vessel was under Swedish flag when it was purchased. It, for reasons that are not clear to anybody, and perhaps are really irrelevant, it took a long time for the ship to get out of Europe, so it was moving from Europe to,

had to go to Guam, was its destination.

It didn't go directly from Europe to Guam, though. It deviated to Singapore. And of course, it didn't just go anywhere to Singapore; it went to a shipyard in Singapore, and it stayed there for a week. And the Sealift, the cover memo that Sealift sent to MSC with the pictures said the vessel arrived here on such-and-such a date, and it departed on such-and-such a date. It was at this shipyard. This is the address of the shipyard. And it had this kind of work done, and it described the work. And here are pictures of what happened.

Then the ship was in the shipyard in Singapore for a week. Now, if all the ship were doing was going to, saw a maritime version of WalMart, it didn't have to be in a shipyard; it could have gone anywhere to pick up supplies, number one.

Number two, it didn't have to spend a week doing that; it was just picking something up. And in fact, it wasn't just picking something up. There were, there were laborers on the ship, there's no dispute about that. We have the invoices from those. And there are --

THE COURT: You have two Singapore tax invoices. One that I see, one that indicates a

hydrotest with nitrogen to 600 psig. I haven't the foggiest idea what that means; we'll come back to that. And the second one showing that new logos were installed into funnel by welding. I don't know where the logos went, and I don't know what the funnel is.

So, but those are the two pieces of evidence in the administrative record that we found. There are two tax invoices.

MR. SHEA: Well, and there are invoices from the, there are invoices, of course, from the shipyard. And they do describe -- there are invoices from the shipyard. And they do describe that sort of activity.

THE COURT: What's the administrative record say on that?

MR. SHEA: Pages 2782 and following. And it showed that they manufactured --

THE COURT: 2782 is the first invoice I told you about. That's the invoice on the hydrotest.

MR. SHEA: Right. So it shows, for instance, first of all, TAL brought in a man named Lucien Castro.

THE COURT: That's all fine and good. I'm trying to find out what is in the administrative record other than those two invoices. That may be enough, I don't --

MR. SHEA: No, I think that is, that is what it is. Those are the invoices.

THE COURT: Okay.

MR. SHEA: And it shows, it says "remove and make templates of existing three-quarter-inch pipe from lower fabricated," et cetera. "Remove and make templates of existing" some other piping. "Fabricate parts." So they took stuff out, they fabricated parts.

And then, then they refurbished the ship's name, okay. So they cropped off the existing name, Bonito, and they repainted the existing-named vessel, they claim. And then they did stuff with the ship's logos. That is correct, Your Honor. That's the reference.

Now, the claim here, and these documents also claim, that after they took out this piping -- we're talking about one-and-a-half or two-inch piping -- they took out this piping, and then reinstalled the old piping. Which I, you know, I mean, is a completely uncommercial activity to do.

THE COURT: The government says what was done was not reflagging work, whatever that means.

MR. SHEA: There is no dispute the CO2 system was reflagging work. And there's no dispute --

well, the government denies it. But the government has the view that even changing the name of the vessel if not reflagging work, which is, I think if they would ask, if there was somebody from the United States Coast Guard there, I don't think they would agree.

The Coast Guard regulations say change the name, if you're changing the name of a vessel, you have to change the name on the hull. And in fact, they changed the name of the vessel; and in fact, they changed the name -- we have, one of the pictures we have, and the government sort of says well, that's right, it does say, it shows a handful of people on some scaffolding. And they, you know, they're on the hull of a vessel, and you can see the writing T-R-A-N-S-P-A-C-I-F-I-C. And there are four guys on the scaffolding.

Now, the government, that's why the government responds to that well, okay, that really wasn't necessarily reflagging. And the answer to that is the U.S. Coast Guard regulations say you have to change, you can't reflag a ship and have the wrong name, have it running around the ocean with the wrong name on it.

THE COURT: Well, I'm trying to look here.

This is the D-F-A-R-S. That's the reg you're looking at, right? And it defines reflagging and repair work.

MR. SHEA: Yes.

THE COURT: And to enable the first A-1 is to enable the vessel to meet applicable standards to become a vessel of the United States. I assume that would be the renaming?

MR. SHEA: Certainly renaming.

THE COURT: How do we know that? Is this to enable to meet applicable standards? So there's another applicable standard where?

MR. SHEA: Well, okay. First of all, we cite on page -- the United States Coast Guard, at 46 C.F.R. § 67.120, says, "No certificate of documentation issued under this part will be deemed valid for operation of vessels until the vessel is marked in accordance with the subpart."

THE COURT: Let me -- I mean, I know we've got the stuff here. I'm trying to figure out which, give me your reference again.

MR. SHEA: That's page 10 of our last submission, Your Honor, at the bottom of my reply brief.

THE COURT: Okay.

MR. SHEA: And in Sec. 67.123 it says, "The

name of the vessel must be marked on some clearly visible exterior part of the port and starboard bow and the stern of the vessel."

And I must say, Your Honor, I don't know, at some point common sense must apply here, too, as well. Doesn't the ship have to be marked as it's named? And it strikes me as a little weird that the government's case would be to come forward and say the ship could, you know, doesn't have to be marked in the way it's been named.

Likewise, there is no dispute here -- and the second part of your question, Your Honor, was where is the standard. There actually is an analysis called the GAAP analysis, which we discuss.

The GAAP analysis is sort of, what I might call sort of a delta. It is the difference between the foreign standard of classification and the U.S. standard. And the GAAP analysis is in the record.

The GAAP analysis includes references. It clearly says, and I don't think the government disputes, that upgrading of the CO2 system is a requirement, and is, it constitutes reflagging work. I don't think that the government disputes that. And there's a clear --

THE COURT: That's because U.S. vehicles

have to have that.

MR. SHEA: And that's actually because the U.S. standards are higher than the foreign standards.

THE COURT: What does psig mean?

MR. SHEA: Where is your reference, Your Honor?

THE COURT: It's to AR-2782. I just don't know what it means.

MR. SHEA: Your Honor, I might not know myself.

THE COURT: Okay.

MR. SHEA: But I don't know. It's 2782?

THE COURT: 2782, on that invoice. It says what I mentioned before. It says, "Hydrotest with nitrogen to 600 psig." It's a measurement standard of some sort.

MR. SHEA: Yes, it's a pressure.

THE COURT: It's a pressure.

MR. SHEA: Right.

THE COURT: Okay. And how can I find out what it means? What does psig stand for?

MR. SHEA: I must tell you, for that particular one, I don't know.

THE COURT: Okay.

MR. SHEA: Probably pounds. And since it's

a foreign, since this is --

THE COURT: Well, Joe was in the Air Force. Do you know the answer?

THE CLERK: It's probably pounds per square inch.

MR. SHEA: Right, right.

THE COURT: Oh, okay. There you go.

MR. SHEA: But of course, Your Honor, I suggest that that means that it was actually installed and they tested it.

THE COURT: Right.

MR. SHEA: Then this is the system I think they say that we installed and we tested it, then we took it out, and we put the old system in.

Now, anyway.

THE COURT: All right.

MR. SHEA: And I think what the bottom-line point that I want to get to, Your Honor, is that this again is a very, very strict statute. That is, it says it's can't be waived by the government. It is, that this work has to be done in the United States. It was an amendment that was not to ancient. We cite the basis for it.

And what the government's position here is, this is a very, very fundamental, I think a very, very

fundamental proposition. Because their view is that okay, it may have been some things -- this vessel went to a foreign port and had some things fabricated. Now, keep in mind, if all it was doing was picking something up, it could have picked something up in a day. But it spent a week in a shipyard, and it got a bill from the shipyard for work done there. And I might add, eight of the guys who did the work there went with Lucien Castro to Guam to put the parts in, or reput them in or do whatever they did, in Guam. But they did all this work.

And then we, but things were fabricated for it. And then they were removed. This is the theory. But they were later reinstalled. And I think the question is, does this statutory provision relating to reflagging and repair work, is that limited -- and the government says in this case the plain language of the statute does not incorporate the removal and reinstallation of the original piping. So they are saying that was not work done on the vessel.

First of all, that was work. It was done on the vessel. And it was reflagging work. And even if they're right that it was later reinstalled, that it was taken off and reinstalled, the activity that was going on in Singapore was work on the vessel, and it

was to fulfill the GAAP analysis. Which is basically, the GAAP analysis is the punch list of things they had to do to turn this vessel from a foreign-flagged vessel to a U.S.-flagged vessel.

So in our view, even if the government -- the government's position still doesn't say this wasn't work on the vessel. It was, there was work being done on the vessel in this shipyard in Singapore. There is really, I don't know how you can make it otherwise.

I might add there is a certain controversy over the status of our pictures, Your Honor. We kind of like the pictures; I think they are very appropriate. I don't think there's --

THE COURT: I have them in the administrative record. Obviously you've got some evidentiary issues.

MR. SHEA: Well, I must tell you, Your Honor, first of all, I don't think the government -- the government acknowledges, first of all, as I said, there's a lot of indicia that the Sealift says this is where the ship went in Singapore. This is the address of the shipyard. It arrived at a certain date, it left at a certain date. We had a guy on here, and here are the pictures, and this is the work done. And

then he described the work.

Then, I don't think the government disputes the picture, at least certainly with respect to these guys on the --

THE COURT: Well, I'll just help you out here. I'm not going to rely on the pictures. I've put them in the record in the event somebody else wants to take a look at them someplace else.

My focus is really what's in the invoices, what's in the administrative record.

MR. SHEA: Very well, Your Honor. Very well, Your Honor.

THE COURT: I mean, I allowed you to put them in; somebody else can take a look at them if they want to. But I think that would be a problem if I relied on those.

MR. SHEA: Well, they were submitted. Your Honor, they were submitted by Sealift to the contracting officer. So in other words, they were --

THE COURT: That doesn't necessarily meet the requirements for the rules of evidence.

MR. SHEA: I understand. I just wanted to make sure you understood that they --

THE COURT: Right.

MR. SHEA: -- didn't just take pictures and

put them in their files; they gave them to the contracting officer.

THE COURT: And he investigated based on that, too.

MR. SHEA: He did. He did. I just think they reached a wrong conclusion. And I do suggest, in our submission somewhere, we cite page 2823 of the record in which -- with this I'll leave this, Your Honor. I won't press this any more, I understand.

But the contracting officer wrote to TAL and said we have evidence that TAL replaced parts, which is the CO2 pneumatic systems, the delay, the timing delay cylinder, the CO2 cylinder headers; we couldn't find this work. That, the evidence he's relying on in my estimation is, that tracks exactly the titles of the pictures that were given by Sealift to the contracting officer.

But with that, I will move to the vetting issue, if I may.

THE COURT: Okay.

MR. SHEA: There was the longstanding requirement -- of course, this vessel would be moving around the Pacific, picking up refined petroleum products, presumably, I think, jet fuel, and moving it to various military installations throughout the Far

East.

There is a requirement throughout the contract that the vessel be, have an authorization, be what is called vetted in the trade. That is, have permission, have been inspected and approved by each of the private, these are the four major oil companies, so that they will permit the vessel to appear at their facilities. Obviously, they don't want substandard vessels going into their facilities that would create, you know, problems of hazard either to their facility or to the environment in such a way that it would create problems for them.

There was a longstanding requirement throughout this procurement that the vessel have the vetting certificates 10 days prior to delivery. We count on the record long exchanges relating to that. In fact, and it's really quite remarkable in a way, in June -- no, in May 2006, TAL wrote to the contracting officer that the vessel must be U.S.-flagged before it's vetted. And TAL says that to the contracting officer.

Then, because of delays that, you know, for some reason or another, TAL decided to keep the vessel's Swedish flag until it got to Guam, all right. So they were not in a position to get it vetted under

U.S. flag until after, until it appeared in Guam. Because it was not, there was not a U.S. crew, and not a U.S. flag on the vessel.

And in between, as late as October 20 of 2006, the contracting officer, there had been a long series of exchanges about how do we get it done. And even though in June of 2006, TAL had said well, you know, it's got to be a U.S. flag to be vetted; after that, they started relying on the vetting of the prior owner and operator. And of course, and we recite the history, the contracting officer repeatedly said look, you know, vetting approvals don't apply from one to the next; and you've got to get it on your own, and it's got to be under U.S. flag.

There was a subissue about is there a certificate at the end, a piece of paper. And it appeared that well, really, there isn't a piece of paper, but you need an approval. You need one -- each of these four companies has to tell us that your ship is approved to come to our facilities, or else you're not going to be any good for us, you know, upon delivery.

As late as October 20, contracting officer wrote to TAL that TAL had to demonstrate that the vessel was vetted by the four oil companies. And as

late as October 27, contracting officer says gee, you haven't submitted to us evidence of those vetting approvals.

Now, I might add, on October 23 the MSC staff says that TAL has not requested vetting, but is trying to rely on prior-owner vettings. So even as late as October 23, they're trying to shift to say well, the prior, approvals for the prior vessel owners is, ought to be good enough. MSC consistently resisted that.

And there is -- so as far as I'm concerned, and no vetting approval from the four majors. There's no email -- there's not only no certificate, there's no email. There's no confirmation. There's no acknowledgement from the four majors that this vessel was vetted; that is, passed their vetting standards.

The government's position is that an inspection that was done -- and I might add, of course, this is really quite fundamental, because of course they, there was no assurance that the vessel would be permitted to call at these other facilities.

Now, the government claims that MSC allowed TAL to demonstrate that its vessel, while owned and crewed by TAL, was vetted by the four oil companies, in lieu of vetting certificates that no longer

existed. And they specifically point to a paper produced by a guy named Captain Tom, who was a consultant for Korea, from Korea. Captain Tom is an independent consultant, though. Captain Tom doesn't work for any oil company. And there is an indication that he, that --

THE COURT: It was always Captain Bob when I grew up. Captain Tom?

MR. SHEA: Well, Captain Tom. Captain Tom writes, "Inspected the vessel on a Sunday, October 27." And he sent his report on a Monday, October 28, saying the ship is in really very good condition.

Now, the government says that he was an agent for I think SK, two of the four oil majors: SK and what I recall as Samyung, but I'm not sure that's the right pronunciation.

But first of all, there's no pretense anywhere that he is a representative for an agent of Cal-Tex. First of all, there's nothing from Samyung or SK, and there's nothing from the other two, which is Cal-Tex, a major one that is Cal-Tex. Cal-Tex appears to be the contractor that the Navy was using to procure, to procure its jet fuel at the time.

Now, what happened was that another Navy activity wrote to, wrote an email to Cal-Tex. And

they say we have this new ship, and we'd really like it to call there. And we cite this at page 17 of our reply, we do it elsewhere, too. But I believe it's a woman named Linda Barksdale, who I think actually works for the activity that purchases this jet fuel.

But she says our military sealift command office has been discussing vetting with Chevron, and they have indicated the above vessel would not be accepted due to a total change and new ownership, new crew, and new name.

We want to make sure that you understand the above information before we show up and find that Cal-Tex may have problems with the above issues. Somebody from Cal-Tex, Mr. Kim, on behalf of the Cal-Tex facility in Korea, wrote, back on November 1, "We accept this vessel on condition of the crew's utmost attention and carefulness, since her first time to our refinery."

So that, I think that line is the vetting. He said well, we'll trust you.

Now, let me even back up with respect to Captain Tom. The date that Captain Tom did his inspection on the vessel, which was Sunday, the 27th, the vessel was still under Swedish flag. The U.S. crew, who presumably were on the, you know, in the

area somewhere, but they were not in control of the vessel -- I think at the time the vessel, as you recall, the vessel was arrested. Once it went to, TAL took the vessel to Guam. They owed some money to Guam's shipyard. Guam's shipyard arrested the vessel, so it was in Guam for about 10 days. A week of those 10 days it was in custodial aegis. And it was --

THE COURT: Sounds like a Humphrey Bogart movie.

MR. SHEA: Really. Anyway, so the very day that the attachment, the very day that the government lifted the judicial attachment, the vessel left. That was the day it was flagged U.S., on Monday, the 28th.

Well, the day Captain Tom did his work, the vessel was still under Swedish flag. The idea that he could have done a vetting, and there's a whole history and description, if you go back and we recite on the record, vetting typically looks, actually watches a crew doing, working the vessel.

Well, the vessel, Captain Tom wasn't in a position to see that happen, first of all. It was in, you know, the vessel wasn't working. On that Sunday it was still in custodial aegis, and it was still under foreign flag. There was no genuine vetting took place.

What happened was, at the end Mr. Kim said well, it's your first time, we'll trust you. And that's all there is to that story, Your Honor.

THE COURT: Okay.

MR. SHEA: Now, let me then talk briefly about one of the issues of standard of review.

In our estimation, the matter of the fuel consumption misrepresentation and the subcontracting are matters that go directly to the award itself. And I don't think the government -- well, the government, of course, disagrees with our underlying, our facts and our analysis of those things. I don't think there's any serious dispute that those are, that those are matters that go to the award itself.

The reflagging matter is, as I've described, I would consider somewhat sui generis, in the sense that there is, the solicitation is based on a specific and really highly, you know, very strict statute. And that's also implemented by the DFARs. And all those three clearly have, they have very clear standards of their own, which says the vessel, a vessel delivered for charter can't have had work, you know, all the repair and reflagging work must be done in U.S. yards.

Now, the last matter is the standard of review with respect to, I suppose this vetting

prospect. And our view is, of course, what the government has done is forgiven -- they basically had, they had a very strict standard. There's no question that the CO, in great particularity, reminded TAL of the fundamental importance of this. Not only did the vetting not take place; in our estimation, there wasn't even a showing of a vetting.

And the question is, what's the standard of review with respect to that. We think that that is the alpha level standard, which is basically that they have changed the solicitation in a fundamental way. The case that we cite, which is, I believe, Cardinal Maintenance, makes clear that forgiving -- that is, altering a solicitation by eliminating requirements -- is entirely within the purview of that same standard. And I might add, that's exactly what the Court found in the TAL case, that a number of provisions were waived so that another offeror was granted the award.

And I think that's all I have to say, Your Honor. There are other details we could attend to, but I don't think --

THE COURT: No. I've got four tests to go through for injunction. Have you thought about those? Maybe you can think about that when we come back to you on your reply time.

MR. SHEA: Well, we made -- first of all, we think, the answer is we think that they really have made some very fundamental and egregious errors here. That the misrepresentation -- I don't know. We made the case on paper, Your Honor. I think it's fairly straightforward.

We think that the fuel consumption misrepresentation is really very, very fundamental to this thing. Likewise to this procurement. Likewise, there is no question really that this repair and reflag activity was an elaborate ruse in many ways. And what TAL decided to do was they were going to do the work with people from Singapore. Whether they installed, and as long as they installed that work in Guam, and incidentally with the guys from Singapore, with Lucien Castro supervising the work -- Lucien Castro, of course, works for this fire protection service. And what fire protection service specializes in is converting vessels from foreign flag to U.S. flag.

THE COURT: Let me try it a different way. The Seventh Circuit has said even if there is a violation of law, and even if there are violations of government regulations, and even if there is a violation of the solicitation, the Court still may

decline to issue an injunction.

Now, I want you to address each of the four factors for the injunction when we come back, okay?

MR. SHEA: Very well, Your Honor. Do you want me to do it now?

THE COURT: The egregious and all this other stuff, none of those are in the four factors.

MR. SHEA: Well, we do --

THE COURT: Okay?

MR. SHEA: Yes, Your Honor. Do you want me to do it now? Or do you want me to do it --

THE COURT: No, I want you to think about it a little bit.

MR. SHEA: Very well, Your Honor.

THE COURT: Why don't you just get your pencil out, write down the four factors, and --

MR. SHEA: Thank you, Your Honor.

THE COURT: Okay.

MR. KRAFCHECK: Good morning.

THE COURT: Good morning.

MR. KRAFCHECK: Christopher Krafcheck.

THE COURT: Which agency?

MR. KRAFCHECK: From MSC, Your Honor.

THE COURT: Okay. Welcome.

MR. KRAFCHECK: May it please the Court.

First and foremost, the government believes the threshold at issue in this matter is that there was not a material misrepresentation on the part of TAL. The RFP clearly and --

THE COURT: Let's ratchet it down and go a little slower.

MR. KRAFCHECK: Yes, ma'am. The RFP clearly and unequivocally asked offerors to submit a warranted consumption fuel rate, and not an actual fuel consumption rate. There's a big difference in that, because it requires each offeror to make a business decision, and think about where their risk is going to be.

In this case, TAL looked at its situation and warranted that it would use 57.4 barrels per day. Since the agency --

THE COURT: Does that warranty mean that all you need to give them is the 57 barrels?

MR. KRAFCHECK: What it means is that the agency will only pay for 57.4.

THE COURT: They have to eat the rest of it.

MR. KRAFCHECK: I'm sorry, Your Honor?

THE COURT: They have to eat it if they make a mistake.

MR. KRAFCHECK: Exactly, Your Honor. This

is a firm, fixed-price contract.

THE COURT: Generally that's what's been going on.

MR. KRAFCHECK: Yes, Your Honor. And built into the RFP is a monthly requirement when supervised fuel for TAL, there's a built-in requirement that there's a monthly report, and the agency has an opportunity to review how much fuel is actually being consumed. So there's no question that the agency is being reasonable and going out and actually determining what amount of fuel is being consumed, and only paying for what it contracted for.

THE COURT: The issue of your reasonability in terms of how you're conducting the administration contract is not at issue before me.

MR. KRAFCHECK: Yes, ma'am.

THE COURT: I could care less about, you know, whether you were reasonable or unreasonable at this juncture.

What we're looking at is whether they made a misrepresentation to you.

MR. KRAFCHECK: Yes, Your Honor.

THE COURT: Yes. Well, your argument to me is, well, they made a misrepresentation, but don't worry about it, because they're paying for it.

MR. KRAFCHECK: No, Your Honor. We argue that, as well. But the point -- we argue that in the papers. But the point I'm attempting to make now is it is not a -- there's no misrepresentation. That never, at any time in their proposal, nor were they required to in the RFP, did they ever say this is our actual fuel consumption rate.

They're saying this is what we believe --

THE COURT: Well, let's go look at those two documents. Let's pull both of those out and show me, okay?

MR. KRAFCHECK: Certainly, Your Honor. The solicitation is 1504, Your Honor, in the administrative record.

THE COURT: I'll follow along with you. Just give me a second.

MR. KRAFCHECK: Sure.

(Pause.)

THE COURT: Now your solicitation starts at 1481, right?

MR. KRAFCHECK: Yes, ma'am.

THE COURT: All right. And you're focusing me on 1504. And that language under item --

MR. KRAFCHECK: Paragraph 4, Your Honor?

THE COURT: Yes, paragraph 4 of a larger

section, I was looking to see. But I've got, hold on just a second, let me mark this.

So all fuel and speed characteristics provided in part 1 shall be deemed warranties, and any breach in warranty shall be subject to the remedies set forth in --

So what you're saying to me is it is not a misrepresentation.

MR. KRAFCHECK: Yes, ma'am.

THE COURT: It's a warranty.

MR. KRAFCHECK: Yes, ma'am. And I would also point out, and I don't remember the exact cite, but I'll have it in a moment for you, TAL gave the same number of barrels per day, at 57.4, for both of its emissions. Although they withdrew their submissions on the EMRET, for lack of a better way of saying it, Your Honor, they gave the exact same number.

So it's clear from the record that this was a business decision, and not any intent to misrepresent their fuel consumption rate.

THE COURT: So from your perspective, you know, if they want to make this a loss leader and basically lose money on this contract knowingly to presumably engender your good will, that was perfectly

fine with you.

MR. KRAFCHECK: Yes, Your Honor. But we also have no -- we believe that this was a question of, they came in and thought we can be more efficient. We don't think it's a lost contract; we think it's a question of efficiency. They came in and, looking at all the factors, made a bid based upon their evaluation.

THE COURT: All right. And the second document. You cited the solicitation in the second document?

MR. KRAFCHECK: I cited their proposal, Your Honor, and said nowhere in their proposal can it be found.

THE COURT: So it's not in your proposal.

MR. KRAFCHECK: Not in the proposal as an actual fuel consumption rate. It's in their proposal as a warranted fuel consumption rate.

THE COURT: Let's look at that.

(Pause.)

THE COURT: Take your time, don't worry.

MR. KRAFCHECK: Thank you, Your Honor.

THE COURT: There's plenty of time, just take what you need.

(Pause.)

MR. KRAFCHECK: Your Honor, the proposal starts at 1597.

THE COURT: Okay. We've got Sealift's first. Exhibit 10-J.

MR. KRAFCHECK: Your Honor, if I may indulge the Court for a moment, Your Honor. Under the RFP, if we could just go back to the RFP for one moment, Your Honor.

THE COURT: Okay.

MR. KRAFCHECK: AR-1491. Each offeror was required to fill out these forms.

THE COURT: Yes.

MR. KRAFCHECK: And the language in these forms warranting the amount of fuel that would be used, the language in these forms, all this is warrant, from 1490 -- I'm sorry, if I can back up for a moment, Your Honor.

THE COURT: Yes, I can see like the boxes that were warranted.

MR. KRAFCHECK: Yes, ma'am.

THE COURT: Okay.

MR. KRAFCHECK: So each proposal, then, would be a warranted amount of fuel per day, and not an actual rate. And while it seems like we're playing semantics, that's a crucial point in this matter.

THE COURT: Well, it goes to who pays.

MR. KRAFCHECK: Yes, ma'am.

THE COURT: All right. So now, let's take a look at their proposal.

(Pause.)

MR. KRAFCHECK: Yes, ma'am. First, at 1745, we have TAL's proposal for the EMRET. And the language in box 86, "average warranted --"

THE COURT: Give me the number again, now.

MR. KRAFCHECK: Yes, ma'am. It's 1745.

THE COURT: 1745 I have as a blank form.

MR. KRAFCHECK: May I approach, Your Honor?

THE COURT: Pardon me? I have it here, I've got 1745.

MR. KRAFCHECK: Oh, I had -- our version of the record, Your Honor, has information in it. And it says --

THE COURT: Oh, I see, I'm sorry. It's teeny-weeny. I see it. It's got "average warranted speed," average warranted speed. And then it says "average fuel consumption."

MR. KRAFCHECK: Yes, ma'am.

THE COURT: So it's not so much the warranty issue there, as the word "average."

MR. KRAFCHECK: Yes, Your Honor.

THE COURT: So they said our average is 57.4 barrels a day.

MR. KRAFCHECK: Yes, Your Honor.

THE COURT: If I'm going 12 knots.

MR. KRAFCHECK: Under the specifications required by the solicitation, ma'am.

THE COURT: Okay. And so the government says okay, that's your average, and your average is a warranty to me.

MR. KRAFCHECK: Yes, Your Honor.

THE COURT: And the reason it's a warranty is because of --

MR. KRAFCHECK: AR-1504, which --

THE COURT: 1504.

MR. KRAFCHECK: Yes, ma'am.

THE COURT: All speed, fuel and speed characteristics shall be deemed warranties. Okay.

All right.

MR. KRAFCHECK: So Your Honor, from the outset we argued it was not a misrepresentation, simply a business decision made by each party.

And then we argue, in the alternative, even if it were a misrepresentation, in a firm, fixed-price context, any offeror is free to bid a lost contract that was passed earlier.

So even if it were a lost contract, that does not harm competition. And as far as the agency is concerned, it's not unreasonable, because they're paying a set price, and there's no chance -- if it were a cost-set contract, the Plaintiff would have a much stronger argument.

Finally, Your Honor, Plaintiff presumes that the agency will sit on its rights; that the agency will not, at each month --

THE COURT: But all that is irrelevant to me in this. Whether you sue these other people or you don't sue them, all that's irrelevant in terms of what my job is here.

MR. KRAFCHECK: Yes, ma'am.

THE COURT: You all do whatever you're going to do.

MR. KRAFCHECK: Absolutely, Your Honor.

THE COURT: So we don't need to spend any time on that.

MR. KRAFCHECK: Okay. The point we wanted to make was it was not a misrepresentation, Your Honor.

THE COURT: Presumably through, you know, conducting yourselves in a bad way, Congress will talk to you about it. Okay.

MR. KRAFCHECK: Yes, ma'am. Next, Your Honor, we'd like to move to reflagging. We believe the work that occurred in Singapore did not constitute reflagging. And first and foremost, we'd point out that the Coast Guard regulation Plaintiff cites, it's 46 C.F.R. § 67.120, does not in any way, shape, or form, throughout the entire regulation, say that renaming a vessel is part of reflagging.

THE COURT: I've got that. I understand that.

MR. KRAFCHECK: Thank you, Your Honor. A follow-on, as we said in our papers.

THE COURT: What about these other invoices? It has nothing to do with the painting of the sign.

MR. KRAFCHECK: No, Your Honor. It goes directly to the CO2 system.

And so the question before the Court is whether it was reasonable or permissible for GAO to go to Singapore, not --

THE COURT: But that's reasonable or permissible or not, the issues is the issue of whether they did reflagging work or not.

MR. KRAFCHECK: Yes. And it's our position that --

THE COURT: They did not reflag it.

MR. KRAFCHECK: Not reflagging.

THE COURT: What is it, then?

MR. KRAFCHECK: It was purchasing the equipment necessary to start the reflagging work itself.

THE COURT: But they did do some work.

MR. KRAFCHECK: Yes, ma'am.

THE COURT: It may not have been much, but they did do some. So why isn't that a violation?

MR. KRAFCHECK: It's not a violation because we see it as all preparatory. And we think there's a distinction between preparation to do the reflagging work -- i.e., buy supplies, have those supplies tested -- we think that falls outside of the reflagging work that's required. The test in the DFARs --

THE COURT: What constitutes what is reflagging work?

MR. KRAFCHECK: 48 C.F.R. It's also reflected in DFARs, but that's, the DFAR copies the exact language in the FAR.

THE COURT: Okay. And so read it to me.

MR. KRAFCHECK: Yes, ma'am. "To enable the vessel to meet applicable standards to become a vessel of the United States."

THE COURT: Okay. Now, what are those applicable standards? That's what we were talking about before. It references something else. What is the something else?

MR. KRAFCHECK: It's referencing the Coast Guard regulations in 46 C.F.R.

THE COURT: All right. Let's take a look at those. What do they tell me about reflagging? What is reflagging work?

MR. KRAFCHECK: Reflagging, there is no clear definition of reflagging, other than what's contained here in the 48 C.F.R.

THE COURT: Which is not much.

MR. KRAFCHECK: It's not much. That's correct, Your Honor.

THE COURT: So, you know, the issue is how do I find out what is reflagging work?

MR. KRAFCHECK: In this case we'd ask the Court to defer to the Coast Guard, who actually informed -- we had a Coast Guard representative on the ground who specifically informed the Navy that no reflagging work had occurred in Singapore.

THE COURT: As far as this Navy person, this Coast Guard person is concerned.

MR. KRAFCHECK: Yes. Yes.

THE COURT: Where is their report in the administrative record?

MR. KRAFCHECK: That's in the record, I can give you the exact cite, AR-2587.

THE COURT: 2587, okay. Hold on just a second. I have mentioned this before. How do you think Abraham Lincoln tried lawsuits without having notebooks? Twenty-five?

MR. KRAFCHECK: Yes, Your Honor.

THE COURT: The Chief Justice of the United States was at the D.C. Circuit Judicial Conference last week, and talked about the number of cases that Lincoln tried. In fact, he even tried one before the Supreme Court of the United States, and had little note cards, which apparently are in history. And he would write his argument down on the note cards. But he didn't have notebooks. I wonder how he managed. Okay.

MR. KRAFCHECK: Your Honor, I apologize, I may have misspoken on the cite.

THE COURT: Okay.

MR. KRAFCHECK: 2685.

THE COURT: 2685.

MR. KRAFCHECK: Yes, ma'am. I apologize, Your Honor.

THE COURT: That's all right. Let's just do this while we have our time together. 2685.

Okay. Now, we have a memo from Ken Allen to Pat Kiefer re reflagging. Now, who is the author? Kenneth Allen.

MR. KRAFCHECK: Your Honor, Ken Allen is the contracting officer, and Mr. Kiefer, Commander Kiefer, is a Coast Guard officer.

THE COURT: Okay.

MS. CONLIN: He was the representative for the Coast Guard station at MSC at the time.

MR. KRAFCHECK: All right. Counsel informed me that he was, Commander Kiefer was our agency representative for the Coast Guard at the time.

THE COURT: And he was located where?

MS. CONLIN: MSC headquarters.

MR. KRAFCHECK: Your Honor, that's an MSC headquarters which is in the Washington Navy Yard here in Washington, D.C.

THE COURT: So he wasn't in Singapore, he was back here in D.C.

MR. KRAFCHECK: Your Honor, I believe -- that's correct, Your Honor. And earlier, when I gave the Court a cite of 2587, that is the gentleman I believe who was in Singapore.

(Pause.)

THE COURT: What is a CG representative?

MR. KRAFCHECK: Coast Guard, Your Honor.

THE COURT: Okay. Now, do we have the underlying documents that Commander Kiefer looked at? He says, "Based on my discussions with the Coast Guard representatives, I do not believe there were any reflagged regulations." And he had discussions with these people who we don't know. Do we have anything in writing from them?

MR. KRAFCHECK: We don't believe so, Your Honor.

THE COURT: There's nothing in the record. All we have is, I don't know what we've got here. We certainly have hearsay. Do you know who those representatives were?

MR. KRAFCHECK: Your Honor, this representative was a -- I want to make sure I'm accurately portraying his name.

THE COURT: Well, we don't have declarations from them in the record, do we?

MR. KRAFCHECK: No, Your Honor. We have email traffic back and forth.

THE COURT: Where is that email traffic?

MR. KRAFCHECK: That's also at 2587.

THE COURT: 2587.

MR. KRAFCHECK: Yes, ma'am.

THE COURT: Okay.

(Pause.)

THE COURT: This email traffic was not to the Commander.

MR. KRAFCHECK: This email being the way it is, Your Honor, it actually starts from 2589 on the last page.

THE COURT: I'm there actually. I'm starting at the bottom.

(Pause.)

THE COURT: That's not very definitive, is it?

MR. KRAFCHECK: If we may, Your Honor, next can we direct your attention to AR-2677?

THE COURT: See, none of this, the Commander is not on that email chain that we just read, from 2587 on. So whatever is in this, which is not much of anything, is not what he relied on.

Okay, 2687 you said?

MR. KRAFCHECK: Seventy-seven, Your Honor.

THE COURT: Seventy-seven, okay. All right. And who is Bob Ewall? He's in Legal.

MR. KRAFCHECK: Yes, Your Honor. He is the

attorney who represented the agency at the GAO protest, Your Honor.

THE COURT: Yes.

(Pause.)

THE COURT: That's not very definitive either, is it? The question he's asking is what we now, we know the invoices. He is asking the question to the legal department about whether those requirements, that activity was reflagging. That doesn't prove anything. He's asked the same questions that have been presented to the Court.

MR. KRAFCHECK: Well next, Your Honor, we would rely on invoices themselves. We realize Plaintiff's counsel --

THE COURT: You rely on the what?

MR. KRAFCHECK: The invoices themselves.

THE COURT: Right, but the invoices show that they did do some work.

MR. KRAFCHECK: Yes, Your Honor.

THE COURT: And the question is, is it reflagging or not? The invoices don't tell us the answer to that. The statute doesn't tell us that, the regulations don't tell us that.

MR. KRAFCHECK: In that case, Your Honor, we would ask the Court to defer to Commander Kiefer's

interpretation of the applicable regulation.

THE COURT: Well, Kiefer said he had discussion with someone. And based upon -- who we don't know, we don't have any evidence of what the discussion was. He said based upon that, I'm satisfied. But we don't know what it is that he saw, or didn't see.

And what is the legal theory now?

MR. KRAFCHECK: With respect to reflagging, Your Honor, the legal theory --

THE COURT: The legal theory is that I should say that no reflagging work was done, because the Commander said he didn't think so, based on discussions with somebody who we don't know, and there's no documentary evidence in the record that substantiates that.

MR. KRAFCHECK: No, Your Honor. We think there is documents.

THE COURT: The documents --

MR. KRAFCHECK: The agency's interpretation invoices. And we look at -- I mean, I realize the Court's position, that once we look at the work there, that some work did take place in Singapore. So the question is whether or not --

THE COURT: It's not the issue whether there

was some. The issue is whether any took place. Excuse me, was there any reflagging work that was done in Singapore. If there was, then there's a violation.

MR. KRAFCHECK: Yes, Your Honor.

THE COURT: And we know from the invoices there was work that was done. It looked, it would appear to an average person, like me, that it was reflagging work. It seems like no one in these three sets of emails was very clear about whether it was or not. They were asking, they were trying to figure out whether it was or wasn't. So who gives us, how do we have the answer?

I mean, the legal department is asking. They're saying I don't know.

MR. KRAFCHECK: Your Honor, we would say we have to trust the judgment of the Coast Guard representatives who were on the ground. And while we realize --

THE COURT: And who are those -- that's what I'm saying. Who are those people? And how do we know what their view is? I don't know who they are. We don't know.

MR. KRAFCHECK: Just a moment, Your Honor. Can I have one moment to consult with the agency, Your Honor?

THE COURT: Sure.

(Discussion held off the record.)

MR. KRAFCHECK: I apologize for taking the Court's time.

THE COURT: Pardon me?

MR. KRAFCHECK: I said I apologize for taking so long.

THE COURT: I don't care how long you take. I mean, we've got to sort this out. It's a big record. You're making arguments to me. So I'm saying fine, show me.

(Discussion held off the record.)

MR. KRAFCHECK: Your Honor?

THE COURT: Yes.

MR. KRAFCHECK: We've found the individual in Singapore. That is Dennis Bubragio (ph).

THE COURT: Where are we?

MR. KRAFCHECK: We are at AR-2590.

THE COURT: 2590. Okay, let's get that one. 2590, okay. To Pat Kiefer from John Jargo. Let me back it up here. This is October, so this document begins at 2592.

(Pause.)

THE COURT: What do you believe this document shows?

MR. KRAFCHECK: It shows a connection between Commander Kiefer and the other Coast Guard representatives. It also gives the Court a reason to find that there was an appropriate communication between that, and that the agency was diligently --

THE COURT: That's not, the issue is not the agency's diligence. The issue is was reflagging work done.

MR. KRAFCHECK: Yes, Your Honor.

THE COURT: And it says in the document that he was informed that they were doing main engine work here, meaning Singapore, because Guam was not qualified to do it. Isn't that evidence just the opposite of what you're telling me?

MR. KRAFCHECK: No, Your Honor. Because the rational inference from this document is that if main engine work constituted reflagging as the Coast Guard interprets it, he would have had a problem with it. He would have said hey, wait a second, they're doing -- we have a problem, stop the presses. That was not done in this case.

They said there was no --

THE COURT: But the boat was gone. The boat was gone. He says, "We have been unsuccessful in gaining any information." This is at the top of 2591.

Sending people in blah-blah-blah.

And then it says the boat is gone, left for Guam. "The technical manager invited me to see the ship before departure. They had been in the Asia-Pacific shipyard on Benhoi Road. I was informed they were doing major engine work here, as Guam was unqualified to do it. Additionally informed that their intent was to go to Guam and do the reflagging work there, which consisted of there major items: the CO2 system, steerage control console, and the third that I didn't know."

So that's saying that reflagging was not, main engine work was not reflagging? I don't think so. We know from the invoices there was work done on the CO2 system, by the invoice.

MR. KRAFCHECK: Yes, Your Honor.

THE COURT: They were misled. The boat was gone; they never saw it, and whoever he talked to may not have fully informed, or perhaps was misled.

MR. KRAFCHECK: Yes, ma'am.

THE COURT: It seems to me this document does just the opposite. It shows that there was reflagging work done.

MR. KRAFCHECK: Actually, Your Honor, where he says "which I did that day," he was invited onto

the ship to inspect it, which he did that day. So he did, in fact, go on the ship.

THE COURT: Right. And he said they were doing main engine work.

MR. KRAFCHECK: Yes, ma'am. But he --

THE COURT: That's not reflagging?

MR. KRAFCHECK: No, Your Honor. The government has presumed that in good faith. And we would think in this case, if that was reflagging, he would have thrown a red flag in to stop the procurement. They're doing reflagging work in Singapore, which they cannot do. Therefore, the reasonable inference in here, from this email, is saying that with Coast Guard and Navy personnel on the ground with eyes on, fully aware of the work that is being done, if they thought --

THE COURT: They're not fully aware. Don't make arguments that are not backed up in the record. You may have a good legal argument, but you're not improving your position here by arguing things that aren't in the record.

What we have is they tried for several days to find out something. Right before the boat leaves, he jumps on board, and he said they're doing main engine work here; in addition, they're going to do

some other stuff when they get to Guam. And when they get to Guam they're going to do three things, one of which we know from the invoices they did in Singapore.

They may have continued the work in Guam, or done additional work in Guam, but they began that, they did the CO2 system -- this was the document we talked about earlier. He may have been on the ground, but he didn't, you know, somebody wasn't honest with him about what had been done.

We know from the invoices the CO2 work, some work was done on that. The issue is not good faith. I mean, he was, you know, he may have been acting in good faith. The issue is that there is evidence in the record that undercuts the conclusion that he made.

I'm trying to find the note I put -- give me a second now. Here we go.

I'm having trouble, you're telling me major engine work is not reflagging work? It would seem to me that the whole point is that you're trying to meet requirements to make the ship safe, and other things to meet regulations. It seems to me, at a minimum, main engine work would be reflagging work.

MR. KRAFCHECK: Your Honor, we would argue that the main engine work is simply repairs, and it does not make it more militarily useful.

THE COURT: How do we know the answer to that, based on this record?

MR. KRAFCHECK: We rely on the -- and this is where I was going with the good-faith argument, Your Honor. We would rely on the Coast Guard individual on the ground who looked at that. He was on the ship. So we feel it's safe to presume that he looked at, he was advised --

THE COURT: He said I was informed. He didn't look at it. I was informed. I was informed what their intent was.

You have a perfectly good argument. The problem you have is that the documents don't match up to it on that issue. Now, you may have another argument that's more productive, but not based upon what you've got in the record.

MR. KRAFCHECK: The next argument on that matter, Your Honor, is that with respect to looking at the invoices, the contracting officer not only sent these people to investigate, but looking at the invoices. The contracting officer came to the conclusion that this does not constitute reflagging work; that the purchase of supplies, the having them placed in and tested and then removed, and having the old equipment put back in, is not reflagging.

Absent that, upon its face, looking to be a violation of the applicable statute, we believe that decision was reasonable, and a correct interpretation of the, of 48 C.F.R and the DFARs provision.

THE COURT: Okay.

MR. KRAFCHECK: If we may, Your Honor, with respect to the subcontracting limitation. It's our position that there is a subcontracting limitation that is standard in any small-business contract, that 50 percent of the proceeds have to be used on actual employees of TAL.

In this case, TAL used a hiring agent. They clearly and unequivocally said in their, I think it's 2740 to 41, informed the agency that they would directly hire their employees. All of Plaintiff's arguments to the contrary are simply lacking support in the record.

Your Honor, with respect to the vetting allegations raised by Plaintiff, and the delivery date change, those are not outside the scope of the original contract. It does not change the work, or the performance, or the price.

And because they are within the original scope of the contract, we believe all of Plaintiff's arguments are lacking in merit, as well.

(Pause.)

MR. KRAFCHECK: Can I have one more moment, Your Honor?

THE COURT: Sure.

(Discussion held off the record.)

MR. KRAFCHECK: The last point I want to make, Your Honor, with respect to reflagging, is that it is a post-award issue that falls squarely within contract administration. And we believe it's best left to the agency to handle. And RFP lays out the steps taken, the steps to be taken if there are any issues at all.

For those reasons, Your Honor, we ask the Court to --

THE COURT: Go to the head of the class.

MR. KRAFCHECK: I'm sorry, Your Honor?

THE COURT: Go to the head of the class. I see you may have an argument, but it's not in the record. That may be a more convincing argument.

In other words, my quarrel with you is your record is one thing and the facts are one thing; but if it's a post-award situation, then it may well be that it's something that is viewed as an administrative issue in the contract. And unless it's a substantial change in the contract -- and you didn't

make that argument.

MR. KRAFCHECK: Yes.

THE COURT: But if it's a substantial change, then the issue is what, was what done substantial enough, or was it a material modification, basically, of the work to be done.

I mean, it appears that there was some reflagging done of some nature. We could argue, since I don't know the total amount -- since it's from the administrative record, it's very hard to figure out what that proportion is. But it's very dangerous.

The reason I walked you through it is it's dangerous to make fraud arguments, and then having -- your documents don't back, the factual arguments don't back it up. You may have a legal basis, which is so what.

MR. KRAFCHECK: Yes, Your Honor.

THE COURT: You see.

MR. KRAFCHECK: Yes, ma'am. And I would also rely on the arguments we made in our papers and briefings to the Court, Your Honor, for anything we might have omitted this morning.

Your Honor, the procedural question --

THE COURT: Let me ask you a different question.

MR. KRAFCHECK: Yes, ma'am.

THE COURT: What's the -- your colleague argued to me that November, 60 days prior to November, October, September -- so by September they'll decide whether they're going to continue the contract or not.

MR. KRAFCHECK: Yes, ma'am.

THE COURT: Has any decision been made at all about resoliciting at this point?

MR. KRAFCHECK: No, Your Honor. With respect to the matter of exercising the options, we assume the agency will continue to go forward, so long as TAL performs adequately and responsibly under the contract.

However, no decision, as I understand it, no decision has been made yet.

THE COURT: What is the burden on the agency to have another open solicitation? I mean, we do have this residual problem from 2005. You know, it wasn't your particular problem, but I mean, somebody in the agency inadvertently provided data which, you know, did, it seems to me it clearly did prejudice the Plaintiff.

MR. KRAFCHECK: Yes, Your Honor. The agency --

THE COURT: Why they didn't do anything

about it in the other proceeding is beyond me. But in any event, they didn't; still haven't done anything about it.

But I mean, they do have some data. So in the interest of fairness, why don't you look at resoliciting other bids? Not only just from this gentleman, but perhaps from someone else?

MR. KRAFCHECK: Your Honor, because the agency believed they did adequately and fairly address the issue. When they provided Sealift with TAL's information, they believed that leveled the playing field. And Sealift has 11 ships in their fleet, so the agency assumed that once it leveled the playing field for the vessels that were submitted in the initial award, or initial solicitation, that at that point the onus went back to both offerors to either propose a different ship or --

THE COURT: This contract is for how much, in total?

MR. KRAFCHECK: In total, $27 million, Your Honor, or approximately.

THE COURT: And it's for five years, is that right?

MR. KRAFCHECK: Yes, ma'am.

THE COURT: So you're starting into year 3.

MR. KRAFCHECK: Yes. Yes, Your Honor. We're in the first option year now. So we're about to start year 3.

THE COURT: Is it one plus four, or one plus five?

MR. KRAFCHECK: I believe it's one plus four, Your Honor.

THE COURT: Okay. So you are then going into the third year of the contract.

MR. KRAFCHECK: Yes, Your Honor.

THE COURT: How is the agency burdened by doing the solicitation again?

MR. KRAFCHECK: With respect to burdened, do you mean what harm would it cause?

THE COURT: Yes, what's, we're going to talk a little bit about, you know, what are the standards under injunction.

MR. KRAFCHECK: Well, yes, Your Honor. In this case, as we see it, the significant harm that the agency would have is its long-term planning. If they were to, even allowing the current contract to expire in November and then resolicit --

THE COURT: Well, that can't be right. If it was long-term planning, you would have a contract for a fixed term of five years. By having a fixed

term of one year with four options, you can't make that argument. Because presumably, each year you're looking anew.

MR. KRAFCHECK: Yes, Your Honor. But the options are built such that the agency benefits by extending the contract.

We understand the Court's point. It would make more sense to do a five-year, if you want, predictability.

THE COURT: If that's your argument, then what you've done doesn't support the argument. What you've done is you've basically set up on a year-to-year basis. And presumably that was for the benefit of the government, so that they could make a change if they didn't like what was going on.

MR. KRAFCHECK: Absolutely, Your Honor. The only thing the government was doing, the Navy was doing at that time was preserving its rights, and preserving its options.

But it's still the case that terminating the current contract, and --

THE COURT: I didn't say terminate. I'm saying to put it --

MR. KRAFCHECK: Allow it to expire? Is that it?

THE COURT: No. You would basically say I haven't decided to renew. You're not required to hire them for the year 3.

MR. KRAFCHECK: No, Your Honor.

THE COURT: Okay. So what I'm saying is, you know, while you still have that option there, why not issue a solicitation and see what happens?

MR. KRAFCHECK: Because right now the agency has a great deal in place, for lack of a better way of saying it, with TAL. It's at a fair and marketable rate. We realize that the world market on fuel is continually changing, also. And we believe there is a long-term benefit of having a five-year plan in place, although we realize they still reserve the option of simply allowing option year 3 to expire, and then start again. That prospect mostly --

THE COURT: You wouldn't want it to expire. You'd want to do something before the contract expires. We're in June now, and you've got a little, few months to work here.

MR. KRAFCHECK: Your Honor, we don't believe four months is a sufficient amount of time to engage in a full procurement, handle whatever litigation might arise. This current procurement started in 2005, and we're still --

THE COURT: Right. That's an interesting, I mean, obviously the Plaintiff didn't figure out where to go.

MR. KRAFCHECK: Yes, Your Honor.

THE COURT: That's their problem. And that makes, that does weigh against an injunction, as far as I'm concerned, as this juncture. I mean, they chose the wrong forum. We are now into year 3. They would have been in a stronger position coming in asking for an injunction on this record earlier.

MR. KRAFCHECK: Yes, Your Honor. The other thing is many of Plaintiff's arguments are now moot. TAL has been performing, and they have all the requisite vetting requirements and flagging --

THE COURT: No, I'm sure, they finally got their act together.

MR. KRAFCHECK: Yes, Your Honor.

THE COURT: Right. I mean, it seems to me that it was not necessarily a model procurement.

MR. KRAFCHECK: Yes, Your Honor. But --

THE COURT: I mean, you know. And you didn't seem, from the correspondence, to be all that -- I mean, much to the agency's credit, when these reflagging issues came up, they looked pretty suspicious. And we don't have any, the record doesn't

show anything definitive on the reflagging to me, other than some reflagging was done.

Now, then the issue is, you know, what's the remedy for that at this juncture. And how significant that was, in terms of the, in terms of the change from what the terms were going in.

MR. KRAFCHECK: We believe the appropriate remedy, Your Honor, would allow the agency to fulfill the contract for the five years, the one-plus-four total.

THE COURT: You don't have a remedy unless you've done something wrong.

MR. KRAFCHECK: Well, we don't believe we've done anything wrong, Your Honor. But I'm assuming --

THE COURT: I don't think you want to see one of remedy. That implies we've got another problem.

MR. KRAFCHECK: Yes, Your Honor, I misspoke. We believe the agency hasn't done anything wrong; and even if they did, it was de minimis at most, and the procurement should be allowed to be completed.

With respect to balancing the harms, Your Honor, if I may, we're not sure Plaintiff even has standing to challenge the protest any longer. As Plaintiff on the record said, Sealift no longer has

tankers, so we're assuming, and we're stepping out --

THE COURT: Well, they're going to have to go run around and find another tanker someplace.

MR. KRAFCHECK: Yes, ma'am.

THE COURT: It looks like that's what the pirates are doing off the coast of Africa.

Now, they have -- the solicitation was in March. You awarded the contract in July. April, May, June, so that was three months. So the timing I'm having some trouble with here. You could do this. You could resolicit this thing. They may not win, but you could resolicit it.

It's not, you said you didn't have the time. You had the time, the time matches up from before.

MR. KRAFCHECK: Yes, Your Honor. But the actual solicitation, many of the proposals were all submitted back, if I remember correctly, before the GAO protest of TAL in 2005. So it's a much longer --

THE COURT: The solicitation that I'm working off here was dated --

MR. KRAFCHECK: I've got my facts a little --

THE COURT: -- 2006, right?

MR. KRAFCHECK: After. Your Honor, I'm sorry, I'm looking at the procurement as one long

stretch. Yes, you're correct, Your Honor. That solicitation was issued in 2006. But the entire --

THE COURT: That's what this contract is responding to, correct?

MR. KRAFCHECK: Yes, Your Honor. That was after the GAO protest. But the services themselves were --

THE COURT: So, but they issued the solicitation at the end of March, and they awarded the contract at the end of July. So it's April, May, June, three months. So the time period can't be the right argument, either.

This is comparable, the timing is comparable. If your needs are the same as the prior solicitation, then it would seem to me, you know, the old solicitation might be, might not need very much additional work done to it.

MR. KRAFCHECK: Oh, the solicitation wouldn't, Your Honor. But in this case, the proposals had previously been submitted, so the agency had all that evaluation time that they were able to chop off that three months.

THE COURT: They had three months.

MR. KRAFCHECK: I'm sorry, Your Honor?

THE COURT: They had three months to

evaluate.

MR. KRAFCHECK: Yes, Your Honor. But we're not --

THE COURT: Three months now.

MR. KRAFCHECK: Yes, Your Honor. But we're also not counting, not building in time for litigation and protracted issues, as well as, if we put a solicitation on the street tomorrow --

THE COURT: You didn't build in time for litigation before.

MR. KRAFCHECK: No, ma'am. But --

THE COURT: And you can always continue someone on a month-to-month basis. Lord knows I've seen that here.

MR. KRAFCHECK: Yes, ma'am.

THE COURT: I mean.

MR. KRAFCHECK: But in light of what these services afford, to provide jet fuel to our military services in the Far East, we think that the fair and reasonable thing to do is allow the contract to continue.

It's not only a time argument; it's also a question of --

THE COURT: Well, the issue is not fair and reasonable. The issue is, the issue is if there's

been a violation, what's the right remedy. And if I say there's been a flagging violation -- I don't know that I'm going to or not -- but if I said there was a flagging violation, I have to figure out whether that was material or not. And it's hard to do from the record, because you don't know the totality of what was redone for the flagging.

Do we have something that tells us what they did in Singapore? The totality of money spent in Singapore?

MR. KRAFCHECK: I believe with the invoices, but I don't have that information off the top of my head. I can tell you that, I'm sure we can find it, Your Honor.

THE COURT: Well, let's have the co-counsel find the citations that show me how much money they, TAL, spent -- and he's shaking his head -- in Guam. So we don't know that, either?

MR. KRAFCHECK: May I have a moment to consult, Your Honor?

(Discussion held off the record.)

MR. KRAFCHECK: We're going to look at the invoices, Your Honor. We believe that they may have a total amount spent, but there won't be a work breakdown. But if it's there, I'll be happy to

provide it to the Court.

THE COURT: All right.

MR. KRAFCHECK: Thank you.

THE COURT: You don't have, if you can't do it today, this is -- there is no contest going here. You can take a day or two to find it, if you can't find it right now.

All right, Plaintiff's counsel. Do you want to talk to me a little bit about the four standards for getting an injunction?

MR. SHEA: Your Honor, I would very much like to speak to you about that. May I offer you a few observations about some of the questions that came up in the prior colloquy with my, with government counsel? Two, if I may.

THE COURT: Sure.

MR. SHEA: One, with respect to, and first of all --

THE COURT: I think he's just gathering his notes up. And you said you want to sit down, so he's not taking your space.

MR. SHEA: All right. I don't mind. I don't want to be --

THE COURT: You can just use the podium, by all means.

MR. SHEA: No, I'm not. Anyway, first of all, going to your last question, which is the question of how do you connect the dots between what constitutes a, what is a reflagging activity and repairs, and what is otherwise. One --

THE COURT: The last point was to figure out the issue of materiality. In order to know how material it is, the issue is -- one of the things we need to determine is how much was spent.

MR. SHEA: I agree.

THE COURT: And compare that with the amount that was spent in Singapore.

MR. SHEA: I want to back up perhaps a little more from that. I would urge the Court's attention to what we have described -- and you wouldn't necessarily know what it looks like -- it's on page 2829 of the record. Which is what was described as the GAAP analysis.

The United States Coast Guard does not --

THE COURT: Okay. Let's talk to me about what a GAAP analysis is.

MR. SHEA: Correct. All vessel operators have, in the international trade, use what are called vessel classification societies.

THE COURT: On 2829?

MR. SHEA: 2829.

THE COURT: 2829 is a Swedish registry.

MR. SHEA: Actually, Det Norske Veritas, which is, that is an inspection society.

THE COURT: Okay.

MR. SHEA: And what they do, they are licensed or authorized by port state authorities; that is, by countries, okay. And what they do is they have a stable of inspectors who go out and look at ships. They know the standards that apply to various kinds of vessels, and they apply those standards to the vessels.

So Det Norske Veritas works worldwide. They also are authorized, they do the GAAP analysis for the ship.

THE COURT: I asked you what was a GAAP analysis.

MR. SHEA: The GAAP analysis is, it's basically a punch list, Your Honor, if you know what I mean by a punch list, Your Honor.

THE COURT: That's what NVIC 10-81, and DNV U.S. Rev. 10, is the standards are set forth for what a GAAP analysis is in those two documents.

MR. SHEA: Well, I think they are, the answer is yes. This is their, this is the punch list.

THE COURT: This is a list of things that they're supposed to do.

MR. SHEA: That need to be done to bring the vessel into compliance. This is the bottom line.

And what happens is they do, the classification society, first of all, is supposed to attend the work, and at the end of the day say yes, this was done. And I might add, for instance, on page -- and this doesn't put prices, because this is solely about performance.

THE COURT: Right. They've got 29 items that they're saying are needed to be done.

MR. SHEA: Right.

THE COURT: The date of this is July? Issued July --

MR. SHEA: No, this is October. This is 10/28. This is delivered at the time the vessel was reflagged.

THE COURT: This was done in Guam, okay.

MR. SHEA: Correct. So this was, this basically was the classification society throwing the holy water on this, on the conversion process, saying okay, these were the things that were done. And this is a list of the changes that were made. And I might add, for --

THE COURT: Well, are these the changes that were made in Guam? Or changes that were made --

MR. SHEA: They don't care. They were made. That's not their function.

THE COURT: How do they know when they were made?

MR. SHEA: What they've done is they verify that by this certificate -- they may have done other things, and they may have done many other things. They, of course, in anticipation of this they would have looked at the vessel and decided what needed to be upgraded.

This is their confirmation that these changes were made. And that, and this is the necessary part of the reflagging process, because it shows that the changes were made to bring it up to U.S. flag standards.

THE COURT: Right.

MR. SHEA: And so on page 2830, there's a lengthy, all this discussion about piping and CO2, those are safety matters. I mean, they're fundamental. Many of these issues deal with --

THE COURT: Well, how does this show, how does this document show that reflagging work was done in Singapore?

MR. SHEA: This document does not show where it was done. It shows what was done.

THE COURT: Okay. Now, so what on this list was done that we can match up with invoices from Singapore?

MR. SHEA: Well, the $CO_2$ work, fire stations, and basically what's on page 2, on page 2830.

THE COURT: And your argument is item 8, 8.1, 9?

MR. SHEA: Right.

THE COURT: Those were all things that you say were done in Singapore.

MR. SHEA: Yes. Basically it's fire prevention, so it's really 7 and 8.

THE COURT: All of 7.

MR. SHEA: Yes, and 8.

THE COURT: And what about 9 and 10?

MR. SHEA: Oh, 9 is, 10 -- those become, just like fire extinguishers and other --

THE COURT: All right. So your argument is 7 through 9.

MR. SHEA: And I might add 13. If you look at 13, for instance.

THE COURT: Let's just --

MR. SHEA: I'm sorry.

THE COURT: -- try to stay with 7 to 9 right now. Seven to 9, it's your contention that was done in Singapore.

MR. SHEA: Correct.

THE COURT: Okay. Now, how do I know that from the two documents we have from invoices from Singapore?

MR. SHEA: And I might add, if I can refer you to .8, Your Honor, the end of .8 talks about testing of systems with, you know, test systems for high-pressure time-delay downstream piping, CO2-powered alarms.

THE COURT: Okay.

MR. SHEA: I would suggest to Your Honor that that parallels the description that we went through for the, for the invoices that we have from Singapore.

THE COURT: I said show me.

MR. SHEA: Well, Your Honor --

THE COURT: Between 7 and 9, we've got two invoices. Show me those invoices, and show me how that matches up.

MR. SHEA: Very well, Your Honor.

THE COURT: I know this is tedious, but --

MR. SHEA: No, I'm happy to. I have to tell you, I've lost the reference to the invoices right now.

THE COURT: Well, I'll see if I can help you out again. Hold on. 2782, 2785.

MR. SHEA: Thank you, Your Honor.

THE COURT: There may be other ones, but these are the two that I've got.

MR. SHEA: Okay. 2782 says MFG, manufacture of parts for fixed CO2 system. That's the title that's there.

THE COURT: Okay.

MR. SHEA: And that's, and if you look at page 2830, item 8 talks about replacement of the CO2 system.

THE COURT: Yes.

MR. SHEA: And so you're talking about, and I'm returning back to, and that's a description. So they're talking about making templates. This hydrotest of nitrogen with, that's 600, whatever the pressure is, piping then that was reinstalled, okay.

So here, at page 2830, what DNV is the typical, the way it's described, Det Norske Veritas, which is a classification society, is saying -- and you see, most of this discussion is about fire-

prevention activities. A new $CO_2$ system is installed for the engine room and pump room. That's what 8 says.

THE COURT: Okay.

MR. SHEA: In accordance with approved drawings. That's what, and that's why those two match.

THE COURT: What do I do with the email from the Coast Guard that talks about engine work being done? Do either of these two invoices show engine work? Or is the record incomplete? Do we just not have the invoice for that?

MR. SHEA: First of all, I don't have, there don't seem to be any invoices for that that I'm aware of, Your Honor.

THE COURT: Well, how in the world was it done? Just finished it for free?

MR. SHEA: Well, first of all, Your Honor, we only have the invoices that the government got from TAL. The government did not get these invoices from --

THE COURT: TAL may not have given them an invoice for the engine work, and they didn't see that problem probably until this morning.

MR. SHEA: That's also the reason why the

information we have does not have numbers. Because when TAL gave the information to MSC, they struck out most, maybe all, they struck out the pricing information. So counsel may well find it, but at least so far as I know, for the most part it was provided to them with the numbers blocked out.

THE COURT: Right. And probably my guess would be that the government didn't know, didn't focus on the fact that this engine work had been done, and didn't note that we have no records in the file from TAL for that. They probably didn't think about that issue.

Okay. So, can we return to the four factors?

MR. SHEA: Your Honor, I'd be delighted to return. May I trouble you for one other small matter on the prior discussion, if I may? On the issue of warranties?

THE COURT: Yes.

MR. SHEA: There was a reference to page 1504 and 1503. In the discussion about what constitutes a warranty on these submissions. And the argument there was essentially that those, the numbers, the fuel consumption numbers, are really just numbers. They're as much as this offeror, or as

little, as they're prepared to deal with.

And if I can just, if you'll just bear with me, Your Honor.

THE COURT: Well, just because it's a warranty doesn't necessarily mean it's misrepresentation. A warranty is a promise.

MR. SHEA: Well, Your Honor --

THE COURT: I promise you blah.

MR. SHEA: I suggest, Your Honor -- I'm sorry to interrupt, but I suggest that what happened was this. And I'd like to take you, just for a moment.

What the government said is give us the characteristics of your ship. And they give them the characteristics of the ship. And then, for some things they say these are warranties, meaning we will hold them to you.

And for instance, they give them, in the very same place with those discussions, they say the characteristics, speed and consumption, shall be deemed warranties; meaning we'll hold you to those.

Now, the government has said well, those are really just, those are any number -- those don't have to be tethered to the performance of the ship.

I think the government would be unhappy if

they would find out the ship, the maximum speed of that ship is six knots, okay, instead of 12. The government's position is no, that's just all we've warranted, and then they may have contractual rights. So if there's some facility out there that needs to be refueled on some urgent basis, well, okay, look, this was just a, I didn't give you a representation of fact; I gave you a contractual representation, and you're entitled to take whatever liberties you can, or remedies. I don't think that's what's intended.

What that provision of 1503 and 1504 says, these are ship characteristics. And certainly they're the characteristics for speed and consumption. We are making a warranty, meaning that we will hold you to, we have various ways of holding to that.

And I might add, in terms of the real world, isn't that the way it ought to be? And that is, they want to know really how, they really want to know how fast this ship goes, not how much TAL is willing to stand behind it, if TAL indeed has anything at all to stand behind that.

And I'll offer one derivative comment on that, and then I'll quit on this, Your Honor. And that is, the government says look, this is a fixed-price contract. It's true it's a fixed-price

contract, except for this: the government supplies the fuel.

So if the fuel price quadruples, they're supplying the fuel, okay. So it's not fixed-price as to the fuel, because the government just keeps supplying it. It's that simple.

THE COURT: Okay.

MR. SHEA: Now, Your Honor, let me speak to the issue of entry of the standards. First of all, irreparable harm to Sealift.

Sealift has already lost, Sealift has a fleet of 11 or 12 vessels. This ship, first of all, they've had this ship for a prior contract, and I don't know what, approximately 2002 more or less. But they couldn't hold the ship after they lost this contract. So that's harm to being with, all right. And they lost the employment for that vessel. You know, the crew. They had a whole overhead set aside for that; that's gone.

In terms of --

THE COURT: Where is that in the record?

MR. SHEA: Well, it's not really in the record. It's not.

THE COURT: Okay.

MR. SHEA: I don't think it's disputed, but

it's not.

Balance of hardships, there has been some discussion about that. And Your Honor correctly observed that the government, in terms of, they have structured this as exercising options.

THE COURT: No, the contractor has exercised his option. They didn't structure it. That's what the contract says.

MR. SHEA: That's right. So all the government has to do, they may or may not exercise that option, some time perhaps in whatever, let's say, you know, September or something like that of this year. I don't think it's a stretch or any burden that the government might have to resolicit for that. I mean, that's specifically contemplated by the way they set up this procurement.

In our estimation, public interest favors --

THE COURT: Of the three favors, public interest isn't the third one.

MR. SHEA: Irreparable harm to Sealift, and, or no.

THE COURT: Okay, go on ahead.

MR. SHEA: Anyway, I guess I'm distracted in some measure, because I'd like to revert to one other matter. But I'll conclude with that. I think that --

THE COURT: Let's try to stay with the injunctive factors first.

MR. SHEA: All right.

THE COURT: Then we'll go back to whatever else you have, okay?

MR. SHEA: All right.

THE COURT: Let's try it my way.

MR. SHEA: I have lost the train of my thought, Your Honor.

THE COURT: Well, forget about it. You're not listening to what I'm saying. The Federal Circuit says let's assume that, you know, you were wrong, wrong, wrong. But I can still not issue an injunction; that's within my discretion, okay?

MR. SHEA: Yes.

THE COURT: So I'm trying to say forget about, let's assume all the arguments that you're making are correct. Your burden, it seems to me, goes right to those four factors. So I'm not hearing a lot of oomph there. And I think that that's, in my judgment that's where you should be spending some time now.

This reflagging thing I think is, you know, a closed issue. So I want to tell, I want to find out why it is that I need to issue an injunction here.

MR. SHEA: Well, I think I've dealt with, the harm to Sealift has been genuine, and has already occurred. And it may not be in the record, but it's certainly true.

The balance of hardships in terms of to Sealift, I've already dealt with the hardships.

THE COURT: Let's go back to why isn't it in the record.

MR. SHEA: Because that happened, first of all, because that happened -- the award was made, that happened long after --

THE COURT: But why didn't you supplement the record? You're the lawyer.

MR. SHEA: Yes, Your Honor.

THE COURT: Yes.

MR. SHEA: Well, I guess we did. But that decision, anyway, that took place after redelivery. And the answer is perhaps we should have. But in fact, Sealift couldn't hold the ship. There was no employment for the vessel.

THE COURT: Do you want to go back, are you finished? Do you want to go back to your original point that you were missing? Or do you think you've finished everything you wanted to say on injunctive relief?

MR. SHEA: I'm sorry, Your Honor. Okay. Again, in terms of where the government is, I don't think there is any special burden to the government. I think the public interest certainly warrants that this award be set aside.

THE COURT: How so?

MR. SHEA: First of all, this award is marred with I think some really egregious errors. And I think in some measure, Sealift is -- and Your Honor understands it -- the fact that the government gave away their bid information, and then, and then resolicited the contract. Then the TAL offer came in less than one percent away, I think less than half of one percent away from Sealift's offer, is an issue that's very hard to get over. It's very hard to get over. The government disadvantaged them.

And then, when they reoffered, Sealift was always going to offer the ship -- they had the Montauk on there for several years, there was no question there was going to be the offer. Then TAL lost control of the ship they were using. So again, Sealift's information was out in the open, and they were fighting an offer that they wouldn't have any information on.

So I think the solicitation was marred by

some things that I think, frankly I think deserve some consideration.

THE COURT: Well, we've been considering it all morning.

MR. SHEA: Very well, Your Honor. I understand, and I don't want to carry it into the afternoon.

Anyway --

THE COURT: The issue is not one of time. The issue is what's in the record, okay?

The reason that these bright young things are sitting in the back of the room, these interns, is so that they can understand some things. Life is not -- everybody can argue anything. The issue is what do I, I've got -- this is what my Bible is. I have to work with what is in the record. And as you saw with the government, sometimes the arguments are not backed up by what's in the record.

And you're telling me there is irreparable harm, and that's something that I can take judicial notice of. And I'm saying well, why isn't it in the record?

MR. SHEA: Your Honor, it should be. But it just, I guess it should be. It was a decision --

THE COURT: You can see my problem.

MR. SHEA: I do.

THE COURT: Yes. Could you possibly think of any way of solving that problem?

MR. SHEA: May I offer to supplement the record with --

THE COURT: Go to the head of the class.

MR. SHEA: Thank you, Your Honor. I'd like to submit --

THE COURT: You need a declaration that shows something in the record. It may or may not be enough for what we're going to do, but you've not provided the Court with anything remotely relevant to being able to satisfy irreparable harm. Other than the fact you didn't get the contract, but that's not enough.

MR. SHEA: Thank you very kindly, Your Honor. We will submit something in a matter of, very shortly.

THE COURT: Okay. Do we have anything else to do?

MR. SHEA: Your Honor, I'd like to test your patience and just point something out to you, if I may.

THE COURT: Okay.

MR. SHEA: And with that, I'll quit.

THE COURT: All right.

MR. SHEA: Which, it goes back to the question of reflagging, and the question of well, all this is post-award activity anyway.

THE COURT: Well, it is.

MR. SHEA: It is. And the question is what standards do you have.

THE COURT: The statute gives me, the statute says thou shalt not reflag.

MR. SHEA: Right.

THE COURT: Then I have to figure out what's reflagging. Unfortunately, Congress decided not to tell me what reflagging was. Nor do the regulations tell me what reflagging is.

The government's argument is I should be able, I've got to rely on what the Coast Guard officer knows what it is in his head, and he knows it when he sees it; and he didn't see it, based upon hearsay from someone who we really don't know that he talked to. And what we do know in the record is that somebody went aboard the ship, said there was engineering work being done on the engines, three other categories were going to be done in Singapore. Excuse me, were going to be done in Guam. Except we know from the documents one of those three was done in Guam.

It's not a very pretty picture. That's what we know from the record. Okay.

MR. SHEA: Again, I don't want to take up too much time. We suggest, I suggest you also may consider, the government suggested that all this, since it was post-award, was all subject to the discretion of the contracting officer.

I previously argued, of course, that the statute says it can't be waived except by the Secretary of Transportation, Secretary of Defense.

THE COURT: That's what the statute does say.

MR. SHEA: And the Secretary of Defense has no paper around indicating the Secretary of Defense has done that.

THE COURT: It doesn't look like it. It looks like he's been busy doing some other things.

MR. SHEA: Right. I'd like to think that he was. And Your Honor, I was just going to point out that the DFAR related to this reinforces that. And it says all the supplies prior to acceptance of the vessel. So there can't be any, it says there can't be any reflagging work, not just prior to award, but subpart, you know, actually the last line says it can't be prior to acceptance of the vessel by the

government. That's my simple point.

THE COURT: Well, let me just ask you this. Assuming for the moment when we walk out of here the government says boy, I don't know what Judge Braden's going to do; she didn't look too pleased with me. What if she does issue an injunction? Then what do I do? And I have to, they have to redo a solicitation.

Now, today is, we're at the middle of June. Let's say for the moment they work diligently, and they get their solicitation done in the middle of July, or even the first of August. How long would it take your company to bid? Would you be satisfied with a 15-day turn-around? The full station goes out; how long does it take you to put an answer in?

MR. SHEA: Your Honor, our recommendation was, I think, we try to work in a four-month period.

THE COURT: Okay.

MR. SHEA: And that --

THE COURT: You worked in a three-month period before, so surely --

MR. SHEA: Yes, we said 120 days, I think. And so I think --

THE COURT: Well, you did it in three months the last time.

MR. SHEA: Right. We did, that's correct.

THE COURT: Okay. So if they issued a solicitation, you would be prepared to let that go, and you'd be ready to go on the money in 90 days, and wouldn't complain?

MR. SHEA: No, I don't think so, Your Honor. I mean, and I wouldn't object to it if the government took --

THE COURT: Was that a yes or a no?

MR. SHEA: The answer is yes, Your Honor, yes.

THE COURT: All right. Does the government -- why don't you send something to me, or send something to, you can send a note to Joe by email, rather than doing something and CC the other parties. And, oh, yes.

Can you get the crewing agent employment contract? And Joe put down to me you want the transcript under seal. No one asked me to have the hearing under seal. So whoever has been in the room is here. Do you care very much about this at this point?

MR. SHEA: I do not. I do not, Your Honor.

THE COURT: I can't imagine that you would, since you've been all over Washington, D.C. with this.

MR. SHEA: No, Your Honor.

THE COURT: So that we don't need the transcript under seal, as to that problem.

I would like, if you could get the crewing employment document from TAL. It seems to me that needs to be in the administrative record, because that will tell us whether there is an employment relationship between the two. We'll know the answer. We'll know right away, whether he says yes, you know, we'll know the answer, right?

MR. KRAFCHECK: Yes, Your Honor.

THE COURT: It shouldn't be hard to find. Presumably they have that in their files. It's been not six years. And then you're going to supplement the record, as well, with giving me some additional invoices from Guam, and adding them up.

MR. KRAFCHECK: That's from Guam, Your Honor? I thought you wanted them from what was already in the record. I thought you wanted me to look at what was in the record and --

THE COURT: I know what's from Singapore, the ones we found. What I don't know is how much work was done in Guam, which would be whatever, presumably invoices to back up that Swedish document. The punch list. If you have it.

MR. KRAFCHECK: Yes, Your Honor.

THE COURT: I mean, surely they should be in there. But if you don't have it.

You also have an interesting issue to me, which is, we clearly know that there was engine work done. But we don't have any invoices from these other people about what was done. You don't have it, either. You haven't the foggiest idea --

MR. KRAFCHECK: No, Your Honor. May I speak to that issue very, very quickly?

THE COURT: Yes.

MR. KRAFCHECK: Plaintiff's counsel has submitted this DNV report, and we quickly read through it and realized it makes no mention about the whole GAAP report, and how any reliance upon that shows that there was reflagging work. There's no mention of engine repairs in that.

THE COURT: Right.

MR. KRAFCHECK: So one would think that the exclusion of engine repair, one would think that the rational inference is that engine repairs were excluded from that.

THE COURT: That's not an inference I can make. They may have just done those. I don't have, I have no way of knowing the answer to that. You don't even have an invoice in there for it.

Let's start with the invoice, and we'll figure out why. But it seems to me that that should have been something that was raised. And it may be an interesting issue, which is you asked these people for the documents, they gave you what they wanted you to have.

MR. KRAFCHECK: Maybe that, Your Honor. Or for all we know, there might not have been any engine work. The gentleman said it was all about a question of intent, as the Court pointed out.

THE COURT: Well, you're telling me I'm supposed to rely on this guy. If there wasn't engine work done, he thought there was. And he thinks that they're doing three other things, except we know we have invoices for one of them from Singapore. That gives me some pause as to how much I'm supposed to rely on this guy.

Presumably, engine work is not something that's minor.

MR. KRAFCHECK: One would think not, Your Honor.

THE COURT: I would think it's a big issue.

MR. KRAFCHECK: Yes, ma'am. Fine. I'm just jotting down notes.

THE COURT: They charge me $1,000 every time

I have the guy look at my old Volvo engine. Just took at the thing, and he has me billed for $1,000. So I suspect when these guys -- and I want you to give some thought to this.

You know, I can issue an injunction. We need to have some other stuff done here. We haven't talked about the court reporter. What type of instructions do you have?

THE REPORTER: No transcript was ordered.

THE COURT: What do you mean, no transcript? Is somebody else ordering a transcript around here?

MR. KRAFCHECK: Not that I know of, Your Honor.

THE COURT: Okay. Well, I'm ordering a transcript. Don't tell me I can't have a transcript. I certainly think I can have a transcript.

MR. KRAFCHECK: We haven't made that decision yet, Your Honor. We did not --

THE COURT: Well, you want to let me know if you do? The reason is the Court has to pay for it if you don't ask for it.

MR. KRAFCHECK: Yes, ma'am.

THE COURT: But I think we need the transcript, based on what we've got here. So maybe the two of you can split it, I don't know.

All right. If you decide you're not going to, then I guess we'll order it. And I think what we need to do is we need to have it relatively soon.

Let's go off the record now, Joe.

(Whereupon, at 12:30 p.m., the hearing in the above-entitled matter was concluded.)

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

## REPORTER'S CERTIFICATE

DOCKET NO.: 07-627C

CASE TITLE: Sealift v. U.S.

HEARING DATE: June 9, 2008

LOCATION: Washington, D.C.

I hereby certify that the proceedings and evidence are contained fully and accurately on the tapes and notes reported by me at the hearing in the above case before the United States Court of Federal Claims.

Date: June 9, 2008

______________________________

Tammy Brodsky
Official Reporter
Heritage Reporting Corporation
Suite 600
1220 L Street, N.W.
Washington, D.C. 20005-4018