# In the United States Court of Federal Claims

No. 07-627C
Filed: July 11, 2008
TO BE PUBLISHED[*]

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| | * | Administrative Dispute Resolution Act of |
| | * | 1996, 28 U.S.C. § 1491(b); |
| | * | Administrative Procedure Act, |
| | * | 5 U.S.C. § 706; |
| | * | Bid Protest; |
| | * | Cargo Preference Act of 1904, 10 U.S.C. § |
| SEALIFT, INC., | * | 2631(b); |
| | * | Competition in Contracting Act of 1984, |
| Plaintiff, | * | 10 U.S.C. § 2305(b), 31 U.S.C. § 3551, |
| | * | 31 U.S.C. § 3553(d), |
| v. | * | 41 U.S.C. § 253(a)(1)(A); |
| | * | Interested Party; |
| THE UNITED STATES, | * | Post-Award Protest; |
| | * | Small Business Set Aside, |
| Defendant. | * | 13 C.F.R. § 121.1007; |
| | * | Standing; |
| | * | Time Charter Contract; |
| | * | 10 U.S.C. § 6011; |
| | * | 32 C.F.R. § 700.204(c); |
| | * | 48 C.F.R. § 9.104-1; |
| | * | Fed. R. Ev. 901; |
| | * | RCFC 52.1. |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Timothy B. Shea**, Nemirow, Hu & Shea, Washington, D.C., for plaintiff.

**Christopher Lonnie Krafchek**, United States Department of Justice, for defendant.

## MEMORANDUM OPINION AND FINAL ORDER

**BRADEN,** *Judge.*

---

[*] On July 8, 2008, a pre-publication draft of this Memorandum Opinion and Order was provided to the parties under seal, with instructions to propose any redactions on or before July 10, 2008. On July 10, 2008, Sealift and the Government submitted proposed redactions.

This pre-award and post-award bid protest concerns allegations that the Military Sealift Command unlawfully awarded a time charter contract despite a material misrepresentation, violations of subcontracting limitations, and waivers of reflagging, security clearance, and alien crew member requirements.

To facilitate review of this Memorandum Opinion and Final Order, the court has provided the following outline:

I.      **FACTUAL BACKGROUND.**

      A.      **The Solicitation And Award.**

      B.      **Protest At The Government Accountability Office.**

II.     **PROCEDURAL HISTORY.**

III.    **DISCUSSION.**

      A.      **Jurisdiction.**

      B.      **Standing.**

      C.      **The Relevant Standards For Decision On The Administrative Record In A Bid Protest Case.**

      D.      **The Parties' Cross-Motions For Judgment On The Administrative Record.**

            1.      **Pre-Award Misrepresentation Regarding The *Bonito's* Fuel Consumption.**

                  a.      **The Parties' Arguments.**

                  b.      **The Court's Resolution.**

            2.      **Pre-Award Violation of The Competition In Contracting Act Of 1984.**

                  a.      **The Parties' Arguments.**

                  b.      **The Court's Resolution.**

            3.      **Post-Award Violations Of The Competition In Contracting Act Of 1984.**

a.      **Prohibited Reflagging Work.**

  i.      **The Parties' Arguments.**

  ii.      **The Court's Resolution.**

b.      **Failure To Timely Obtain Proper Facilities Clearance.**

  i.      **The Parties' Arguments.**

  ii.      **The Court's Resolution.**

c.      **Transatlantic Lines, Ltd.'s Use Of Alien Crew Members.**

  i.      **The Parties' Arguments.**

  ii.      **The Court's Resolution.**

d.      **Military Sealift Command's Waiver Of The Delivery Date.**

  i.      **The Parties' Arguments.**

  ii.      **The Court's Resolution.**

e.      **Change In Vetting Requirements.**

  i.      **The Parties' Arguments.**

  ii.      **The Court's Resolution.**

IV.   **CONCLUSION.**

\* \* \*

## I.    FACTUAL BACKGROUND.[1]

### A.    The Solicitation And Award.

Military Sealift Command ("MSC") is an operating unit of the Department of the Navy ("Navy"). *See* 10 U.S.C. § 6011; *see also* 32 C.F.R. § 700.204(c) ("The operating forces of the Navy and the Marine Corps comprise the several fleets, seagoing forces, Fleet Marine Forces, other assigned Marine Corps Forces, the Military Sealift Command and other forces and activities that may be assigned thereto by the President or the Secretary of the Navy."). MSC is responsible for the acquisition of vessels and other maritime assets for the use and support of the Navy and other military departments. *See* Military Sealift Command, www.msc.navy.mil ("MSC's mission is to support our nation by delivering supplies and conducting specialized missions across the world's oceans.").

On March 31, 2006, the Navy issued Solicitation Number N00033-06-R-5409 ("the March 31, 2006 Solicitation") to procure a tank vessel for operations in the Pacific under a "time charter" contract,[2] to begin in October 2006 for a base period of one year, with three one-year option periods and an additional eleven-month option period. *See* AR 1481-82, 1486. The March 31, 2006 Solicitation stated that the fixed price contract would be awarded as a 100% small business set aside, to an offeror that submitted the lowest priced, technically acceptable proposal. *See* AR 1481-82, 1572. In addition, each offer was required to include information about the proposed vessel, including: the size; draft; pumping capacity; configuration; and to warrant speed and fuel consumption, because fuel costs would be included in the contract. *See* AR 1486-1504. In the event of a breach of the speed and fuel warranty, the March 31, 2006 Solicitation allowed the Navy to: reduce payment by the overcharge; terminate the charter; or place the charter

---

[1] The facts recited herein were derived from: the October 19, 2007 Administrative Record and Supplements thereto ("AR 1-3091"); Plaintiff's February 12, 2008 Statement Of Facts ("Pl. PF"); and the Government's March 24, 2008 Cross-Motion For Judgment Upon The Administrative Record And Opposition To Plaintiff's Motion For Judgment Upon The Administrative Record, including a Statement Of Facts ("Gov't Op. and Resp.").

[2] A "time charter contract" is defined as one where "a vessel is let to a charterer for a stipulated period of time or voyage, for a remuneration known as hire, generally a daily rate per ton deadweight. The shipowner continues to manage the vessel through the master and crew who remain his servants." *See* MacAndrews Shipping Dictionary, *available at* http://www.macandrews. net/resources/dicts.html.

off-hire.[3]  *See* AR 1504.  The March 31, 2006 Solicitation also included a limitation on subcontracting.  *See* AR 1535.

On April 19, 2006, Sealift, Inc. ("Sealift")[4] submitted an offer in response to the March 31, 2006 Solicitation for the vessel *Montauk*, a United States flag ship built in 1999.  *See* AR 1597, 1612.  Sealift warranted that the *Montauk's* fuel consumption rate was 67 barrels per day, at an average speed of 12 knots.  *See* AR 1617.  Sealift also warranted a fuel consumption rate of 4.0 barrels per day when the ship was idle in port, and a rate of 7.5 barrels per day, when the vessel was discharging in port.  *Id*.  The engines and auxiliaries of the *Montauk* used 180 grade fuel at $55.32 per barrel.  *Id.*; *see also* AR 1985.  Based upon Sealift's warranted fuel consumption rate and average speed, MSC estimated that the total bunker costs for the *Montauk,* based on a 1,796 day pricing scenario, would be $4,227,081.05.  *See* AR 1992.  Sealift's final proposed price for the *Montauk*, without fuel costs, was $25,591,140.00.  *Id.*  Sealift's final "total estimated price[,] including fuel," was $29,818,221.05.  *Id.*

Transatlantic Lines, Ltd. ("TAL") submitted two separate proposals in response to the March 31, 2006 Solicitation: one for the *Bonito*; and one for the *Emre-T*.[5]  *See* AR 1808 (TAL *Bonito* Proposal); AR 1687 (TAL *Emre-T* Proposal).  The *Bonito* was a Swedish flag ship, built in April 2001.  *See* AR 1860.  TAL warranted that the *Bonito's* fuel consumption rate was [redacted] barrels per day, at an average speed of 12 knots.  *See* AR 1865.  TAL warranted a fuel consumption rate of [redacted] barrels per day, when the ship was idle in port, and a rate of [redacted] barrels per day, when the vessel was discharging in port.  *See* AR 1865, 2050.  The engines and auxiliaries of the *Bonito* used 380 grade fuel at $53.41 per barrel.  *See* AR 2050.  Based upon TAL's warranted fuel consumption rate and average speed, MSC estimated that the total bunker costs for the *Bonito*, based on a 1,796 day pricing scenario, would be [redacted].  *See* AR 1985, 2050.  TAL's final "total estimated price[,] including fuel," was $29,068,713.74.  *See* AR 1992.

---

[3] "Off-hire" is defined as "a period which a vessel is temporarily incapable of trading due to drydocking, maintenance, repair or breakdown."  *See* MariSafe Boating Dictionary, *available at* http://www.marisafe.com/resources/boatdictionary.asp.

[4] Sealift is a closely-held company, incorporated in New York, and owned by John Raggio, Ragnar Knutsen, Alan Alder, and Fred Isaksen.  *See* AR 3050 ¶ 1 (June 12, 2008 Supplemental Declaration of John Raggio); *see also* Sealift's website, www.sealiftinc.org.  Mr. Raggio is Sealift's Vice President.  *Id.*  Sealift "operates a fleet of twelve U.S. Flag, ocean-going ships; most of these vessels operate in [Sealift's] U.S. Flag Liner Service to world wide destinations."  Sealift's website, www.sealiftinc.org.  Sealift also is classified as a small business, pursuant to the Small Business Administration regulations.  *See* AR 3050 ¶ 1; *see also* 13 C.F.R. § 121.

[5] On May 22, 2006, TAL withdrew the proposal for the *Emre-T*.  *See* AR 1928.

TAL also informed MSC that it would utilize the services of a crewing agent "to find crew for [its] vessel." AR 2027. TAL's crew proposal was for: "Captains and Engineers within [the] company that have tanker experience" and "two licensed engineers, as [TAL's] in-house technical managers that are qualified to operate the engine room of the tanker." AR 1921.

On May 17, 2006, the contracting officer ("CO") determined that both Sealift and TAL's proposals were within the competitive range and discussions commenced with each company. *See* AR 2010, 2037, 2047. On June 7, 2006, the Tanker Project Officer found that both the Sealift and TAL proposals technically were acceptable. *See* AR 2052, 2056. In addition, both price proposals were found to be "fair and reasonable." *See* AR 2168-69. The CO, however, recommended that the contract be awarded to TAL, because it had the lowest price. *Id.*

On June 27, 2006, the CO notified TAL that it was the successful offeror, but that other offerors had until July 5, 2006 to challenge TAL's small business status. *See* AR 2173. On July 7, 2006, the United States Small Business Administration ("SBA") notified TAL that Sealift challenged TAL's small business status. *See* AR 2235. On July 14, 2006, however, the SBA dismissed Sealift's protest for failure to provide specific information challenging TAL's qualifications.[6] *See* AR 2238.

On July 21, 2006, MSC awarded the contract to TAL and provided notice of the award to Sealift. *See* AR 2185, 2224. On July 31, 2006, a debriefing took place, at Sealift's request. *See* AR 2225-27.

---

[6] Federal Acquisition Regulation ("FAR") 121.1007 states:

(a) Particular procurement. A protest challenging the size of a concern which does not pertain to a particular procurement or sale will not be acted on by SBA.

(b) A protest must include specific facts. A protest must be sufficiently specific to provide reasonable notice as to the grounds upon which the protested concern's size is questioned. Some basis for the belief or allegation stated in the protest must be given. A protest merely alleging that the protested concern is not small or is affiliated with unnamed other concerns does not specify adequate grounds for the protest. No particular form is prescribed for a protest. Where materials supporting the protest are available, they should be submitted with the protest.

(c) Non-specific protests will be dismissed. Protests which do not contain sufficient specificity will be dismissed by SBA.

13 C.F.R. § 121.1007.

Prior to delivering the vessel, TAL changed the vessel's name from *Bonito* to *Transpacific*. *See* AR 2672-73; *see also* Pl. PF ¶ 27.

## B.      Protest At The Government Accountability Office.

On August 7, 2006, Sealift filed a bid protest with the Government Accountability Office ("GAO"), contesting the award to TAL. *See* AR 2247. On August 8, 2006, MSC decided not to suspend performance during the protest.[7] *See* AR 2382. At the GAO, Sealift argued that: TAL misrepresented the *Bonito's* fuel consumption rate and crewing requirements; TAL was not a "responsible offeror;" and Sealift was prejudiced by MSC's improper disclosure to TAL of Sealift's offer in a prior 2005 Solicitation.[8] *See* AR 2254-63; *see also* 48 C.F.R. § 9.104-1 (responsible offeror).

---

[7] The Competition in Contracting Act of 1984 states:

> If the Federal agency awarding the contract receives notice of a protest . . . the contracting officer shall immediately direct the contractor to cease performance under the contract and to suspend any related activities that may result in additional obligations being incurred by the United States under that contract.

31 U.S.C. § 3553(d)(3)(A).

This Section, however, only applies if the agency receives a notice of protest within 10 days after award or 5 days after a required debriefing. *See* 31 U.S.C. § 3553(d)(4).

[8] On February 17, 2005, MSC issued Solicitation N000-33-05-R-5400 ("2005 Solicitation") to procure a tank vessel for operations in the Pacific under a different time charter contract. *See* AR 422. TAL submitted an offer for the vessel *Mercury* and Sealift submitted an offer for the *Montauk*. *See* AR 551 (TAL); *see also* AR 654 (Sealift); AR 649, 748 (other offers). MSC awarded the contract to Sealift. *See* AR 1075.

On June 2, 2005, TAL filed a GAO bid protest, and on June 6, 2005, MSC issued a stop work order to Sealift. *See* AR 546, 1250. On July 7, 2005, MSC issued a letter reopening the 2005 Solicitation to allow offerors to submit revised proposals in accordance with an amendment concerning the "equation for calculating fuel costs." *See* AR 546, 1288. During this protest, MSC disclosed the evaluation of Sealift's *Montauk* offer to TAL, including Sealift financial data. *See* AR 1273, 1292. To rectify this error, MSC provided Sealift with the *Mercury's* offered charter hire rates, evaluated fuel costs, and evaluated fuel consumption data. *See* AR 1234, 1290. Sealift argued that this was not sufficient, because TAL planned to offer a vessel other than the *Mercury* for the next solicitation. *See* AR 1167. Sealift, however, did not pursue any legal action regarding MSC's improper disclosure of confidential information to TAL. *See* 6/9/08 TR 8. TAL was unable to supply the offered vessel and Sealift was awarded the contract in late 2005. *See* Pl. Mem. at 14 n.2.

7

On October 13, 2006, the GAO denied Sealift's protest, concluding that the "accuracy of TAL's warranties is irrelevant," because a "below-cost bid or offer is permissible in a fixed-price environment, since contract payment will be based on the offered price, [that] is not subject to adjustment during performance barring unforeseen circumstances." *See Sealift, Inc.*, B-298588, Oct. 13, 2006 (AR 2536-38) (citing *GTSI Corp.*, B-286979, Mar. 22, 2001, 2001 CPD ¶ 55 at 4 ("[T]he submission of a below-cost or a low-profit offer is not illegal and provides no basis for challenging an award of a firm, fixed-rate contract to a responsible contractor, since fixed-rate contracts are not subject to adjustment during performance, barring unforeseen circumstances.")). The GAO also determined that, since the March 31, 2006 Solicitation only "requires the owner to provide the crew list no later than 96 hours prior to the time the ship is to be delivered," the crewing requirements were a matter of contract administration. *Id.* (AR 2538) (citing *Fritz Cos., Inc.*, B-246736, May 13, 1992, 92-1 CPD ¶ 443 at 5 ("Whether [a contractor] and its subcontractor actually comply with [the] performance requirement is a matter of contract administration for consideration by the procuring agency, not by [the GAO].")). In addition, the GAO decided that Sealift's challenge to TAL's subcontracting activity was untimely. *Id.* (AR 2537-38). The GAO did not address Sealift's other arguments. *Id.* (AR 2536-38).

## II.     PROCEDURAL HISTORY.

On December 12, 2006, Sealift filed a Complaint in the United States District Court for the District of Columbia to challenge the MSC's June 27, 2006 award of the March 31, 2006 Solicitation to TAL. On February 16, 2007, the Government filed a Motion To Transfer To The United States Court Of Federal Claims. On May 23, 2007, the United States District Court for the District of Columbia granted the Government's Motion and the case was transferred to the United States Court of Federal Claims on July 18, 2007. On August 23, 2007, the case was assigned to the undersigned judge.

On August 30, 2007, Sealift filed an Amended Complaint ("Amend. Compl."), alleging: 1.) "The source selection decision based on false information in TAL's offer violated the Competition in Contracting Act and [the FAR];" 2.) TAL's vessel was ineligible for award under the [March 31, 2006] [S]olicitation, because reflagging and repairs were performed outside the United States; and 3.) the contracting officer "materially altered the material terms of the [S]olicitation in favor of TAL." Amend. Compl. ¶¶ 38-49.

On September 10, 2007, the court convened a telephone conference with the parties and issued a Scheduling Order. On October 1, 2007, the Government filed an Unopposed Motion For A Protective Order. On October 3, 2007, the court granted the Government's October 1, 2007 Motion and entered a Protective Order. On October 15, 2007, the parties filed a Joint Status Report. On October 16, 2007, the court convened a telephone conference regarding the submission of the Administrative Record. On October 19, 2007, the Government filed the Administrative Record.

On November 1, 2007, Sealift filed a Motion To Supplement The Administrative Record. On December 14, 2007, the Government filed a Response.  On December 27, 2007, Sealift filed a Reply.  On January 17, 2008, the court convened a hearing regarding the Plaintiff's Motion To Supplement The Administrative Record.  *See* 11/17/08 TR 1-51.  On January 23, 2008, the court granted Sealift's Motion To Supplement The Administrative Record.  On January 30, 2008, the Government filed the Supplemental Administrative Record.  *See* AR 2536-3046. On February 7, 2008, the court convened a telephone conference regarding releasing certain documents to Sealift, subject to the October 3, 2007 Protective Order, and Sealift withdrew the request.

On February 12, 2008, Sealift filed a Motion For Judgment On The Administrative Record ("Pl. Mot."), together with a Memorandum In Support ("Pl. Mem.") and Proposed Findings Of Fact.  On March 24, 2008, the Government filed a Cross-Motion For Judgment On The Administrative Record And Response To Plaintiff's Motion For Judgment On The Administrative Record.  On April 8, 2008, Sealift filed a Reply ("Pl. Reply").  On April 22, 2008, the Government filed a Reply To Plaintiff's Response To The Government's Cross-Motion For Judgment On The Administrative Record ("Gov't Reply").  On June 9, 2008, an oral argument was convened at which the court requested that the Administrative Record be supplemented, if the requested information was available.  *See* 6/9/08 TR 119-22.  On June 12, 2008, Sealift filed an Unopposed Motion To Supplement The Administrative Record with the June 12, 2008[9] Declaration Of John Raggio.[10]   On June 16, 2008, the court granted Sealift's Motion To Supplement The Administrative Record.  *See* AR 3050-52.  On June 19, 2008, the Government

---

[9] Mr. Raggio's Declaration is not dated.  *See* AR 3050-52.

[10] Mr. Raggio advises the court, in the June 12, 2008 Supplemental Declaration that the *Montauk* was "the foundation of [the] company" and "a very important revenue base . . . for carrying Sealift's overhead."  *See* AR 3050-51.  The *Montauk's* failure to obtain the March 31, 2006 contract has caused Sealift the loss of: "(i) the opportunity to derive income from the tanker service itself; (ii) [] the substantial market appreciation of the *Montauk* that has taken place in the tanker market over the time since [Sealift] sold the vessel; and (iii) [] some of the in-house expertise Sealift had to operate tankers and, thus, limiting [Sealift's] ability to get back into the tanker business again."  AR 3051.

filed a Notice Of Filing to comply with the court's request at the June 9, 2008 hearing.[11]  *See* AR 3053-91.

## III.    DISCUSSION.

### A.    Jurisdiction.

The Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996, Pub. L. No. 104-320, §§ 12(a), (b), 110 Stat. 3870 (1996) ("ADRA"), authorizes the United States Court of Federal Claims to "render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."   28 U.S.C. § 1491(b)(1); *see also Banknote Corp. of Am., Inc.* v. *United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004) ("The [United States] Court of Federal Claims has jurisdiction to review both pre-award and post-award bid protests pursuant to 28 U.S.C. § 1491(b), enacted as part of the Administrative Dispute Resolution Act of 1996[.]").

The Amended Complaint alleges that, prior to the award, TAL made a material misrepresentation to MSC and that MSC acted contrary to law, by awarding the contract to TAL without verifying compliance with the limitation on subcontracting.  *See* Amend. Compl. at 1. The Amended Complaint also alleges that MSC materially altered the March 31, 2006 Solicitation after the July 21, 2006 award, in violation of 41 U.S.C. § 253(a)(1)(A) (Competition in Contracting Act, Pub. L. No. 98-369, 98 Stat. 494 (1984) ("CICA") (codified as amended in scattered sections of 10, 31, and 41 U.S.C.)).  *See* Amend. Compl. at 1; *see also HDM Corp.* v. *United States*, 69 Fed. Cl. 243, 254 (2005) ("In determining whether a modification falls within

---

[11] The Government summarized the court's order as requesting:

1.    The written agreement between [TAL] and its manning company/agency, Vessel Management Services ("VMS") should one exist;
2.    Any and all invoices that were not included in the [A]dministrative [R]ecord depicting work performed on its proposed tanker, the *TransAtlantic*, in Guam or Singapore; and
3.    Non-redacted copies of the invoices that were included in the [A]dministrative [R]ecord at pages 2780-2820.

Gov't Notice of Filing at 1; *see also* 6/9/08 TR 119-22.  Although the Government objected, the Government provided: 1.) a representation that no written employment agreement exists between the crewing agent and TAL; 2.) a representation that all invoices are in the Administrative Record; and 3.) non-redacted and clearer copies of the invoices in the Administrative Record.  *See* Gov't Notice of Filing at 1-2; *see also* AR 3053-91.

CICA's competition requirement, the Court examines whether the contract as modified is materially different from the original contract[.]").

For these reasons, the court has determined that the allegations in the Amended Complaint recite a sufficient basis to exercise jurisdiction, pursuant to 28 U.S.C. § 1491(b)(1). *See* Amend. Compl. ¶¶ 38-49.

## B. Standing.

As a threshold matter, a protester must establish that it is an "interested party." 28 U.S.C. § 1491(b)(1). The United States Court of Appeals for the Federal Circuit has construed the term "interested party," as synonymous with "interested party," as defined by the CICA, 31 U.S.C. § 3551 (Definitions).[12] *See Rex Serv. Corp.* v. *United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006) ("[T]he term 'interested party' in section 1491(b)(1) is construed in accordance with the Competition in Contracting Act [], 31 U.S.C. §§ 3551-56.") (citations omitted); *see also Banknote Corp.*, 365 F.3d at 1352 (holding that the United States Court of Federal Claims' jurisdiction under the Tucker Act, as amended, is limited to "actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract." (quoting 31 U.S.C. § 3551)). Accordingly, the trial court must

---

[12] (2) The term "interested party"—

> (A) with respect to a contract or a solicitation or other request for offers described in paragraph (1), means an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract; and
> (B) with respect to a public-private competition conducted under Office of Management and Budget Circular A-76 with respect to the performance of an activity or function of a Federal agency, or a decision to convert a function performed by Federal employees to private sector performance without a competition under Office of Management and Budget Circular A-76, includes--
>> (i) any official who submitted the agency tender in such competition; and
>> (ii) any one individual who, for the purpose of representing the Federal employees engaged in the performance of the activity or function for which the public-private competition is conducted in a protest under this subchapter that relates to such public-private competition, has been designated as the agent of the Federal employees by a majority of such employees.

31 U.S.C. § 3551(2).

apply a two-part test to determine whether a protester is an "interested party," *i.e.*, the protestor must show that it was an *actual or prospective bidder* and the protester must have a *direct economic interest* in the procurement. *See Rex Serv. Corp.*, 448 F.3d at 1307 ("[T]o come within the [United States] Court of Federal Claims' section 1491(b)(1) bid protest jurisdiction, [the protester] is required to establish that it (1) is an actual or prospective bidder, and (2) possesses the requisite direct economic interest." (citations omitted)).

As part of the "direct economic interest" requirement, a protestor must show that any alleged errors caused the protestor "prejudice." *See Galen Med. Assocs.* v. *United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004) ("'[T]o prevail in a protest the protestor must show not only a significant error in the procurement process, but also that the error prejudiced it.'" (quoting *Data Gen. Corp.* v. *Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996) (alterations in original))); *see also Myers Investigative & Sec. Servs., Inc.* v. *United States*, 275 F.3d 1366, 1370 (Fed. Cir. 2002) ("[P]rejudice (or injury) is a necessary element of standing."). The United States Court of Appeals for the Federal Circuit has advised trial courts that, "because the question of prejudice goes directly to the question of standing, the prejudice issue must be reached *before* addressing the merits." *Info. Tech. & Applications Corp.* v. *United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (emphasis added); *see also Myers*, 275 F.3d at 1369 ("standing is a threshold jurisdictional issue." (citations omitted)).

The United States Court of Appeals for the Federal Circuit has held that a protestor can establish prejudice by showing a "substantial chance" that it would have received the award, if the alleged error was corrected. *See Bannum, Inc.* v. *United States*, 404 F.3d 1346, 1358 (Fed. Cir. 2005) ("To establish prejudice [plaintiff] must show that there was a 'substantial chance' it would have received the contract award but for . . . errors" in the bid process.) (citations omitted); *see also Statistica, Inc.* v. *Christopher*, 102 F.3d 1577, 1581 (Fed. Cir. 1996) ("To establish competitive prejudice, a protestor must demonstrate that but for the alleged error, there was a '*substantial chance*' that [it] would receive an award-that was within the zone of active consideration." (citations omitted) (emphasis and alterations in original)).

The court has determined that Sealift has established that it is an "interested party," as an actual protestor with a direct economic interest in the July 21, 2006 contract. In addition, having submitted a "technically acceptable" proposal with a price that was "fair and reasonable," Sealift had a substantial chance of being awarded the contract, but for the alleged errors. *See* Amend. Compl. ¶¶ 1-23.

### C.   The Relevant Standards For Decision On The Administrative Record In A Bid Protest Case.

Pursuant to the Tucker Act, as amended by the ADRA, the United States Court of Federal Claims reviews challenges to agency decisions, pursuant to the Administrative Procedure Act, 5 U.S.C. § 706. *See* 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall

review the agency's decision pursuant to the standards set forth in section 706 of title 5."); *see also* 5 U.S.C. § 706(2)(A) ("[T]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]").

Accordingly, the United States Court of Appeals for the Federal Circuit has held that "a bid award may be set aside if either (1) the procurement official's decision lacked a rational basis; *or* (2) the procurement procedure involved a violation of regulation or procedure." *Galen Med. Assocs.,* 369 F.3d at 1329 (internal citations omitted) (emphasis added); *see also Bannum,* 404 F.3d at 1351 (holding that a trial court initially must determine if the Government "acted without rational basis or contrary to law when evaluating the bids and awarding the contract."); *Banknote Corp.*, 365 F.3d at 1350 ("Among the various APA standards of review in section 706, the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A): a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (citation omitted)).

The protester, however, bears a "heavy burden" of showing that an award decision had no rational basis. *See Impresa Construzioni Geom. Domenico Garufi* v. *United States*, 238 F.3d 1324, 1332-33 (Fed. Cir. 2001). Therefore, when the court finds a "reasonable basis" for an agency's action, the court should "stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." *Honeywell, Inc.* v. *United States*, 870 F.2d 644, 648 (Fed. Cir. 1989) (citation omitted). This standard requires that the final decision reached by an agency be the result of a process that "consider[s] the relevant factors" and is "within the bounds of reasoned decision making." *Baltimore Gas & Elec. Co.* v. *Natural Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983); *see also Impresa*, 238 F.3d at 1332-33 ("[T]he test for reviewing courts is to determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." (citation & internal quotations omitted)).

If the trial court determines that an agency's decision fails an APA review, the court is then obligated to inquire whether the protester was prejudiced by the Government's conduct. *See Bannum*, 404 F.3d at 1351 ("[I]f the trial court finds that the government's conduct fails the APA review under 5 U.S.C. § 706(2)(A), then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct."); *see also Impresa*, 238 F.3d at 1333 ("When a challenge is brought on the second ground, the disappointed bidder must show 'a clear and prejudicial violation of applicable statutes or regulations.'" (citations omitted)). A claim on the merits of a bid protest will only succeed if both requirements are satisfied. *See Galen Med. Assocs.*, 369 F.3d at 1330 ("'[T]o prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it.'" (quoting *Data Gen. Corp.*, 78 F.3d at 1562) (alterations in original)). Prejudice, in this context, requires the protestor to show that it had a "substantial chance" to receive the contract award, but for the

13

Government's error. *See Bannum*, 404 F.3d at 1358 ("To establish prejudice Bannum was required to show that there was a 'substantial chance' it would have received the contract award but for the . . . errors in the bid process."); *see also Metcalf Constr. Co.* v. *United States*, 53 Fed. Cl. 617, 622 (2002) ("[M]inor errors or irregularities, *i.e.*, harmless errors, committed in the course of the procurement process are not sufficient grounds to warrant judicial intrusion to upset a procurement decision." (citation omitted) (emphasis added)).

Bid protest actions are considered upon cross-motions for judgment on the Administrative Record, pursuant to Rule of the Court of Federal Claims ("RCFC") 52.1. RCFC 52.1 does not have a counterpart in the Federal Rules of Civil Procedure and "is similar but not identical to a Motion for Summary Judgment, pursuant to RCFC 56." *Info. Scis. Corp.* v. *United States*, 73 Fed. Cl. 70, 97-98 (2006) (citing *Bannum, Inc.* v. *United States*, 404 F.3d 1346, 1355 (Fed. Cir. 2005)). Under RCFC 52.1, the court is required to weigh the evidence when considering a Motion for Judgment on the Administrative Record, because RCFC 52.1 is "designed to provide for a trial on a paper record, allowing fact-finding by the trial court." *See Bannum*, 404 F.3d at 1355-56.

**D.      The Parties' Cross-Motions For Judgment On The Administrative Record.**

   **1.      Pre-Award Misrepresentation Regarding The *Bonito's* Fuel Consumption.**

      **a.      The Parties' Arguments.**

Count I of the August 20, 2007 Amended Complaint challenges MSC's pre-award decision, because TAL misrepresented the *Bonito's* fuel consumption to MSC. *See* Pl. Mem. at 8; *see also* Amend. Compl. ¶¶ 38-41. Sealift argues that TAL's warranted fuel consumption rate of [redacted] barrels per day at an average speed of 12 knots was a material misrepresentation, because the *Bonito's* actual fuel consumption rate was 77.52 barrels per day. *See* AR 1865. In support, Sealift's Vice President submitted a Declaration, stating that:

> The *Bonito* has a nearly identical hull configuration, displacement and propeller arrangement as Sealift's vessel *Montauk*. Both vessels have B&W Alpha engines with the *Bonito's* 2720 KW being a little larger tha[n] the *Montauk's* 1966 KW [engine]. The slightly larger engine on the *Bonito* should have a fuel consumption no less than that of the *Montauk*. Yet, according to the information from the CO at the debrief, [TAL] warranted its consumption at 19% less that of the *Montauk*. . . . In fact, [TAL] has materially understated the consumption rate of the *Bonito*. The current commercial managers of the *Bonito*, Nordtank Shipping A/S, who are identified as the vessel commercial managers by the vessel owners' website, have published vessel particulars on their website showing "Speed / Consumption: 12,0 kts / 12 mts" for the *Bonito*. . . . Using the equivalencies in the

14

Solicitation, 12 measurement tons converts to 78.34[$^{13}$] barrels per day using standard IFO 180 fuel.

Declaration of John Raggio ("Raggio Declaration") ¶¶ 4-5 (AR 2266).

Sealift reported that TAL sent MSC a "*Bonito's* Ship's Particulars" form on October 27, 2006, with the spaces for inputting the vessel's daily consumption of fuel "blanked out in this otherwise complete record, suggesting an effort to avoid disclosure of [the previous owner's] consumption rate to MSC." Pl. Mem. at 15; *see also* AR 2956-57. In fact, TAL was aware that the *Bonito's* fuel consumption rate was lower than that of the *Montauk*, because MSC inadvertently released the *Montauk's* vessel information to TAL in June 2005 during the 2005 Solicitation. *See* Pl. Mem. at 14; *see also supra* note 8.

The Government responds that the *Bonito* had a better fuel consumption rate than the *Montauk*, because the *Bonito* "was a more modern vessel, whose powerful engine burned with greater efficiency." Gov't Op. and Resp. at 23 (citing AR 2466, 2476-77, 2481). Significantly, the *Montauk* burns 188 grams of fuel per kilowatt hour[$^{14}$] ("KWH") under a 100 percent load and 187 grams of fuel per KWH under an 85 percent load, while the *Bonito* only burns 182 grams of fuel per KWH under a 100 percent load and 180 grams of fuel under an 85 percent load. *See* Gov't Op. and Resp. at 24 (citing AR 2466, 2476-81); AR 1612 (Sealift Proposal); AR 1860 (TAL Proposal)). In addition, the Government asserts that the Raggio Declaration is not reliable, because it relies on a single data point from the unconfirmed website of the previous owner, Nordtank. *See* Gov't Op. and Resp. at 25 (citing AR 2301-07) (Nordtank's website does not "warrant or guarantee the accuracy of the fuel consumption rates listed on its website, and Nordtank may have its own policy or legal reasons for overestimating the vessel's consumption rate.")*.*

Sealift counters that Nordtank's website is "inherently reliable, because it is the information provided by the owners for the use of charterers in the marketplace in the ordinary course of business at the very same time that the vessel was offered to MSC." Pl. Reply at 4. In addition, the other details provided to MSC in the "*Bonito's* Ship's Particulars" match the

---

[13] Sealift acknowledged a conversion error in the Raggio Declaration and corrected the record to reflect the *Bonito's* fuel consumption rate as 77.52 barrels per day of IFO 380 fuel. *See* Pl. Reply at 4 n.1.

[14] The unit "gram per KWH" is a measure of specific fuel consumption, which is defined as "the weight flow rate of fuel required to produce a unit of power as thrust[.]" McGraw-Hill Dictionary of Scientific And Technical Terms (6th ed. 2002). The use of "gram" is appropriate "because the chemical energy in the fuel is a function of the mass of fuel. A gallon of fuel expands or contracts with temperature. Therefore, a gallon of cold fuel contains more energy than a gallon of warm fuel." http://selair.selkirk.bc.ca/aerodynamics1/Performance/Page4.html.

information on Nordtank's website.  *Id.* at 4 n.2 (citing AR 2536).  In fact, Sealift contends that posting information on Nordtank's website creates a warranty.  *Id.* at 5 (citing *Transatlantic Lines, LLC* v. *Tidewater Marine, Inc.*, Soc'y of Mar. Arb., No. 3834 (Nov. 4, 1998)); *see also Denholm Shipping Co.* v. *W.E. Hedger, Co.*, 47 F. 2d 213, 214-15 (2d Cir. 1931); *The Atlanta*, 82 F. Supp. 218, 230 (D. Ga. 1948).

The Government replies that the Administrative Record demonstrates that the *Bonito's* engine is larger, more powerful, and more fuel efficient than the *Montauk's* engine.  *See* Gov't Reply at 5 (citing AR 2466, 2476-77, 2481).  Sealift's unsupported conclusion that the *Bonito's* engine is larger than the *Montauk's* engine and that it must consume more fuel is speculation and cannot overcome the clear evidence to the contrary.  *See* Gov't Reply at 5.  Moreover, Sealift offers only unsupported theories as to why the fuel consumption rate posted on an unrelated third party's website must be accurate.  *Id.* at 7.  In fact, Nordtank may have overestimated fuel consumption rates in order to avoid the risk that "unexpected fuel costs or consumption will run over into the profits of the charter itself."  *Id.*

### b.    The Court's Resolution.

The United States Court of Appeals for the Federal Circuit held in *Planning Research Corp.* v. *United States*, 971 F.2d 736 (Fed. Cir. 1992) that:

> [T]he submission of a misstatement . . . which materially influences consideration of a proposal should disqualify the proposal.  The integrity of the system demands no less.  Any further consideration of the proposal in these circumstances would provoke suspicion and mistrust and reduce confidence in the competitive procurement system.

*Id.* at 741 (citation omitted).

Therefore, to establish a material misrepresentation, Sealift must demonstrate both that TAL intentionally made a false statement and that MSC relied on that false statement in awarding the contract to TAL.  *See Blue & Gold Fleet, LP* v. *United States*, 70 Fed. Cl. 487, 495 (2006) ("To establish a  material misrepresentation, plaintiff must demonstrate that (1) [the awardee] made a false statement; and (2) the [agency] relied on that false statement in selecting [the awardee's] proposal for the contract award. . . . To preserve the integrity of the solicitation process when such a material misrepresentation influences the award of the proposal, the proposal is disqualified from consideration.") (citations omitted), *aff'd*, 492 F.3d 1308 (Fed. Cir. 2007); *see also Northrop Grumman Corp.* v. *United States*, 50 Fed. Cl. 443, 468 (2001) ("[I]t is quite common for proposals to fall short of their assertions; it is not something to be punished unless the errors were willful and egregious.").  Intent may be established by circumstantial evidence. *See Planning Research Corp.*, 971 F.2d at 742 ("This court has held that intent frequently must

be proved by circumstantial evidence.") (citing *Klein* v. *Peterson*, 866 F.2d 412, 415 (Fed. Cir. 1989)).

In awarding this contract, MSC advised that:

It is useful to compare the offered rate to previous contract awards for comparable vessels under similar requirements. . . . Th[ese] comparisons provide support that the rates offered by [TAL] and Sealift under this procurement are both highly competitive and very reasonable.

AR 1985.

MSC's price analysis also stated that:

[T]he daily rate proposed by [TAL] is considered fair and reasonable based on price competition and comparison with previous competitively awarded prices for comparable vessels under similar requirements in accordance with FAR [] 15.404-1(b)(2)(i) and (ii)[15] respectively.

AR 1992.

Sealift's primary evidence that TAL misrepresented the *Bonito's* warranted fuel consumption is the Raggio Declaration that relies on a single data point found on a website. *See*

_____

[15] FAR 15.404-1(b) states:

(b) Price analysis. (1) Price analysis is the process of examining and evaluating a proposed price without evaluating its separate cost elements and proposed profit.

(2) The Government may use various price analysis techniques and procedures to ensure a fair and reasonable price. Examples of such techniques include, but are not limited to, the following:

(i) Comparison of proposed prices received in response to the solicitation. Normally, adequate price competition establishes price reasonableness (see 15.403-1(c)(1)).

(ii) Comparison of previously proposed prices and previous Government and commercial contract prices with current proposed prices for the same or similar items, if both the validity of the comparison and the reasonableness of the previous price(s) can be established.

48 C.F.R. § 15.404-1(b).

AR 2266.  The Government, however, states that: "[t]o assess [TAL]'s compliance with its fuel warranties, it is necessary to gather information on the vessel's speed, weather conditions, load, and fuel consumption for each voyage the vessel makes."  *See* AR 2513.  Sealift agrees that "[g]auging actual fuel consumption requires some research, judgment, and initiative" in addition to "expert review of the varying factors that affect vessel operations."  Pl. Mem. at 16.

The March 31, 2006 Solicitation provided that the "[c]ost of fuel consumed will be based on an operational scenario of 60% underway laden at 12 knots . . . , 28% in-port idle . . . , and 12% in-port discharge[.]"  AR 1572.  The Raggio Declaration, however, only considered the *Bonito's* fuel consumption "when steaming at 12 knots."  AR 2266 (Raggio Declaration ¶ 6).  Moreover, it did not consider the March 31, 2006 Solicitation's required "operational scenario." *See* AR 1572.  The Raggio Declaration also assumed that "[t]he slightly larger engine on the *Bonito should* have a fuel consumption no less than that of the *Montauk*."  *See* AR 2266 (Raggio Declaration ¶ 3) (emphasis added).  Other evidence, however, indicates that the *Montauk* burned 188 grams of fuel per KWH under a 100 percent load and 187 grams of fuel per KWH under an 85 percent load, while the *Bonito* burned 182 grams of fuel per KWH, under a 100 percent load, and 180 grams of fuel under an 85 percent load.  *See* AR 2266, 2476-77, 2481 (citing http://www.sea-web.com, an online service of LLOYD'S LIST).[16]  Sealift did not challenge this data.

Nordtank does not guarantee or warrant the data on the website.  *See* AR 2301-07.  In addition, the cases cited by Sealift are not precedential and do not stand for the proposition that fuel consumption rates on a website are warranted.  *See* Pl. Reply at 5.  Instead, they hold that a representation of fuel consumption *in a charter may* create a warranty in certain circumstances. *See Transatlantic Lines, LLC*, *Soc'y of Mar. Arb.*, No. 3834 (Nov. 4, 1998) (determining that "speed and fuel consumption capabilities" were incorporated into a contract through an annex); *see also Denholm Shipping Co.*, 47 F.2d at 214-15 ("[A] description of a ship's capacity, in speed, as well as in any other respect, when inserted in the body of *a charter*, will support a suit for damages.") (citation omitted) (emphasis added); *The Atlanta*, 82 F. Supp. at 230 (a statement as to speed and fuel consumption *in a charter* results in a warranty "rather than a representation, even though the statement is not expressly designated as a warranty").

Accordingly, the court has determined that the *Bonito's* fuel consumption rate, posted on Nordtank's website, does not evidence a material misrepresentation by TAL, particularly since Sealift has not proffered any independent evidence that the information on Nordtank's website was reliable.  *See* AR 2301-07.  In addition, the Administrative Record contains no evidence that the *Bonito* did not achieve a consumption rate of [redacted] barrels per day, although the court

---

[16] "LLOYD'S LIST [is a company that] produces hundreds of supplements and special reports every year targeted at specific markets in the maritime sector and related industries.  It publishes the industry's first and best shipmanagement magazine, LSM and Maritime Asia, written and produced in the local market."  *See* ABOUT LLOYD'S LIST, www.lloydslist.com.

afforded Sealift the opportunity to supplement the Administrative Record with post-award information. *See* AR 2536-3047; *see also* 1/17/08 TR 38, 41-42.

For these reasons, the court has determined that, as a matter of law, Sealift did not establish a false statement was made by TAL to the CO. *See Blue & Gold Fleet, LP*, 70 Fed. Cl. at 495.

### 2.   Pre-Award Violation Of The Competition In Contracting Act Of 1984.

#### a.   The Parties' Arguments.

The Amended Complaint alleges that the CO's decision to award the contract to TAL violated the Competition in Contracting Act of 1984, 10 U.S.C. § 2305(b), because TAL "would not incur at least fifty percent of its labor costs on the contract from its own employees[,]" and the CO failed to verify that at least 50 percent of the cost of contract performance incurred for personnel would be expended for the contractor's own personnel. *See* Amend. Compl. ¶ 46 ("TAL's declared intention in its offer to contract for the officers and crew on the vessel in violation of the Solicitation requirement was patently in contravention of [10 U.S.C. § 2305 and FAR 52.219-14(b)(1)].");[17] *see also* AR 1509 ("The Master, Officers, and crew of this Vessel shall be appointed or hired by the Owner and shall be deemed to be the servants and agents of the Owner at all times except as otherwise specified in this Charter."); Pl. Mem. at 18-20 (citing *Transatlantic Lines, LLC* v. *United States*, 68 Fed. Cl. 48, 54 (2005) (requiring that an award be set-aside when "the contracting officer did not have a reasonable basis for determining that [the awardee] could meet the Limitation on Subcontracting clause[.]")).

TAL's offer advised MSC that TAL intended to use a "manning company/agency" to hire and train the *Bonito* crew, other than for two members. *See* Pl. Mem at 19 (citing AR 1921).[18]

---

[17] FAR 52.219-14(b)(1) provides that:

(b) By submission of an offer and execution of a contract, the Offeror/Contractor agrees that in performance of the contract in the case of a contract for --
(1) Services (except construction). At least 50 percent of the cost of contract performance incurred for personnel shall be expended for employees of the concern.

48 C.F.R. § 52.219-14(b)(1).

[18] During the GAO protest, the Government denied that the March 31, 2006 Solicitation contained a limitation on subcontracting; therefore, the CO would have no reason to investigate TAL's use of a crewing company. *See* Pl. Mem. at 19 (citing AR 2501). Subsequently, the Government acknowledged that the Government's representation to the GAO that the March 31,

Therefore, the Government contends that TAL's offer complied with 10 U.S.C. § 2305(b), because although a crewing agency located personnel to crew the *Bonito*, those individuals were employed by TAL. *See* Gov't Op. and Resp. at 29 ("TAL represented that it would use a crewing agent to 'find crew for [its] vessel,' similar to a headhunter or an employment agency.") (quoting AR 1921). Therefore, the Government contends that "TAL's offer did not propose to subcontract any of its personnel[.]" *Id.*[19]

Sealift counters that TAL did not directly employ personnel from the crewing agent like a "headhunter," so the "[h]iring and training of the crew by the crewing agent is precisely what the subcontracting limitation precludes." Pl. Reply at 8-9 (citing AR 1940) ("Vessel Management has been crewing vessels for 12 years"); *see also* AR 2971 (Oct. 3, 2006 e-mail from the CO confirming that TAL is "using the management company and crew that will be employed under the contract"); AR 1880 (Jan. 12, 2006 statement from Insurance Underwriting Services, Inc. referring to "Vessel Management Services, Ltd. as crew managers").

The Government replies that TAL represented that all the crew would be directly employed by TAL and that Sealift has failed to demonstrate otherwise. *See* Gov't Reply at 9 (citing AR 2470-71 ("[I]f TAL hires a crewing agent, as Sealift alleges TAL may do, the agent by law is acting for TAL and the agent's actions are those of the principal.")). In addition, there appears to be no agreement between TAL and the crewing agent that would establish an employment relationship. *See* Gov't Notice of Filing at 2 ("Based upon prior relationships, TAL did not have a written agreement with VMS to locate the crew for the *TransAtlantic*.").

### b.    The Court's Resolution.

Section 2305(b)(1) of the CICA states that "[t]he head of an agency shall evaluate . . . competitive proposals and make an award based solely on the factors specified in the solicitation." 10 U.S.C. § 2305(b)(1). The March 31, 2006 Solicitation states that the master, officers, and crew of the vessel be appointed or hired by the owner, and the crew "shall be deemed to be the servants and agents of the Owner at all times." AR 1509. The FAR requires that: "[b]y submission of an offer and execution of a contract, the Offeror/Contractor agrees that in performance of the contract . . . at least 50 percent of the cost of contract performance incurred for personnel shall be expended for employees of the concern." 48 C.F.R. § 52.219-14(b)(1). In addition, a contractor awarded a small business set-aside contract for services must show that at least 50 percent of the labor costs incurred will be performed by the company's own employees.

---

2006 Solicitation contained a subcontracting limitation was incorrect. *See* Pl. Mem. at 19 (citing 1/17/08 TR 39-40).

[19] Despite the Government's initial misstatement to the GAO that the contract did not have a limitation on subcontracting, the CO subsequently verified TAL's compliance. *See* Gov't Op. and Resp. at 30 (citing AR 1940-41).

*See* 48 C.F.R. § 19.508(e) (requiring that contracting officers include FAR 52.219-14, Limitations on Subcontracting, "in solicitations and contracts for supplies, services and construction, if any portion of the requirement is to be set aside for small business and the contract amount is expected to exceed $100,000.").

Here, the issue is whether a "subcontractor" includes employees hired through an agent. The FAR does not define "subcontractor." *See* 48 C.F.R. § 2.101 (Definitions). The Small Business Subcontracting Plan, however, defines a "subcontract" as "any agreement (*other than one involving an employer-employee relationship*) entered into by a Federal Government prime Contractor or subcontractor calling for supplies or services required for performance of the contract or subcontract." 48 C.F.R. § 252.219-7004(a) (emphasis added); *see also* BLACK'S LAW DICTIONARY 1464 (8th ed. 2004) (defining a "subcontractor" as "[o]ne who is awarded a portion of an existing contract by a contractor . . . . For example, a contractor who builds houses typically retains subcontractors to perform specialty work such as installing plumbing, laying carpet, making cabinetry, and landscaping"). Therefore, if an employer-employee relationship existed between TAL and the *Bonito's* crew, there was no violation of the Limitation on Subcontracting. *See* 48 C.F.R. § 2.219-14(b).

The FAR also does not define "employee" or "employer-employee" relationship. *See* 48 C.F.R. § 2.101 (Definitions). The Internal Revenue Service, however, uses the common law test to determine if an employer-employee relationship exists. *See* 26 C.F.R. § 31.3121(d)-1(c)(1) ("Every individual is an employee if under the usual common law rules the relationship between him and the person for whom he performs services is the legal relationship of employer and employee."). An employer-employee relationship exists under the common law when:

> the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished. . . . The right to discharge is also an important factor indicating that the person possessing that right is an employer. Other factors characteristic of an employer, but not necessarily present in every case, are the furnishing of tools and the furnishing of a place to work, to the individual who performs the services. In general, if an individual is subject to the control or direction of another merely as to the result to be accomplished by the work and not as to the means and methods for accomplishing the result, he is an independent contractor. An individual performing services as an independent contractor is not as to such services an employee under the usual common law rules.

26 C.F.R. § 31.3121(d)-1(c)(2); *see also* BLACK'S LAW DICTIONARY 564 (8th ed. 2004) (defining "employee" as "A person who works in the service of another person (the employer) under an express or implied contract of hire, under which the employer has the right to control the details of work performance.").

In this case, TAL's crewing agency appeared to operate as a headhunter or an employment agency. *See* AR 1921; *see also* AR 1940-41. In either event, Sealift failed to establish that the crewing agent had the "right to control and direct" the *Bonito's* crew. *See* 26 C.F.R. § 31.3121(d)-1(c)(2). Instead, the record indicates that TAL controlled the members of the crew. *See* AR 1921 ("We utilize the services of a manning company . . . to *find* crew for *our* vessels.") (emphasis added). The record also contains no evidence that the crewing agency had the "right to discharge" *Bonito* crew members after they were hired. *See* AR 1921; *see also* 26 C.F.R. § 31.3121(d)-1(c)(2). In addition, TAL furnished the crew members with "tools" and "a place to work." *See* AR 1921. Therefore, Sealift failed to establish that the crewing agent was "awarded a portion of an existing contract" by TAL. *See* BLACK'S LAW DICTIONARY 1464 (8th ed. 2004) ("Subcontractor").

For these reasons, the court has determined that TAL's use of a crewing agent did not establish a subcontract relationship, and TAL's proposal properly complied with the March 31, 2006 Solicitation. *See* 48 C.F.R. § 252.219-7004(a) (defining a subcontract as "any agreement . . . *other than one involving an employer-employee relationship*") (emphasis added); *see also* AR 1860.

### 3.   Post-Award Violations Of The Competition In Contracting Act Of 1984.

#### a.   Prohibited Reflagging Work.

The *Bonito* was a Swedish flag vessel. *See* AR 1860. The March 31, 2006 Solicitation required that an awardee with a foreign vessel must have the vessel reflagged as a United States vessel, in compliance with United States Coast Guard regulations. *See* AR 1493 (Solicitation I-8), 1860 (TAL Proposal), 2848-50 (Reflagging Analysis).[20]

---

[20] The March 31, 2006 Solicitation required:

[a]ny reflagging or repair work to (1) enable the vessel to meet applicable standards to become a vessel of the United States; or (2) to convert the vessel to a more military useful configuration *must be performed in the United States*.

AR 1493 (Solicitation at I-8) (incorporating Defense Federal Acquisition Regulation Supplement ("DFARS") 252.247-7025) (emphasis added).

DFARS 252.247-7025 provides:

(a) Definition. "Reflagging or repair work," as used in this clause, means work performed on a vessel—

i.        **The Parties' Arguments.**

The Amended Complaint alleges that, after the contract was awarded to TAL, MSC unlawfully waived the March 31, 2006 Solicitation's reflagging and repair work requirement. *See* Amend. Compl. ¶¶ 42-44; *see also* Pl. Mem. at 8, 25.   Sealift argues that the reflagging requirement, governed by the terms of the Cargo Preference Act of 1904, as amended by 10 U.S.C. § 2631(b),[21] is material and may not be waived unless "the Secretary [of Defense] determines that [a] waiver is critical to the national security of the United States."  10 U.S.C. § 2631(b)(3); *see also* Pl. Mem. at 25.

---

(1) To enable the vessel to meet applicable standards to become a vessel of the United States; or
(2) To convert the vessel to a more useful military configuration.
(b) Requirement. Unless the Secretary of Defense waives this requirement, reflagging or repair work shall be performed in the United States or its outlying areas, if the reflagging or repair work is performed —
(1) On a vessel for which the Contractor submitted an offer in response to the solicitation for this contract; and
(2) Prior to acceptance of the vessel by the Government.

48 C.F.R. § 252.247-7025.

[21] The Cargo Preference Act of 1904, in relevant part, provides:

(b) (1) In each request for proposals to enter into a time-charter contract for the use of a vessel for the transportation of supplies under this section, the Secretary of Defense shall require that any reflagging or repair work on a vessel for which a proposal is submitted in response to the request for proposals be performed in the United States (including any territory of the United States).
  (2) In paragraph (1), the term "reflagging or repair work" means work performed on a vessel —
    (A) to enable the vessel to meet applicable standards to become a vessel of the United States; or
    (B) to convert the vessel to a more useful military configuration.
  (3) The Secretary of Defense may waive the requirement described in paragraph (1) if the Secretary determines that such waiver is critical to the national security of the United States. The Secretary shall immediately notify the Congress of any such waiver and the reasons for such waiver.

10 U.S.C. § 2631(b).

23

In addition, the Amended Complaint alleges that on October 2, 2006, TAL violated 10 U.S.C. § 2631(b), because the *Bonito* had various repairs performed at a shipyard in Singapore. *See* Amend. Compl. ¶ 26; *see also* Pl. Mem. at 5 ("The contracting officer had firm evidence that the vessel had had reflagging and repair work performed in Singapore."). On October 11, 2006, Sealift sent an e-mail to MSC with photographs that show:

> bent, discarded small diameter CO2 piping on the deck of the *Bonito* which had been recently removed from the engine room; new galvanized distribution piping for CO2 next to a saw being fabricated on deck of the vessel; and new headers above the CO2 cylinders installed in the CO2 room of the vessel in Singapore; and workers painting the name TransPacific on the aft of vessel.

Pl. Mem. at 22 (citing AR 2599-2603).

In response, MSC required TAL to "explain, by 24 October 2006, the nature of the work performed in Singapore and how it complies with DFARS 252.247-7025, and the Contract." Pl. Mem. at 22 (quoting AR 2610 (Oct. 20, 2006 letter from the CO to TAL)). On October 24, 2006, TAL responded that:

> All that occurred in Singapore was that a template was created to rename the vessel TRANSPACIFIC. Creating the template required the temporary removal of the name BONITO, which was repainted on to the vessel. The actual renaming of the vessel will be done in Guam, when the name TRANSPACIFIC will be painted onto the vessel. . . . The sole purpose for removing the piping again was to create a template for the fabrication of the new pipes. The piping has been procured and placed on deck for installation in Guam by the local shipyard, Casamar.

AR 2615.

Nevertheless, the Administrative Record includes two invoices from Singapore indicating that reflagging work took place. *See* AR 2782 (Oct. 2, 2006 Singapore Tax Invoice indicating a "[h]ydro test with Nitrogen to 600 psig");[22] AR 2785 (Oct. 2, 2006 Singapore Tax Invoice indicating workers "[i]nstalled new logos onto funnel by welding"). In addition, a "company specializing in conversion of fire systems to Coast Guard standards sent representatives to Singapore for 13 days and to Guam for the entire stay of the vessel." Pl. Mem. at 24 (citing AR 2814 (travel invoice from Fire Protection Systems, Inc. showing expenses for air fare, per diem, and rental cars)). The fact that these representatives were in Singapore shows that reflagging

---

[22] "Pounds per square inch gauge" is defined as "The gauge pressure, measured by the number of pounds-force exerted on an area of 1 square inch." MCGRAW-HILL DICTIONARY OF SCIENTIFIC AND TECHNICAL TERMS (6th ed. 2002).

work was completed there. *Id.* The Administrative Record also contains evidence that the *Bonito* had "main engine work" done in Singapore. *See* AR 2590.

The Government responds that all of the *Bonito's* required reflagging work was *completed* within the United States. *See* Gov't Op. and Resp. at 34-38 (arguing that the work accomplished in Singapore does not constitute reflagging). Therefore, MSC "did not modify or waive any reflagging restrictions[.]" *Id.* at 34. Instead, after learning that the *Bonito* docked in Singapore, the CO contacted MSC representatives in Singapore and Guam, TAL, and the Coast Guard to determine if any improper reflagging work had been performed. *See* Gov't Op. and Resp. at 34 (citing AR 2589 (Oct. 3, 2006 e-mail from MSC's Tanker Project Officer to Naval Sealift Logistics Command, requesting an "inquir[y] as to what work is being done there"); AR 2590-92 (Oct. 3-12, 2006 e-mail string between various Naval personnel regarding the *Bonito's* work in Singapore); AR 2609-10 (Oct. 20, 2006 letter from the CO to TAL regarding the work performed in Singapore); AR 2677 (Nov. 22, 2006 e-mail from Headquarters Legal to the CO stating that "nothing [Naval personnel] observed in Guam . . . would lead them to believe that any reflag work was completed in Singapore") (internal quotations omitted)).

MSC's investigation showed that TAL purchased parts in Singapore for reflagging work that subsequently was done in Guam. *See* Gov't Op. and Resp. at 34-35 ("The contract and applicable regulations only restrict the 'work' performed to reflag a vessel[;] it does not restrict where parts to reflag the vessel are purchased or manufactured.") (citing AR 1493, 1542). TAL explained to MSC's satisfaction that only "templates" for the *TransPacific* logo were made in Singapore, but it was installed in Guam. *See* Gov't Op. and Resp. at 35 (citing AR 2615-16). The invoices from Guam support this conclusion. *See* AR 2782 (Oct. 2, 2006 Singapore Tax Invoice with heading: "[*Manufacture*] Parts for Fixed CO2 System") (emphasis added); AR 2788-89 (Oct. 30, 2006 Guam Tax Invoice stating: "Installation of fixed CO2 systems in the engine machinery spaces, pump room and paint locker;" "Installed all new controls and pipings, tested to the satisfaction of USCG;" and "Installation of Offshore Piping System"). Other CO2 system reflagging work also was accomplished in Guam. *See* Gov't Op. and Resp. at 37-38 (citing AR 2823 (May 11, 2007 e-mail from TAL to MSC stating that the replacement of the pneumatic release valves, a timing delay cylinder, and CO2 cylinder headers were "done in Guam"); AR 2823-31 (inspection reports evidencing that all reflagging work was accomplished in Guam)). Moreover, the Government contends that the photographs do not contradict TAL's position that all the reflagging work took place in Guam.[23] *See* Gov't Op. and Resp. at 36-37 ("The piping depicted in the photographs may be the original piping which was temporarily removed. . . . the

---

[23] The Government objects to the admission of the photographs, because "[n]o chain of custody has been established for the photographs and no foundation has been presented." Gov't Op. and Resp. at 36. Although the court allowed the photographs to be included in the Administrative Record, since Sealift provided them to the MSC to initiate an investigation of alleged improper reflagging, the court has not relied on these photographs, as they do not meet the requirements of Fed. R. Ev. 901.

administrative record contradicts Sealift's assumption and contains an invoice from the shipyard in Singapore reporting that '[a]ll piping was reinstalled in exact locations as original.'") (citing AR 2782).   In addition, the "main engine work" performed in Singapore did not constitute reflagging, because MSC knew about the work and if the work constituted reflagging, MSC "would have thrown a red flag in to stop the procurement."  6/9/08 TR 79.

In the alternative, the Government argues that, even if reflagging work was done in Singapore, the work at issue did not materially change the requirements of the Solicitation.  *See* Gov't Op. and Resp. at 33-34 ("[E]ven if TAL's vessel had a new name painted in Singapore, that would not constitute reflagging work and would not violate the contract's reflagging restrictions.").  The Solicitation specifically requires reflagging or repair work to: "(1) enable the vessel to meet applicable standards to become a vessel of the United States; or (2) [] convert the vessel to a more useful military configuration."  *See* AR 1493, 1542.  Changing the name of the vessel to *TransPacific* was not a prerequisite to becoming a United States vessel, nor did the change convert the *Bonito* to a more useful military configuration.  *See* Gov't Op. and Resp. at 33.  Although Coast Guard regulations require that "the name of the vessel must be marked on some clearly visible exterior part of the port and starboard bow and the stern of the vessel[,]" whether the vessel's name was marked as *Bonito* or *TransPacific* is not relevant to U.S. flagging requirements.  *See* 46 C.F.R. § 67.123(a) ("[T]he name of the vessel must be marked on some clearly visible exterior part of the port and starboard bow and the stern of the vessel.  The hailing port of the vessel must be marked on some clearly visible exterior part of the stern of the vessel.").

Sealift responds that the Coast Guard requires that "the name of the vessel must be marked on some clearly visible exterior part of the port and starboard bow and the stern of the vessel[,]" or no Certificate of Documentation will be issued.  *See* 46 C.F.R. § 67.120.  Therefore, the painting of "*TransPacific*" on the *Bonito's* hull was a reflagging action.  *See* Pl. Reply at 10-11.  In addition, Sealift insists that TAL had new piping installed in the *Bonito* in Singapore, because it would be "commercially unrealistic" to remove and reinstall the "original" pipes.  *See* Pl. Reply at 13.  Assuming that TAL split the work between Singapore as well as Guam, the eight days of work done in Singapore still constitutes reflagging and repair work within the plain meaning of 10 U.S.C. § 2631(b), DFARS 252.247-7025, and the Solicitation.  *See* Pl. Reply at 13.

The Government replies that the "plain language of [10 U.S.C. § 2631(b)] does not incorporate the removal and reinstallation of piping that TAL had performed in Singapore."  Gov't Reply at 11.  Although the new piping that met Coast Guard standards may have been *purchased* in Singapore, the original piping that did not meet standards was *replaced* in Guam.  *Id.* at 11-12.  Moreover, even if the *Bonito's* name was changed in Singapore, that action was not reflagging work under 10 U.S.C. § 2631(b), because the name did not need to be changed to meet Coast Guard standards.  *Id.* at 12 ("[T]he name was changed at the preference of the owners.").  Therefore, no work to "enable the vessel to meet applicable standards to become a vessel of the United States" was completed in Singapore.  *See* 10 U.S.C. § 2631(b)(2)(A).

26

ii.      **The Court's Resolution**

Count II of the Amended Complaint states that "TAL's vessel [*Bonito*] was and remains ineligible for award . . . under the Cargo Preference Act of 1904, 10 U.S.C. § 2631, by reason of the reflagging[24] and repair work done outside the United States." Amend. Compl. ¶ 43. That Act, however, contains neither a right of action nor remedy. Therefore, even if the Government failed to comply with this Act, the court has no jurisdiction to set aside the contract at issue on that basis alone.

Moreover, the text and legislative history of 10 U.S.C. § 2631(b)(1), indicate that Congress intended to rely on the United States Government to enforce the reflagging requirements, and Sealift's interests are only "marginally related to" and "inconsistent with the purposes implicit in the statute." *Clarke* v. *Securities Indus. Ass'n*, 479 U.S. 388, 399 (1987). Therefore, Sealift cannot show that it is within the "zone of interests" protected by the provisions of 10 U.S.C. § 2631(b)(1). *See* U.S. Coast Guard, NVIC 10-81, *Guide For Coast Guard Certification And Inspection Of Certain Categories Of Existing Vessels*, www.uscg.mil.hq/g-m/NVIC/10_81/n10-81.htm ("NVIC 10-81") ("Existing foreign flag vessels may be brought

---

[24] The text of the 10 U.S.C. § 2631(b)(3) does not define what specific work constitutes "reflagging," and the legislative history is not instructive.

In the Spanish–American War, the U.S. Merchant Marine had been unable adequately to provide for the shipment of military supplies. *See* H.R. Rep. No. 58-1893, at 3 (1904). Consequently, the U.S. Military was forced to purchase a large number of ships in a very short period, at an exorbitantly high price. *Id.* Even when the ships had been purchased, sufficient numbers of American sailors could not be found and the foreign sailors who had previously piloted the vessels were unwilling to risk their lives by participating in a foreign conflict. *Id.* As a result, the US military was unable effectively to confront even a "feeble third-rate power[.]" *Id.* Congress determined that the outcome of future conflicts would "depend upon the sea power of the country for their successful termination." *Id.*

In response to these problems, the Senate proposed a bill to bolster the U.S. Merchant Marine by requiring that only American vessels be used to ship military supplies. *See* S. Rep. No. 58-182, at 1 (1904). This requirement prevented American shippers from being undercut by cheaper foreign competitors. *Id.* at 2-3. The debate on S. Rep. No. 58-182 centered on whether the bill would accomplish that purpose. The Minority Report did not dispute that bolstering the Merchant Marine was a worthy goal but instead argued that the bill was a subsidy to U.S. merchants and sailors. *See* H.R. Rep. No. 58-1893, at 1-2 (1904) (Minority Report); *see also* H.R. Rep. No. 58-1893 (1904) (Part III, Report of Congressman Small). Some Members were concerned that U.S. vessels would cost more than foreign vessels and that U.S. merchants would be able to drive up the price of their services. Therefore, Subsection (b) was added in 1993 as part of the National Defense Authorization Act for Fiscal Year 1994. *See* Pub. L. 103-160 § 315(a). The Congressional Record includes no comment on this provision of the bill.

under a U.S. flag in a manner consistent with the principles and levels of safety in current Coast Guard regulations.").

       The CICA, however, requires that executive agencies procure property or services to "obtain full and open competition through the use of competitive procedures[.]" 41 U.S.C. § 253(a)(1)(A). A post-award modification of a contract that "*materially departs* from the scope of the original procurement violates the CICA by preventing potential bidders from participating or competing for what should be a new procurement." *CESC Plaza Ltd.* v. *United States*, 52 Fed. Cl. 91, 93 (2002) (emphasis added). In this case, Sealift has the burden to demonstrate that any modification that took place was materially different from the March 31, 2006 Solicitation. *See AT&T Commc'n, Inc.* v. *Wiltel, Inc.*, 1 F.3d 1201, 1205 (Fed. Cir. 1993) ("[The] CICA . . . does not prevent modification of a contract by requiring a new bid procedure for every change. Rather only modifications outside the scope of the original competed contract fall under the statutory competition requirement."); *see also Cygnus Corp., Inc.* v. *United States*, 72 Fed. Cl. 380, 387 (2006) ("To prevail on a CICA claim, [Sealift] must show (1) that there was a modification; and (2) that modification materially changed the scope of the original contract."). To determine whether a contract is "materially different," the court must consider "whether the original contract, as modified, calls for 'essentially the same performance.'" *Cardinal Maint. Serv., Inc.* v. *United States*, 63 Fed. Cl. 98, 106 (2004) (quoting *Executive Bus. Media, Inc.* v. *United States Dep't. of Defense*, 3 F.3d 759, 764 (4th Cir. 1993)).

       The Administrative Record includes invoices evidencing that some work that allowed the *Bonito* to be flagged as a United States vessel occurred in Singapore. *See* AR 2782, 2785. Nevertheless, the majority of the reflagging work, and the work specifically understood by the CO to fall under 10 U.S.C. § 2631(b)(3), was performed and completed in Guam. *See* AR 2788-89, 2823. Therefore, the Administrative Record does not evidence that the work completed in Singapore was a material modification of the Solicitation. *See Cardinal Maint. Serv., Inc.*, 63 Fed. Cl. at 106. Instead, the Administrative Record evidences that the *Bonito* already was a U.S. flagged vessel at the time the CO accepted the vessel. Therefore, that acceptance was not arbitrary, capricious, nor a violation of law. *See* AR 3009-10; *see also* NVIC 10-81 ("Existing foreign flag vessels may be brought under a U.S. flag in a manner consistent with the principles and levels of safety in current Coast Guard regulations."); *Galen Med. Assocs.*, 369 F.3d at 1329 ("[A] bid award may be set aside if either (1) the procurement official's decision lacked a rational basis; *or* (2) the *procurement procedure* involved a violation of regulation or procedure.") (internal citations omitted) (emphasis added). For these reasons, the court has determined that the reflagging work performed in Singapore did not violate the Competition in Contracting Act of 1984.

c.       **Failure To Timely Obtain Proper Facilities Clearance.**

i.       **The Parties' Arguments.**

The March 31, 2006 Solicitation required offerors to "comply with all administrative requirements, including the necessary investigative actions required by the Government to obtain a Government facilities clearance." AR 1529. The Solicitation also required that "corporate officers and at least the Master, Chief Mate, and one additional officer (deck or engineering) of the Vessel [] be cleared to receive information up to and including SECRET." *Id.*

The August 30, 2007 Amended Complaint alleges that, because the *Bonito's* crew members did not have the appropriate clearances when the vessel began operation on November 19, 2006, MSC materially changed the March 31, 2006 Solicitation's terms. *See* Amend Compl. ¶¶ 47, 48; *see also* Pl. Mem. at 28-29. The Government responds that the Solicitation "did not establish a specific date by which TAL had to receive its clearances." Gov't Op. and Resp. at 38 (citing AR 1529). The *Bonito's* crew received the appropriate clearances on October 16, 2007, because the Defense Security Service ("DSS"), the agency that processes security clearances, was backlogged with over 3,000 pending applications. *See* Gov't Op. and Resp. at 38-39 (citing AR 2483 (Decision To Halt Security Clearance Processing Prompts Outcry, www.Govexec.com)).

ii.       **The Court's Resolution.**

The court has determined that the CO did not change any material provisions of the March 31, 2006 Solicitation, requiring the awardee to "comply with all administrative requirements," including "the necessary *investigative actions* required by the Government to obtain a Government facilities clearance." AR 1529 (emphasis added). The Administrative Record evidences that TAL obtained the required clearances. *See* AR 3048-49 (Oct. 26, 2007 letters from DSS). Sealift did not argue otherwise. The March 31, 2006 Solicitation also required that certain corporate officers be "cleared to receive information up to and including SECRET." AR 1529. Although TAL did not acquire these clearances until October 26, 2007, TAL acquired an interim security clearance to receive secret information.[25] *See* AR 3048-49.

Assuming, *arguendo*, that TAL did not obtain the required clearances prior to the *Bonito's* deliverance on November 19, 2006, that event alone was not a "material change" from the Solicitation. *See AT&T Commc'n, Inc.,* 1 F.3d at 1205 ("In determining whether a modification falls within CICA's competition requirement, this court examines whether the contract as modified materially departs from the scope of the original procurement."). Allowing TAL additional time to obtain required clearances was not "outside the scope of the original competed

---

[25] Although the record does not evidence when the interim clearance was granted, Sealift did not establish that the CO waived this contract requirement. *See Cygnus Corp.,* 72 Fed. Cl. at 387.

contract," because DSS, the only agency that grants security clearances, delayed the processing of applications. *Id.*

For these reasons, the court has determined that the timeliness of the requested clearances did not violate the Competition in Contracting Act of 1984.

### d.      Transatlantic Lines, Ltd.'s Use Of Alien Crew Members.

### i.      The Parties' Arguments.

The March 31, 2006 Solicitation required that the "Masters, Officers, and entire crew [] be U.S. citizens" and that the winning offeror "must provide an accurate and current crew list no later than 96 hours prior to delivery of the vessel at the designated load or delivery port . . . , time permitting." *See* AR 1494, 1503-04. TAL's proposal advised MSC that TAL intended to use "US Officers and Crew as proposed." AR 1859. As of October 27, 2006, however, the *Bonito's* crew list contained a non-U.S. citizen. *See* AR 3010.

Sealift argues that, although MSC ordered the alien at issue removed from the *Bonito*, the fact that TAL delivered the *Bonito* with an alien crew member evidences that MSC waived a requirement of the March 31, 2006 Solicitation. *See* Pl. Mem. at 29-30. The Government responds that the CO ordered that the alien crew member be removed from the *Bonito*. *See* Gov't Op. and Resp. at 39 (citing AR 2569 (Oct. 3, 2006 e-mail from the CO ordering TAL to "confirm acknowledgment that the crew will be 100% U.S. citizens by vessel delivery"); AR 2676 (Nov. 20, 2006 e-mail from MSC to the CO stating: "Also noted at the onhire that the Filipino cook was stil[l] on boa[r]d. This must be rectified before sailing from Okinawa."); AR 3010 (Oct. 26, 2007 crew list)). Accordingly, the Government argues that MSC was diligent in enforcing the March 31, 2006 Solicitation's requirements. *See* Gov't Op. and Resp. at 39.

### ii.      The Court's Resolution.

The Administrative Record does not evidence that the CO waived the March 31, 2006 Solicitation's requirement that the crew consist of only U.S. citizens. *See* AR 2569; *see also* AR 2676; AR 3010. Instead, the CO acted to enforce the requirements of the March 31, 2006 Solicitation when he learned that TAL was in potential violation. *Id.* Accordingly, the court has determined that the March 31, 2006 Solicitation was not modified in any material manner. *See Cygnus Corp., Inc.*, 72 Fed. Cl. at 387 ("To prevail on a CICA claim, Plaintiff must show (1) that there was a modification; and (2) that modification materially changed the scope of the original contract."). For these reasons, the court has determined that the delivery of the *Bonito* with an alien crew member did not violate the Competition in Contracting Act of 1984.

e.     **Military Sealift Command's Waiver Of The Delivery Date.**

i.     **The Parties' Arguments.**

The March 31, 2006 Solicitation initially required a delivery date of October 10, 2006. *See* AR 1486.  Prior to award, however, the Solicitation was amended to allow an October 31, 2006 delivery date.  *See* AR 1593 (June 20, 2006 Modification).  Nevertheless, MSC did not accept actual delivery of the *Bonito* until November 19, 2006.  *See* AR 2673 (Certificate of Delivery).  The Amended Complaint alleges that the 19-day delay requiring "MSC to extend the *Montauk*, at an additional cost of over $1,461,000," was a material change from the March 31, 2006 Solicitation, because failure to deliver the vessel by October 31, 2006 could have resulted in cancellation of the contract.  *See* Amend. Compl. ¶ 35; *see also* Pl. Mem. at 30 (citing AR 2742-43 (July 31, 2006 Debriefing) ("Will MSC give the awardee an extension to ensure the vessel will be able to meet all the requirements?  It is not in the Government's interest to allow an extension.  However, it is ultimately the Contracting Officer's decision and said decision will be made on a case-by-case basis.")).

The Government responds that a 19-day waiver is not a material change.  *See* Gov't Op. and Resp. at 41-42 (citing *CWT/Alexander Travel Ltd.* v. *United States*, 78 Fed. Cl. 486, 495 (2007) (determining that a two-year delay was not a material change)).  Moreover, Sealift's Small Business Administration protest delayed the contract award by at least 16 days.  *Id.* at 42.  More significantly, however, the contract extension did not affect the contract scope, price, or type of service.  *Id.* at 43.

ii.     **The Court's Resolution.**

The March 31, 2006 Solicitation authorized the CO to make "[c]hanges within the general scope of any of the terms and conditions of [the] contract[.]"  *See* AR 1500; *see also AT&T Commc'n, Inc.,* 1 F.3d at 1205 ("A modification generally falls within the scope of the original procurement if potential bidders would have expected it to fall within the contract's changes clause.").  Therefore, the court has determined that the 19-day delay of the potential five-year contract at issue was not a material change to the March 31, 2006 Solicitation and did not violate the Competition in Contracting Act of 1984.  *See AT&T Commc'n, Inc.,* 1 F.3d at 1205 ("CICA, however, does not prevent modification of a contract by requiring a new bid procedure for every change.").

f.     **Change In Vetting Requirements.**

i.     **The Parties' Arguments.**

The March 31, 2006 Solicitation also initially required that the awardee acquire vetting approvals by September 20, 2006 from four commercial petroleum refiners: SSANGYONG; Exxon-Mobil; Cal-Tex; and SK.  *See* AR 1493.  Prior to award, however, the CO changed the requirements of the March 31, 2006 Solicitation to require that vetting certificates be obtained no later than 10 days prior to vessel delivery.  *See* AR 1593.  On September 20, 2006, TAL advised the CO that the major oil companies no longer issued "vetting certificates," but instead performed a screening of

the vessel on a voyage-by-voyage basis. *See* AR 2542-43. After further evaluation, the CO allowed TAL to demonstrate that the *Bonito* was vetted by the four oil companies, specified in the March 31, 2006 Solicitation, in lieu of providing vetting certificates. *See* AR 2569.

Sealift concedes that official vetting certificates are no longer used. *See* 1/17/08 TR 22. Nevertheless, Sealift argues that "[t]here is no certificate or other evidence that the [*Bonito*] satisfied any vetting process for Cal-Tex or for other refineries[,]" other than a single letter from Cal-Tex that TAL did not meet the vetting standard. *See* Pl. Mem. at 27 (citing AR 2654-55 (Nov. 1, 2006 e-mail string between Cal-Tex and MSC re: "Vetting confirmation requested," stating that Cal-Tex "accept[s] this vessel on the condition that the crew's [*sic*] utmost attention and carefulness since [it is] her first time to our refinery.")).

The Government responds that SSANGYONG, Exxon-Mobil, Cal-Tex, and SK properly accepted the *Bonito*. *See* Gov't Op. and Resp. at 44 (citing AR 2629-30 (Oct. 25, 2006 e-mail from Cal-Tex to MSC stating: "Re [vetting confirmation], we accept MV 'Bonito' as she was built in 2001, which means that she is [] acceptable to us with our vetting criteria.")); *see also* AR 2612-14 (Oct. 23, 2006 letter from TAL to the CO stating: "Exxon Mobil gave the BONITO a very high vetting score"); AR 2646, 2648-53 (SK and Ssangyong Vetting Inspection Report by Captain Tom determining that the *Bonito* rated "Very Good"). In any event, "TAL has been performing on [the] contract, and has been accepted at all four oil refineries over the past 18 months." Gov't Op. and Resp. at 45 (citing AR 2208). In addition, the March 31, 2006 Solicitation allowed the CO to make "[c]hanges within the general scope of any of the terms and conditions of [the] contract[.]" Gov't Op. and Resp. at 45 (quoting AR 1500).

Sealift replies that, since the *Bonito* was not reflagged until October 28, 2006, "no vetting *of the US flag vessel and crew*" could have occurred prior to that date. *See* Pl. Reply at 17-18 (emphasis in original). Therefore, the evidence cited by the Government does not demonstrate that the *Bonito* properly was vetted. *See* Pl. Reply at 17 ("[T]here is no indication that MSC accepted TAL's representation that Captain Tom [vetted] Ssangyong and SK."); *see also id.* ("There is no evidence that Cal-Tex had any inspection or other documentation to support its decision to permit the vessel to load.").

## ii.    The Court's Resolution.

Sealift does not dispute that the March 31, 2006 Solicitation acknowledged that an official vetting certificate was no longer required. *See* 1/17/08 TR 22; *see, e.g.*, AR 2570 (Sept. 20, 2006 e-mail from TAL to the CO stating: "Exxon Mobil does not give Vetting Approvals to any vessel that is not under time charter to Exxon Mobil. Exxon Mobil only performs screening of vessels on a voyage basis."). Therefore, it was appropriate for the CO to change the type of documentation required to demonstrate that the *Bonito* would be accepted by the four oil companies listed in the Solicitation. *See* AR 1493. The only issue is whether the CO's actions "circumvent[ed] the statutory requirement of competition." *See AT&T Commc'n, Inc.,* 1 F.3d at 1205. The Administrative Record evidences that TAL properly documented that the *Bonito* would be able to operate at the four oil refineries. *See* AR 2612-14; *see also* AR 2629-30; AR 2646, 2648-53. In addition, there is no evidence, after 18 months of operation, that the *Bonito* has experienced any problems dealing with any of the aforementioned fuel companies. *See* AR 2208. Therefore, in comparing

the March 31, 2006 Solicitation to the contract as modified, the court has determined that competition was not affected.  *See AT&T Commc'n, Inc.,* 1 F.3d at 1205 ("The analysis thus focuses on the scope of the entire original procurement in comparison to the scope of the contract as modified.").  For these reasons, the court has determined that the change in vetting requirements did not violate the Competition in Contracting Act of 1984.

## IV.   CONCLUSION.

For the aforementioned reasons, the court has determined that Plaintiff has not demonstrated that the contract award was arbitrary, capricious, or otherwise unlawful.  Moreover, even if the court had found a violation, injunctive relief is not appropriate.  *See PGBA, LLC* v. *United States*, 389 F.3d 1219, 1226 (Fed. Cir. 2004) ("We thus hold that, in a bid protest action, [28 U.S.C. §] 1491(b)(4) does not automatically require a court to set aside an arbitrary, capricious, or otherwise unlawful contract award.").  Sealift's February 12, 2008 Motion For Judgment On The Administrative Record is denied.

The Clerk of the United States Court of Federal Claims is directed to enter judgment in accordance with this Memorandum Opinion and Final Order.

**IT IS SO ORDERED.**

<u>s/Susan G. Braden</u>
**SUSAN G. BRADEN**
**Judge**